# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ELLEN LUCILLE VERNON-WILLIAMS, | ) | Case Nos.: 04-37223-DOT |
| GERALD & VICKI DOELLING, | ) | 03-32020-DOT |
| JIMMY & DEBORAH PYLES, | ) | 03-32251-DOT |
| GERALDINE BESSIE MARKINS, | ) | 03-34259-DOT |
| MICHAEL LEE LIPSCOMB, JR., | ) | 03-35603-DOT |
| THOMAS D. CHILDREY, IV., | ) | 03-37186-DOT |
| A'BRAHAM & KHALIYAH BARAKHYAHU, | ) | 03-37623-DOT |
| CARROL & MELINDA WOOD, | ) | 03-37772-DOT |
| ZOE LAQUANDA JARRELL, | ) | 03-37773-DOT |
| MARY LOU ANN RANICKI, | ) | 03-38152-DOT |
| CELESTINE BERRYMAN, | ) | 03-39422-DOT |
| | ) | |
| *Debtors.* | ) | |
| | ) | Chapter 13 |

## MEMORANDUM OPINION

This matter came on for hearing on March 7, 2006, upon the Omnibus Objection of the United States Trustee to certain Supplemental Fee Applications of the Boleman Law Firm. At the conclusion of the hearing, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the hearing and the pleadings submitted, the Court makes the following findings of fact and conclusions of law.

## I.
## PARTIES AND PROCEDURAL HISTORY

The Boleman Law Firm, P.C. (the "Boleman Firm") provides bankruptcy services to consumer debtors and is headquartered in Richmond, Virginia. On July 29, 2004, the

Boleman Firm filed a Chapter 13 Bankruptcy Petition for Ellen Lucille Vernon-Williams ("Vernon-Williams").    On April 18, 2005, the Boleman Firm filed a Supplemental Application for Compensation ("supplemental fee application") for the Boleman Firm in the Vernon-Williams case, whereby the firm requested fees and costs above the previously paid fee of $1,500.00 plus costs.    The Internal Revenue Service filed an Objection to the Supplemental Fee Application ("IRS Objection") on April 25, 2005.    A hearing on the supplemental fee application in the Vernon-Williams case was scheduled for May 18, 2005, before Chief Judge Douglas O. Tice, Jr.    The hearing was repeatedly continued by the consent of the parties.    Subsequently a status hearing was held on September 8, 2005, and an evidentiary hearing on the IRS Objection was scheduled for October 6, 2005.

Around September 30, 2005, the United States Trustee initiated objections to supplemental fee applications of the Boleman Firm through the First Omnibus Objection of the United States Trustee to Supplemental Fee Applications of the Boleman Law Firm ("First Omnibus Objection").[1]  This First Omnibus Objection was filed in the Vernon-Williams case and approximately one hundred and thirty-two other cases.[2]  On October 5, 2005, the hearing

---

[1] The United States Trustee does not challenge nor seek disgorgement of any of the fees already received by the Boleman Firm in any of the cases subject to the First Omnibus Objection or Second Omnibus Objection.  Therefore, this ruling addresses only whether the Boleman Firm should receive supplemental fees and costs in addition to the monies already paid to the Boleman Firm in each of these cases.

[2] Between March 2005 and June 2005, the Boleman Firm submitted supplemental fee applications in approximately one hundred thirty-three cases, which are the subject of the First Omnibus Objection.  The First Omnibus Objection is dated September 30, 2005; however, it was not filed in the Electronic Case Filing System ("ECF") until October 7, 2005.  On December 16, 2005, the case of Vernon-Williams was designated as the lead case for all pleadings relating to

scheduled before Chief Judge Tice was cancelled by the Court, and the Court reassigned the

matter to Judge Stephen C. St. John.  An Order reassigning the issue of the supplemental fee

applications  and objections to Judge St. John was entered on October 11, 2005.  On October

27, 2005, the Boleman Firm filed their Opposition to the First Omnibus Objection.

Furthermore, on November 3, 2005, the Boleman Firm filed a Motion to Overrule the First

Omnibus Objection.  On November 16, 2005, Judge St. John conducted an initial pre-trial

conference on the supplemental fee applications, objections, and motions, whereby Judge St.

John set deadlines regarding related motions and responses, and continued the hearing until

December 16, 2005.

At the December 16, 2005, hearing, the Court denied the Boleman Firm's Motion to

Overrule the First Omnibus Objection.[3]  Further, the Court ordered the IRS Objection and

---

the First Omnibus Objection.

Furthermore, for clarity purposes regarding the procedural history, the Omnibus
Objection discussed in this Memorandum Opinion is referred to as the "First Omnibus
Objection" because on December 7, 2005, the United States Trustee filed a Second Omnibus
Objection to an additional fifty-eight supplemental fee applications filed by the Boleman Firm
("Second Omnibus Objection").  The case of Ernest W. Brown and Ida Mae Brown ("Brown")
was designated as the lead case for all pleadings relating to the Second Omnibus Objection.  A
hearing on this Second Omnibus Objection was scheduled for May 16, 2006; however, on April
19, 2006, the parties filed a Joint Motion to Continue Hearing on Second Omnibus Objection
and Extend Applicable Pre-Trial Deadlines.

[3] The Boleman Firm argued that the First Omnibus Objection should be overruled
because the United States Trustee failed to file a timely objection to the supplemental fee
applications and failed to particularize the objection.  Motion to Overrule Omnibus Obj. of the
U.S. Trustee, at 1.  The Boleman Firm relied on Local Bankruptcy Rule 2016-1(c)(5) and argued
the Omnibus Objection was required to be filed within ten business days of the meeting of
creditors.  Further, the Boleman Firm contended that a global resolution was necessary to resolve
these issues and that the First Omnibus Objection before the Court was not the proper forum.

In response to these arguments, the Court recognized that these supplemental fee
applications had been pending for longer than typical; however, the Court held that this was not

the First Omnibus Objection to be set jointly for hearing and designated the Vernon-Williams

case as the lead case for all pleadings related to the First Omnibus Objection.  In addition,

the Court determined that a hearing on the supplemental fee applications of the Boleman

Firm in the case of Vernon-Williams and the first ten cases listed in Exhibit A to the First

Omnibus Objection would be held on March 7, 2006.

On January 4, 2006, the Court denied the Boleman Firm's Motion for Immediate

Allowance of Supplemental Fees and granted the Motion for an Order Directing the Chapter

13 Trustee to Hold Monies and Not Close Cases.  On February 15, 2006, the Court entered

a Consent Order Resolving the IRS Objection in the Vernon-Williams case (between the

Boleman Firm and the Internal Revenue Service).  On February 27, 2006, the United States

Trustee and the Boleman Firm each filed their respective lists of exhibits and witnesses.  The

Boleman Firm objected to Exhibit 168 and Exhibit 169 of the United States Trustee on

---

a typical case.  Further, the Court ruled that under Section 330 of the Bankruptcy Code, the
Court has an independent duty to review all supplemental applications.  The Court also ruled that
the local rule was intended to facilitate the award of fees, but as with all local rules, the
provisions of the Bankruptcy Code had to take precedence.  In this regard, the Court ruled that
under Section 307 of the Bankruptcy Code, the United States Trustee's participation was not
time-barred because this provision gives the United States Trustee "sweeping authorization" to
provide guidance to the Court.  The Court cited to *In re A-1 Trash Pick-Up, Inc.*, 57 B.R. 380
(E.D. Va. 1986), and concluded that it was the intention of Congress for the United States
Trustee to supervise bankruptcy cases, including participation in the review by the Court of
applications for awards of compensation to professionals.  Further, the Court relied upon the fact
that, even if the 10-day rule did apply, the transcript of the status conference held before Chief
Judge Tice on September 8, 2005, suggests that there might be a waiver issue regarding the 10-
day rule.  Therefore, for all of the aforementioned reasons, the Court overruled the motion that
the Omnibus Objection was time-barred.

Furthermore, the Court ordered that the First Omnibus Objection was particularized with
enough specificity to put the Boleman Firm on notice and to allow the case to proceed to the
discovery stage.  Therefore, the Court denied the motion that the First Omnibus Objection should
be overruled for lack of specificity.

4

February 28, 2006.[4]   On March 5, 2006, the Boleman Firm filed Plaintiff's Pre-Trial

Memorandum, and on March 6, 2006, the United States Trustee also filed a Pre-Trial

Memorandum.   The hearing regarding the First Omnibus Objection to supplemental fee

applications filed in the Vernon-Williams case and the first ten cases set forth in Exhibit A

to the First Omnibus Objection commenced on March 7, 2006, and continued through March

8, 2006, whereby the Court allowed the parties ten days to file post-trial briefs and took the

matter under advisement.

II.

FINDINGS OF FACT

The Boleman Firm was formed by G. Russell Boleman ("Boleman") in 1991.

Currently, the Boleman Firm consists of approximately thirteen lawyers and nineteen para-

professionals and has its principal office in Richmond, Virginia.   The firm also maintains an

office in Virginia Beach, Virginia.   Boleman owns ninety percent of the shares of the

Boleman Firm, and Laura Alridge and Mark Leffler each own five percent.   Boleman

testified that the Boleman Firm limits its practice to debtor representation and approximately

forty percent of the Chapter 13 filings in Richmond are filed by his firm.   He also testified

that in 2005, the Boleman Firm filed approximately 1,750 Chapter 13 bankruptcy cases.

Furthermore, he testified that the Boleman Firm filed approximately 450 supplemental fee

---

[4] All other exhibits of the Boleman Firm (Plaintiff's Exhibits 1 through 158) and the
United States Trustee (United States Trustee's Exhibits 101 through 167) were admitted at the
hearing since they were not objected to prior to the hearing pursuant to the Pre-Trial Order dated
December 20, 2005.  At the hearing, the United States Trustee stated it was withdrawing Exhibit
168; therefore Exhibit 168 was not admitted into evidence.  However, Exhibit 169 was admitted
over the Boleman Firm's objection as the Court deemed it was properly authenticated.

applications in 2005.

It is uncontested that the Boleman Firm enjoys an excellent reputation in the community.  The Boleman Firm is involved in pro bono work, continuing legal education, and other community events and organizations.  Boleman testified that he is an "AV" rated consumer bankruptcy attorney and has also been rated by Virginia Business magazine as one of Virginia's best bankruptcy lawyers.  Furthermore, Boleman stated that he, and other lawyers in the firm, speak, write, and publish regularly.  Additionally, Boleman testified that the Boleman Firm achieves a seventy percent success rate in their cases, where success is defined as the debtors completing their Chapter 13 Plans and receiving a discharge from bankruptcy.  Bruce White, a Richmond, Virginia, attorney; Robert Hyman, a Chapter 13 Trustee for the Richmond Division of this Court; and Bruce Matson, a Chapter 7 Trustee for the Richmond Division of this Court and a shareholder in the Richmond office of the law firm LeClair Ryan, P.C., all testified to their belief that the quality of the work performed by the Boleman Firm is extremely good, and that the hourly rates the firm charged in these cases were very reasonable.[5]

A. Boleman Firm's Procedures for Handling a Chapter 13 Bankruptcy Case

The Court heard extensive testimony regarding the Boleman Firm's detailed process

---

[5] During the hearing, the United States Trustee stated that reasonableness of the Boleman Firm's hourly rates in these cases is not being contested.  Further, the Court does not dispute the reasonableness of an hourly attorney rate of $165.00 or the reasonableness of an hourly administrator rate of $65.00.  Tr. at 95; *see infra* pg. 75, fn.52.  Therefore, the issue before the Court is not the reasonableness of the hourly rates; rather, it is whether the calculation or time-keeping method is appropriate and reasonable.

for handling Chapter 13 bankruptcy cases. The Boleman Firm alleges that it has created a systematic and streamlined process for handling Chapter 13 bankruptcy cases. Clients are not assigned to a specific attorney; rather, the Boleman Firm assigns its lawyers and non-lawyers ("administrators") to address distinct steps in the bankruptcy process. Pl. Pre-Trial Mem., at 4. The firm segments the division of labor into two distinct groups: the Pre-341 Group and the Post-341 Group. Each group is further separated by task; therefore, the division of labor at the Boleman Firm is divided by tasks rather than clients. The Pre-341 Group handles the following tasks: (1) inquiry calls; (2) intake appointments; (3) petition preparation; (4) sign appointment; (5) electronic case filing ("ECF"); and (6) Section 341 Meeting of Creditors.[6] The Post-341 Group handles all matters that arise for a client after the Section 341 Meeting. The Boleman Firm has a voluminous policy and procedures manual which documents the various tasks to be completed by the Pre-341 and Post-341 Groups and explains the process ("Boleman Manual"). Pl. Exh. 1.

Mark Leffler ("Leffler"), an attorney with the Boleman Firm since 2000, testified that he believes the Boleman Manual and segmentation of the tasks ensures efficiency. Furthermore, Leffler testified that each task has specific quality control sheets, check-lists and procedures associated with it to ensure quality control. *See, e.g.*, Pl. Exh. 17; Pl. Exh. 18. He also testified that the Boleman Firm uses specific software known as "Abacus," and

---

[6] From the testimony given in this case, it is this Court's understanding that frequently a different attorney handles each distinct task. For example, the attorney who handles the petition preparation for a given client is generally not the same attorney who handles the Section 341 Meeting of the Creditors for that client, as one attorney will handle all of the Section 341 Meetings for all clients of the Boleman Firm on a given day.

the employees are required to record their actions regarding specific tasks undertaken for the client in the client's Abacus file.  Additionally, he testified that the members of the firm check each others' work, the quality control sheets, and Abacus to ensure all the required steps are completed.  Tr. at 27.  Leffler testified that this method of record keeping allows any member of the firm to provide services to the client; thus, clients do not have to be specifically assigned to an individual attorney.  Further, Leffler testified that these detailed procedures and steps ensure that the employees of the Boleman Firm follow the same steps in every case.

However, Leffler's testimony also revealed that not all tasks submitted on the supplemental fee applications are recorded in Abacus.  The United States Trustee questioned Leffler about this by asking, "[I]f you were to compare only Abacus entries with the template for the initials, there are a whole bunch of billed for services that show up on the template that are not specifically set out in Abacus?"  *Id.* at 100.  Leffler responded, "Abacus has fewer entries than the spreadsheet.  That is correct."  *Id.*

B. Fees & Costs Received Prior to the Filing for Supplemental Compensation

In all of the contested cases, the Boleman Firm has already received at least $1,780.00 per case.  This $1,780.00 represents $1,500.00 for the "no-look" fee and $280.00 for costs as part of the "no-look" fee,[7] whereby the fees and costs are defined as "no-look" because

---

[7] Local Bankruptcy Rule 2016-1(C)(5) provides:

> (5)   ***Fees Requested Not in Excess of $1,500 [For All Cases and Proceedings Filed on or After 1/1/03]:*** Where the Rule 2016-1 disclosure of compensation does not exceed $1,500, the Court may award compensation in such amount or less, plus reimbursement of actual and necessary

they are generally approved without the necessity of the attorney filing a formal fee application.[8]

Along with the $1,780.00 "no-look" portion, the Boleman Firm also charged the clients for certain pre-petition costs and filing fees. These amounts vary between the eleven cases. For example, as part of the "Fees and Costs Agreement" (the "Client Agreement") in the Vernon-Williams case, the client agreed to pay $156.00 for costs and $194.00 for the

> expenses, with or without a hearing, upon the following:
>
> (a) ***Notice:*** The debtor's attorney shall serve a copy of the Rule 2016-1 disclosure of compensation and Chapter 13 Plan and Related Motions on the debtor and the standing trustee, along with notice that they have ten (10) business days from the meeting of creditors in which to file an objection to the fees requested in the Rule 2016-1 disclosure of compensation opposing said fees in their entirety, or in a specific amount. Counsel for the debtor may file a request for hearing with the Court and notice of same shall be served upon the debtor(s), the standing trustee, and the United States Trustee. At any such hearing, each of the parties shall have the burden of proof established in 11 U.S.C. §§328, 329 and 330. In the absence of notification of objection by the debtor or the standing trustee, the fees will be allowed as disclosed.

Local Bankruptcy Rule 2016-1(C)(5)(2005).

Accordingly, unless an objection is filed, the Court routinely grants compensation for $1,500.00 or less. Further, the Local Bankruptcy Rule 2016-1(C)(6) provides: "Any fee in excess of the maximum [the $1,500.00] established in the rule will require an application for allowance of compensation and reimbursement of expenses by separate and distinct pleading." *Id.* Rule 2016-1(C)(6).

---

[8] It is unclear to this Court how the $280.00 for costs was calculated. The $1,500.00 for fees as part of the "no-look" amount is set forth in Local Bankruptcy Rule 2016-1. However, the local rule does not give an amount for costs; rather, it provides for "plus reimbursement of actual and necessary expenses." Therefore, the Court does not dispute that $280.00 was the amount the Boleman Firm received; however, the Court is unsure how the $280.00 was determined to be the actual and necessary expense in each case. For a discussion of this subject matter, *see infra* pg. 62, fn.41 and pgs. 64-71.

United States Bankruptcy Court filing fee. Pl. Exh. 46. In the Barakhyahu case, however, the debtors agreed to pay $140.00 for costs and $185.00 for the filing fee.[9] Pl. Exh. 90. Therefore, while the amount of money received from the client varies, excluding the filing fee, the Boleman Firm has already received between $1,780.00 and approximately $1,900.00 per case.

It is undisputed that these monies were received prior to the filing for supplemental compensation; however, the United States Trustee does dispute the handling of the money the Boleman Firm received from the client for the initial costs. The Boleman Firm discloses these initial costs received from the client on the Statement of Financial Affairs. *See, e.g.*, Pl. Exh. 39, Question 9, at 3. The Boleman Firm lists the filing fee on the firm's Disclosure of Compensation of Attorney for Debtor(s) (the "Rule 2016 Disclosure Statement").[10] *See, e.g.*, Pl. Exh. 40. However, the Boleman Firm did not list the initial costs paid by the debtor, for example the $156.00 in the Vernon-Williams matter, on the firm's Rule 2016 Disclosure Statements, which the United States Trustee alleges is problematic. *Id.*

Discussing the $156.00 costs payment in the Vernon-Williams case, Leffler testified

---

[9] The discrepancy in the filing fee amounts is explained by the fact that, at the time the Barakhyahu case was filed (August 5, 2003), the Chapter 13 filing fee was $185.00. However, the filing fee in effect at the time the Vernon-Williams case was filed on July 29, 2004, was $194.00. While this change in filing fees explains the difference between the $185.00 and the $194.00, it does not explain the difference in monies requested from the client pre-petition for initial costs.

[10] Attorneys are required to disclose all compensation received on the Disclosure Statement pursuant to Federal Rule of Bankruptcy Procedure 2016; thus, the form will be referred to as "Rule 2016 Disclosure Statement."

that the Boleman Firm did not list the $156.00 on the Rule 2016 Disclosure Statement because the pre-petition money paid by the debtors was intended to be for costs. Tr. at 91-92; Pl. Exh. 40. Further, he testified that he believed the Rule 2016 Disclosure Statement only requires fees to be disclosed. *Id*. He also testified that when he moved to the Tidewater area office of the Boleman Firm, he was under the belief that a full disclosure of fees and costs had to be made on the Rule 2016 Disclosure Statement for the cases filed in the Norfolk Division even though the Boleman Firm did not disclose it in its Richmond Division cases; however, he alleges that a Chapter 13 Trustee for the Norfolk Division objected and said that costs need not be disclosed on the Rule 2016 Disclosure Statement. *Id.* at 92-93. Laura Alridge ("Alridge"), an attorney with the Boleman Firm since 1998, also testified that the initial money paid to the firm by the debtors was intended to cover costs. Further, discussing the $156.00 in the Vernon-Williams case, she testified it was applied only to costs, and thus she did not think it needed to be disclosed on the Rule 2016 Disclosure Statement. *Id.* at 154-55. However, while the testimony of Leffler and Alridge stated these initial monies paid by their clients were for the costs, these initial monies are accounted for on the supplemental fee applications as "Total Amount of Attorney Fees and Costs received prior to bankruptcy filing." *See, e.g.*, Pl. Exh. 38, line 139.

## C. Time Records

It is uncontested that the Boleman Firm used non-traditional billing methods and relied on "minimums" to determine the time spent on the tasks depicted in the supplemental fee applications. Pl. Pre-Trial Mem., at 19; Tr. at 88, 140-43, and 196-202. However,

Boleman testified that when he first began submitting supplemental fee applications in the early 1990's, he kept actual records of time, and continued this practice until approximately 1996. Tr. at 190. Boleman's testimony regarding why he stopped utilizing actual time records is not entirely clear; however, he did suggest that he stopped keeping actual time records because of his discussions with the Local Rules Committee, members of the Richmond Bar, the United States Trustee, the Chapter 13 Trustee, and the Bankruptcy Court. Tr. at 191-200. On cross-examination of Boleman, the United States Trustee questioned Boleman about the fact that he no longer keeps actual time records and asked if Boleman was familiar with some of Chief Judge Tice's opinions, wherein the United States Trustee alleges Chief Judge Tice "repeated over and over again the need to keep time records from the beginning of the case." *Id.* at 209. Boleman testified that he was familiar with a supplemental fee case decided by Chief Judge Tice entitled *In re Harris*. However, Boleman disagreed with the United States Trustee's reading of Chief Judge Tice's discussion in *In re Moss*, whereby the United States Trustee alleges that *In re Moss* references *In re Harris* and the requirement that lawyers must keep time records from the commencement of the case to be awarded supplemental fees. *Id.* at 209-10. Furthermore, Boleman admitted to being familiar with other cases decided by Chief Judge Tice in the early 2000's; however, he disagreed with the United States Trustee regarding the interpretation of the cases. *Id.* at 210-14. Boleman also testified that he was familiar with the requirements for supplemental fee applications promulgated by Chief Judge Tice and that Chief Judge Tice specifically solicited the Boleman Firm's input on those guidelines; however, he disagreed with the United States

Trustee's statement that the guidelines provide that lawyers must keep complete time records.[11]    *Id.* at 210-12.  When questioned, Boleman stated, "I think that what the, the requirement is, is that you be able to demonstrate that you have done the work; that the time amount required is reasonable, and that the lone [*sic*] star factors in a complete evaluation, demonstrate that the fee is reasonable."  *Id.* at 211.

Regardless of this difference of opinion regarding Chief Judge Tice's rulings and how it did or did not impact the Boleman Firm's decision to record actual time, it is undisputed that the Boleman Firm did not record its actual time spent in regard to the contested supplemental fee applications.  The Boleman Firm alleges that while it did not record the actual time it took to complete a task, the firm kept contemporaneous records regarding each task completed in an individual case.  Leffler testified that the Boleman Firm recorded what was done in each case by requiring the employees to utilize check-sheets and keep notes in Abacus regarding what was done and by whom; however, the employees did not record the time each task took as part of these notes.[12]  Further, Leffler testified that while the Abacus

_____

[11] The specific question asked by the United States Trustee was, "Would you agree, sir, that those requirements include, among other things, complete time records from commencement of attorney services in representing a debtor in a bankruptcy case?"  Tr. at 211.

Furthermore, when instructed by the Court to read the direct quote from the requirements promulgated by Chief Judge Tice, the United States Trustee quoted Paragraph D, which is the following quote into the record: "Attachments to the application must include the following: 1: Complete time records from commencement of attorney's services in representing a debtor in a bankruptcy case."  *Id.* at 212.  In response, Boleman asked, "What do you want me to say to that?"  The United States Trustee responded, "Are you familiar with the requirements for Supplemental Fee Applications - - ", whereby Boleman responded, "Absolutely."  *Id.*

[12] *See* Plaintiff's Exhibit 44, for an example of Abacus note entries in the Vernon-Williams case.  Pl. Exh. 44; Tr. at 105.

program does allow for the ability to enter time records as the program allows the firm to "manually enter anything [the firm] wanted," the Boleman Firm chose not to enter any information in the notes field about the time it took to complete a task.[13] *Id.* at 115. Boleman also testified that there is time entry field in Abacus that the Boleman Firm could have used to record time entries; however, the firm did not utilize it. *Id.* at 207-08.

### D. Supplemental Fee Applications

Alridge is the primary attorney at the Boleman Firm responsible for preparing supplemental fee applications. Out of the eleven contested fee applications discussed at the hearing, Alridge prepared all but one of the applications. Furthermore, while she did not prepare the supplemental fee application in the Vernon-Williams case, she had a supervisory role and reviewed the application before it was filed. She also testified that the Boleman Firm files supplemental fee applications in less than ten percent of its cases.

Alridge testified regarding the criteria used in deciding whether to file a supplemental fee application: "First, a determination has to be made as to whether or not post-341 work has been done, and if the amount of work that's been done rises to the level that would warrant a supplemental fee application being filed." Tr. at 135. Further, she testified that she reviews the entire physical file, the notes regarding the case, Abacus, the Chapter 13

---

[13] However, Leffler testified the Boleman Firm has been keeping track of the amount of time it takes to complete tasks in cases that commenced after the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 went into effect on October 17, 2005, as the firm needs to establish an understanding of the amount of time the firm is spending on new cases. Nevertheless, this change in policy does not impact the contested supplemental fee applications, as it is undisputed that said applications were created using "minimums."

Trustee's website, and the Court's docket, when deciding whether to file a supplemental fee application. *Id.* at 136. She reviews these sources of information "because that is where information is contained in documents that work was done on the case." *Id.* Furthermore, Alridge testified that she relies on Abacus and the case file to determine that the work was actually performed and admitted that she thus relies on the lawyers and administrators to have correctly filled out the check-sheets and notes.[14] She also testified that she reviews the Chapter 13 Trustee's website:

> to determine how the cases pan out, meaning what kind of dividend to unsecured creditors is being paid at the moment. Compare that with what the plan was confirmed at, the percentage rate. And we review the claims to see if there are, you know, if any unsecured claim has been paid in any amount. We're determining whether or not there's, 1, money in the case. And 2, is there, is there going to be any disruption in the case? Is the case going to become underfunded or otherwise not work properly?

*Id.* at 137.

In addition, Leffler also testified regarding how the Boleman Firm decides whether to file supplemental fee applications. He testified that the firm relies on the fee application control sheet (the "Control Sheet"), which is used to determine whether to file a supplemental fee application. *See, e.g.*, Pl. Exh. 37.[15] Further, he testified that "this [Control Sheet] is used

---

[14] The United States Trustee asked Alridge, "[Y]ou rely on the fact that the people filled out the check sheet, the check lists - - ?" She answered, "Yes." The United States Trustee then asked, "[O]n the basis of what you're putting into the application?" Alridge again answered, "Yes." Tr. at 152.

[15] Plaintiff's Exhibit 37 is blank and is not associated with any one case; rather, it is only a demonstrative exhibit. Leffler testified that the Control Sheet is used in all cases that have supplemental events; however, he also testified he does not know why the Control Sheets for the contested cases were not turned over in response to the U.S. Trustee's Discovery request. Tr. at

in deciding whether or not to file a fee application.  And it's used to determine how much, to what extent the plan may be overfunded, um, and allow, which would allow, um, for a request for, um, for fees, supplemental fees."  Tr. at 107.  Both Leffler and Alridge testified that they do not ask clients to extend their plans to pay additional attorney fees, and Leffler agreed that one of the problems with trying to extend plans to pay additional fees is that the clients would have to agree to the extension.

The format used in all of the supplemental fee applications at issue in the eleven contested cases is identical.  Alridge testified that the reason the format is identical is because she uses a computer form to create the supplemental fee applications.  Furthermore, Alridge testified that she relies on a template to help her prepare the supplemental fee applications, and the template contains a set amount of time for a given task (the "minimum").  *Id.* at 137.  It is uncontested that this set amount of time in the template is based on the Boleman Firm's calculation of the minimum time it takes to perform various tasks; however, the supplemental fee applications do not state that the calculations are based on minimum amounts of time rather than actual recorded time entries.  *Id.* at 218.

### E. How the Boleman Firm Determines Minimum Times and Costs to Include in Supplemental Fee Applications

As previously stated, it is uncontested that the Boleman Firm relied on "minimums" rather than actual time entries when the firm created and submitted the contested supplemental fee applications.  Boleman testified that he starting filing supplemental fee

---

108.

applications in the early 1990's and that he kept actual time records until approximately

1996. Further, Boleman testified that these actual time records played a role in determining

the amount the Boleman Firm calculated as the minimum time required to complete a given

task. Boleman also testified that Carl Bates ("Bates"),[16] a former attorney at the Boleman

Firm, was instrumental in determining how to calculate said "minimums," as Bates worked

as a stockbroker before becoming a lawyer and has extensive training in statistical

methodologies. Boleman also testified that, "Carl, was, was able to bring more accuracy to,

to what the minimum amount of time it actually took to do things." Tr. at 201. In addition,

Boleman testified that the creation and determination of "minimums" has been an evolving

process over the years.

Leffler testified that in 2001, he, Boleman, and Alridge engaged in discussions

regarding what the minimum time amounts should be. He further testified that they used and

updated a previous template and assigned minimum time amounts to each task the Boleman

Firm engages in during the representation of a Chapter 13 debtor.[17] Alridge also testified that

in 2001, she, Boleman, and Leffler, engaged in a major review of the minimum time allotted

for the tasks and updated the template. Discussing this template, she stated that they went

through it "line by line, making necessary adjustments." *Id.* at 141. Given this constant

---

[16] Bates currently serves as a Chapter 13 Trustee in the Richmond Division of the Eastern
District of Virginia.

[17] At different times throughout the testimony of Leffler, Alridge, and Boleman, the
"template" was also referred to as a "spreadsheet." For the sake of consistency, the Court will
use the term "template" throughout its discussions to refer to this document.

17

review, the Boleman Firm alleges that this template contains the "bare minimum" amount of time it takes to complete a given task. Alridge then uses this template when she is creating and compiling supplemental fee applications. *Id.* at 137, 150-51.

Alridge testified that they review the template a couple of times a year and make adjustments to it. Further, the testimony by Alridge and Boleman alleges that the template has evolved over time as the Boleman Firm updates it whenever it is necessary to adjust the minimum time because of a change in the firm or procedures for handling cases. The United States Trustee questioned Alridge on whether the total number of hours for the initial services is ever reduced downward, and Alridge responded that she would have to review old fee applications to answer that question. She further testified that she does not keep old templates after the template has been updated as she "wouldn't want to make the mistake of using an old template." *Id.* at 151. Boleman and Leffler also testified that they do not keep records or notes regarding changes to the time-keeping methods and "minimums." *Id.* at 117 and 214.

Alridge testified that the current "minimums" the Boleman Firm relies on, and the ones she uses in creating supplemental fee applications, were determined based on the fact that "[i]t's the minimum amount of time it takes in order to complete a particular task. You can't do it properly in less than that time." *Id.* at 139. She further testified that if the task was done in less than the minimum amount of time it would be "picked up along the line." *Id.* at 139-40. Alridge also testified that these "minimums" were calculated based on her own experience, as well as the experience of Boleman, Leffler, and others in the firm. Further,

18

she testified that they discuss said "minimums" at length.  Leffler also testified that he thinks the minimums relied upon are accurate based on the fact that he has "had years of experience doing the same tasks that are identified here."  *Id.* at 86-87.  Further, he testified that if a given task took an extraordinary amount of time, the lawyers are given discretion to keep note of this time.  He defined extraordinary as, "It's one of those things that we know from having done it so many times . . . ."  *Id.* at 87.  Further, in regard to how the Boleman Firm decided to assign a specific time allotment for a given event, Leffler testified, "We do the same thing in every case that we handle.  We follow the same procedures.  We go to the same forms and cover the same material . . . . The time amounts that are ascribed to each case are, from our experience . . . the minimum amount of time it takes to complete each of these tasks."  *Id.* at  90.

The United States Trustee alleged that there is no way to determine the actual minimum amount of time required for each task and questioned various witnesses regarding the determination of said minimums.  Further, the United States Trustee questioned Alridge regarding certain time entries on the supplemental fee applications in order to determine if the "minimums" were always true and accurate.  For example, the United States Trustee asked Alridge to explain why lines 152, 158, 166, and 172 of the Vernon-Williams supplemental application are all identical entries of 0.2 hours for telephone conferences with the client on July 29, 2004.[18]  Pl. Exh. 38.  Alridge responded that every time one of the tasks

---

[18] Counsel for the Boleman Firm pointed out in the Post-Trial Memorandum that actually only three of the calls of the four disputed calls were to the client.  Pl. Post-Trial Mem., at 7.

in the aforementioned line is completed, the Boleman Firm calls the client and that these four calls probably took even more than 0.8 hours, or 48 minutes, of calling time in total. She further responded to the United States Trustee's question regarding whether the Boleman Firm could wait until the end of the day to call the client once regarding all four items, by stating that it could not work that way unless "we lived on some perfect planet." Tr. at 163.

The United States Trustee also presented testimony from two ex-employees of the Boleman Firm, Brian Guillena ("Guillena") and Butch Cabreros ("Cabreros"), who alleged that some of the services and tasks could be done for less than said minimums in the contested supplemental fee applications. For example, Guillena testified, when discussing the 9.6 hours for "total billable para-professional time," that it could be done for less time. *See, e.g.*, Pl. Exh. 38, line 111. He also testified that time can vary case by case. Similarly, Cabreros testified, while discussing Plaintiff's Exhibit 38, that he could conduct an initial client consultation in about one hour. *See, e.g.*, Pl. Exh. 38. Guillena and Cabreros testified that they were asked to resign from the Boleman Firm; further, they both testified that they were handed a letter of resignation and asked to sign it.

Boleman and Leffler provided rebuttal testimony regarding Guillena and Cabreros. Boleman alleged that Guillena, who worked primarily in Internet Technology for the Boleman Firm, caused problems by trying to assert himself in a managerial role. Further, Boleman testified that he hired an independent consultant to review the Internet Technology, who found certain items were out-of-date regarding the technology and that the firm had illegal information service programs on their computers. However, when Boleman testified

20

earlier during direct examination, he stated that there was a major systems overhaul in 2004, and "Brian [Guillena] did a fine job with the IT. He was actually a very qualified engineer." Tr. at 202. Leffler alleged that Cabreros was a bright but inexperienced lawyer who did not always spend enough time on his assigned tasks, leading to the occurrence of errors. Further, Leffler testified that if Cabreros had spent more time on certain tasks, this might have changed some of the erroneous judgments he made.

Bates, who was employed at the Boleman Firm until 2004, when he departed to become a Chapter 13 Trustee for the Richmond Division, was also called as a rebuttal witness. While Bates testified that Guillena's time estimates regarding the intake tasks were not an accurate representation of how long it should take an administrator to complete such a task, Bates' testimony also revealed that there were times when the initial client consult would take Bates less than the minimum time allocated to that task. For example, Bates testified that he could perform an initial client consultation in approximately one hour, which is less than the minimum assigned to that task by the Boleman Firm on the supplemental fee applications currently before the Court.[19]

In order to determine the costs for a given case, and which costs to include in the supplemental fee applications, Alridge testified that she counted the number of photocopies and the number of faxes to determine the appropriate charges. However, she also admitted

---

[19] The Boleman Firm alleges that this one hour is not less than the minimum assigned, because the "one hour" that Bates and Cabreros testified to regarding "the initial client consultation" does "not include all of the services performed under the umbrella of 'Pre-Filing Services' found on the first two pages of the spreadsheet included with each application." Pl. Post-Trial Mem., at 7. For a discussion of this testimony, *see infra* pgs. 41-42, fn.28.

that she did not count the number of copies of the Bankruptcy petition, schedules, and

Statement of Financial Affairs because she always records that five copies were made.  Pl.

Exh. 138, line 124.  She testified that the Boleman Firm always makes five copies because

one is mailed to the client, one goes in the firm's file, and three are used as draft copies.  The

United States Trustee asked, "What if you print out a copy, and you don't need to make

changes?  . . .  Do you still make the three draft copies in every case?"  Alridge responded

that she "can't imagine that happening, that the petition would be perfect on the first time

out." Tr. at 166.  In addition, she testified that the Boleman Firm charges a flat fee of $7.00

in every case for PACER fees.[20]  Further, she admitted that the firm does not count the pages

downloaded from PACER for each client; rather, the firm "ha[s] agreed not to bill more than

$7.00 per case."  *Id.* at 167.  She also testified that she cannot imagine a case where the

PACER charges could ever be less than $7.00, as the $7.00 fee is the PACER charge for the

entire case.  *Id.* at 167-68.

F. Other Testimony Regarding Supplemental Fee Applications

Along with the testimony of employees from the firm, the Boleman Firm also

attempted to introduce testimony from witnesses regarding the firm's practices, reputation,

and reasonableness of supplemental fees requested.  Robert Hyman ("Hyman"), a Chapter

13 Trustee for the Richmond Division of the Eastern District of Virginia, testified that he

---

[20] The acronym "PACER" stands for "Public Access to Courts Electronic Records," which allows the public to electronically access case and docket information for Bankruptcy Court, District Court, and Federal Appellate Court cases.

believes the Boleman Firm does high quality work.  On a scale of zero to one hundred, Hyman stated that he gives the Boleman Firm a ninety to a ninety-five and does not give anybody a one hundred.  However, when asked whether he reviews the supplemental fee applications submitted in Chapter 13 cases, Hyman admitted that until recently he did not review supplemental fee applications.

The Boleman Firm offered Bruce White ("White"), a local attorney, as an expert witness.  The United States Trustee objected to White as an expert witness, and the Court allowed the United States Trustee to conduct voir dire.  The Court overruled the objection and held that the core of the objection went to the weight the Court should place on White's testimony as an expert.  White testified that he clerked for Judge Shelley of this Court in 1980-81, his practice area is primarily bankruptcy, and that he started filing supplemental fee applications in the early 1990's.  White stated that he believes the fees requested in the eleven cases are for actual and necessary expenses, and he thinks the time entries are reasonable.  White further testified that while he used to submit detailed time entries in his own supplemental fee applications, he now uses minimum amounts when submitting supplemental fee applications to the Court.[21]  White also testified that the Court has awarded him supplemental fees in previous cases.  However, White's testimony on cross-examination was difficult to interpret; while he testified that he relies on "minimums" when creating his

---

[21] Unlike the Boleman Firm which, at the time of the hearing, consisted of thirteen lawyers and nineteen para-professionals, White testified he is a solo practitioner assisted only by his wife, who serves as his paraprofessional.

23

supplemental fee applications, it was unclear whether he also keeps actual time records of some tasks he undertakes. In addition, on cross-examination, White admitted he was testifying as an expert without compensation.

Bruce Matson ("Matson"), a Chapter 7 Trustee in Richmond, Virginia and a shareholder in the firm of LeClair Ryan, P.C., was also called as an expert witness by the Boleman Firm to testify regarding Chapter 13 supplemental fee applications. The United States Trustee objected to the calling of Matson as an expert witness. The Court ruled that while Matson was an extremely qualified bankruptcy attorney, because his practice area expertise was not in Chapter 13 cases, he was not an expert regarding Chapter 13 supplemental fee applications. Accordingly, Matson was not permitted to testify on the record regarding the services and time entries on the supplemental fee applications. The Court did permit Matson to testify regarding his opinion of the Boleman Firm and the quality of the firm's legal practice, whereby Matson testified the quality of the firm's work is exceptional.

## III.
## ARGUMENTS

The United States Trustee alleges the Boleman Firm did not keep contemporaneous time records and that without actual time records, there is no clear method of calculation for the Court to determine whether the supplemental fees requested are accurate. In addition, the United States Trustee argues that the "supplemental applications . . . contain cookie cutter time entries and excessive fees for average cases." First Omnibus Obj., at 4. The United States Trustee contends that "the time entries and descriptions of services for the initial

services [services performed through the Section 341 Meeting of Creditors] are identical in both description and amount of time expended." United States Trustee's Pre-Trial Mem., at 1. Furthermore, the United States Trustee "objects to these applications because the firm is billing for duplicate work performed, billing for overhead costs, and using boiler plate entries to substantiate unreasonable, unnecessary and excessive fees." First Omnibus Obj., at 4.

The United States Trustee also contends that the Boleman Firm created a system whereby they submit supplemental applications using "minimum" time records and that this system leads to Alridge making assumptions about time calculations. Furthermore, the United States Trustee argues that the Boleman Firm did not prove that the time entries relied upon were always the "minimum" amount and points to the testimony of Butch Cabreros and Carl Bates as evidence that the time entries have not been proven to always be the minimum time required.[22] In addition, the United States Trustee alleges that while the Boleman Firm may have an opinion about how long it takes to perform certain services, the firm did not

---

[22] The United States Trustee's Post-Trial Memorandum states:

> As to the assertion that the time entries reflect the "bare minimum" for attorney time expended, this was contradicted by the evidence. By way of example, in each of the fee applications before the Court, 2.6 hours is attributed for attorney time performing an initial bankruptcy consultation. Butch Cabreros and Carl Bates, both former attorneys with the firm, testified that, on average, it took them one hour to perform this service. Obviously, if both of these gentlemen believed that one hour was their average, their *bare minimum* must be something less than one hour.

United States Trustee's Post-Trial Mem., at 10. For a discussion of this testimony, *see infra* pgs. 41-42, fn.28.

prove that the firm can know it always takes said time. The United States Trustee further argues that they are not certain the *Barber* factors are relevant here, as the cases that discuss the *Barber* factors start with time. *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978). Furthermore, the United States Trustee contends that case law instructs that detailed time records are required when requesting and receiving supplemental fees.

Along with the argument that no contemporaneous time records exist, the United States Trustee objects to the Supplemental Fee Applications filed by the Boleman Firm on the grounds that: (1) the plans filed in some of the cases fail to disclose that the debtors paid funds to the Boleman Firm pre-petition; (2) the total receipts to the Boleman Law Firm for initial services exceeded the maximum allowed under the "no-look" fee; (3) the Rule 2016 Disclosure Statement fails to disclose the payment of pre-petition funds by the debtor; (4) many of the fees charged in the supplemental fee applications should be considered as part of the "no-look" fee; and (5) the Boleman Firm improperly charges para-professional rates for clerical services. United States Trustee Pre-Trial Mem., at 2; United States Trustee Post-Trial Mem., at 1-2. Further, the United States Trustee argues that the Boleman Firm has the burden of proof to establish that there is a basis for the supplemental fees requested, and the evidence establishes that the Court should deny the supplemental fees requested by the Boleman Firm.

The Boleman Firm admits that the systems adopted by the firm regarding the contested fee applications are not based on traditional billing practices; however, they argue that the firm keeps contemporaneous records regarding the services they provide. Pl. Pre-

26

Trial Mem., at 19.  Furthermore, the Boleman Firm contends that the firm created a

systematic approach to providing services to consumer debtors whereby the firm uses event

codes, notes, software applications, and other similar methods to document all services

provided to their clients.  In addition, the Boleman Firm argues that the issues presented in

most consumer bankruptcy cases are so similar that this results in almost identical tasks being

performed in the cases.  They also contend that because the services in most cases are routine

and similar, the firm has determined the minimum amount of time it takes to complete each

required task.  Thus, the Boleman Firm alleges that this "minimum" is not an estimate or an

average; rather, the firm has determined it to be "the minimum amount of time actually

required to complete such services, based upon many years of experience in handling

thousands of consumer bankruptcy cases."[23]  *Id.* at 22.  In addition, the Boleman Firm

contends that because the firm relies on an established minimum rather than an estimate, the

case at bar is distinguishable from Chief Judge Tice's previous rulings regarding the use of

estimates.  *Id.* at 21-22; Pl. Post-Trial Mem., at 2-3, fn.4.

Furthermore, the Boleman Firm contends that even if the Court requires that the firm

return to a traditional billing system, the firm should still recover its fees and costs in these

---

[23] The Boleman Firm also alleges that the testimony of Cabreros, Guillena, and Bates
does not demonstrate that less time was spent than what is indicated on the applications.  In
support of this argument, the Boleman Firm highlights the fact that Cabreros and Guillena parted
with the firm "on unfavorable terms due to performance issues."  Pl. Post-Trial Mem., at 7, fn.7.
The Boleman Firm also argues the United States Trustee's contention that Bates and Cabreros
testified that the initial client consultation was one hour, not the 2.6 hours on the supplemental
fee applications, "rests on a misapprehension of the testimony."  *Id.* at 7.  For a discussion of this
testimony, *see infra* pgs. 41-42, fn.28.

contested cases as the fees and costs requested are reasonable.  The Boleman Firm argues

that the evidence establishes that the work completed in each case has exceeded the

$1,500.00 base amount for which the firm has already received compensation and that they

have established that the work the firm has done in these cases deserves additional

compensation.  The Boleman Firm further argues that the total costs and fees requested are

reasonable and that the firm generally "discounts" or "writes-off" a portion of their fees; thus,

the Court should take into account the fees already waived by the firm.  Opposition to the

Omnibus Obj., filed October 27, 2005, at 5.  Citing to the lodestar method and the *Barber*

factors, the Boleman Firm alleges that the fees requested are reasonable.  *See Barber v.*

*Kimbrell's*, *Inc.*, 577 F.2d 216, 226 (4th Cir. 1978).  The Boleman Firm contends the Court

should consider the firm's reputation, success rate in Chapter 13 cases, and overall handling

of these cases in determining whether to award fees.  The Boleman Firm also argues that it

does disclose pre-petition money the firm receives from clients and that said money is

applied to costs.  Further, the Boleman Firm argues that this disclosure issue has already been

resolved through a Consent Order with the United States Attorney.

Additionally, the Boleman Firm contends that the allegations raised in these

proceedings beg for a systematic solution.  The Boleman Firm also argues that the firm has

been operating in this now contested manner for a lengthy period of time without objection

from the United States Trustee and the Court system as a whole.  Further, the Boleman Firm

alleges that the firm relied on the lack of objection(s); therefore, even if the firm is required

to return to a traditional billing system, the firm should still receive its fees and costs in these

28

contested cases.

IV.

CONCLUSIONS OF LAW

Before addressing the issue of whether the Boleman Firm is entitled to supplemental

fees, it is appropriate for this Court to address its duty to review supplemental fee

applications. Courts have overwhelmingly held that bankruptcy courts have a duty to review

supplemental fee applications. *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 841 (3d Cir.

1994) ("the bankruptcy court has a *duty* to review fee applications, notwithstanding the

absence of objections . . . "); *In re Roman*, Case No. 05-31472, 2005 WL 3736305, at *1

(Bankr. E.D. Va. June 27, 2005); *In re Harris*, Case No. 96-36765, 1998 WL 408896, at *1

(Bankr. E.D. Va. Apr. 14, 1998); *In re Great Sweats, Inc.*, 113 B.R. 240, 242 (Bankr. E.D.

Va. 1990). "Morever, since every dollar received by the applicant results in one dollar less

for the creditors, justification for compensation is a necessity." *Cont'l Ill. Nat'l Bank &

Trust Co. v. Wooten* (*In re Evangeline Refining Co.*), 890 F.2d 1312, 1326 (5th Cir. 1989)

(citing *In re Hotel Assocs.*, 15 B.R. 487, 488 (Bankr. E.D. Pa. 1981)); *In re Szymczak*, 246

B.R. 774, 778 (Bankr. D.N.J. 2000) (quoting *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d at 844)

(discussing that the court's obligation to examine fee applications derives from the need to

"protect the estate, lest overreaching attorneys or other professionals drain it of wealth which

by right should inure to the benefit of unsecured creditors"); *see also In re Courtois*, 222

B.R. 491, 494 (Bankr. D. Md. 1998) (quoting *In re Yates*, 217 B.R. 296, 300 (Bankr. N.D.

Okla. 1998)) (finding that "such duty to independently review professional fee applications

in Chapter 13 cases becomes a particularly important supervisory function of the court when

'neither the debtors nor most creditors have an incentive to object to attorney's fees'").

Furthermore, the determination of what is reasonable compensation is within the sound

discretion of the bankruptcy court. *In re Breeden*, 180 B.R. 802, 808 (Bankr. N.D. W. Va.

1995) (citing *In re AOV Indus., Inc.*, 43 B.R. 468 (D.D.C. 1984)) ("The determination as to

what constitutes reasonable compensation for actual, necessary expenses for the purposes of

reimbursement under these various Code sections is within the sound discretion of the

Court."); *In re Bernard Hill*, *Inc.*, 133 B.R. 61, 69 (Bankr. D. Md. 1991).  The burden of

proof is always borne by the applicant in a fee application case.  *In re Maxine's Inc.*, 304

B.R. 245, 249 (Bankr. D. Md. 2003); *In re Computer Learning Ctrs.*, 272 B.R. 897, 908

(Bankr. E.D. Va. 2001) ("The burden of proof with respect to a fee application is on the

applicant.").

A. Applicable Law and Code Provisions for Supplemental Fee Applications

Compensation for attorneys and professional persons employed by the debtor is

governed by Section 330 of the Bankruptcy Code; Rule 2016 of the Federal Rules of

Bankruptcy Procedure; and Local Bankruptcy Rule 2016-1.[24]  In this district, under the local

rules, it is customary for attorneys to charge an initial flat fee for representing a debtor in a

Chapter 13 case. *In re Harris*, Case No. 96-36765, 1998 WL 408896, at *1 (Bankr. E.D. Va.

---

[24]   The citations and quotations in this Memorandum Opinion to Title 11 of the United
States Code are to those sections in effect at the time the supplemental fee applications were
filed, not to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which took
effect October 17, 2005.  Furthermore, the citations and quotations in this Memorandum Opinion
to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules are also to those
sections in effect at the time the supplemental fee applications were filed.

Apr. 14, 1998). Furthermore, under Local Bankruptcy Rule 2016-1 and the general customs in this district, the Court routinely approves a Chapter 13 fee request of $1,500.00, or less, without a hearing. *In re Roman*, Case No. 05-31472, 2005 WL 3736305, at *1 (Bankr. E.D. Va. June 27, 2005). This request for $1,500.00 or less is customarily referred to in this district as the "no-look" fee. A truly routine case that involves services that are normal and customary should not require a supplemental fee application. As Chief Judge Tice provided, when discussing this "no-look" fee:

> Ordinarily this charge should cover interviews with the client, contacting creditors when necessary and verifying other information for the statements and schedules, preparation of petition, schedules and a confirmable plan, attendance at the § 341 meeting of creditors, and, finally, attendance to other routine matters encountered in the case.

*In re Harris*, 1998 WL 408896, at *1.

If an attorney is requesting fees in excess of $1,500.00 in a Chapter 13 case, the attorney is required to submit a detailed supplemental fee application. Local Bankruptcy Rule 2016-1(C)(6) (2005). According to Local Bankruptcy Rule 2016-1(C)(6): "Any fee in excess of the maximum established in the rule will require an application for allowance of compensation and reimbursement of expenses by separate and distinct pleading. Any such application shall comply with 11 U.S.C. § 330, FRBP 2016 and any other provisions of this Local Bankruptcy Rule." *Id.* Section 330 provides:

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103--

31

(A)     reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B)     reimbursement for actual, necessary expenses.

11 U.S.C. § 330 (2005).  Further, Section 330 provides that "the court may, on its own motion or on the motion of the United States Trustee . . . award  compensation that is less than the amount of compensation that is requested."  *Id.* § 330(a)(2).  Section 330 also provides that "[i]n determining the amount of reasonable compensation to be awarded . . . the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors . . . ." *Id.* § 330(a)(3). These factors include:

(A)     time spent on such services;
(B)     the rates charged for such services;
(C)     whether the services were necessary to the administration of . . .  a case under this title;
(D)     whether the services were performed within a reasonable amount of time . . . ; and
(E)     whether the compensation is reasonable based on the customary compensation charged . . .

*Id.* at § 330(a)(3)(A)-(E).[25]

Federal Rule of Bankruptcy Procedure 2016 discusses compensation for services rendered and reimbursement of expenses and provides that "[a]n entity seeking interim or

---

[25] In its argument to the Court, the Boleman Firm suggested that the literal language of 11 U.S.C. § 330 does not mention the necessity of maintenance of contemporaneous time records in the award of "reasonable compensation for actual, necessary services rendered by the . . . professional person."  However, 11 U.S.C. § 330(a)(3) specifically admonishes the Court to "consider the nature, the extent, and the value of such services, taking into account all relevant factors, including - the time spent on such services . . . . "  11 U.S.C. § 330(a)(3) (2005).

final compensation for services, or reimbursement of necessary expenses, from the estate

shall file an application setting forth a detailed statement of (1) the services rendered, time

expended and expenses incurred, and (2) the amounts requested." Fed. R. Bankr. Proc.

2016(a) (2005). Rule 2016 also provides that attorneys must disclose compensation paid or

promised to the attorney. *Id.* Rule 2016(b). In addition, Section 329, by its plain language,

requires such disclosures of attorney compensation. 11 U.S.C. § 329 (2005); *see, e.g.*, *In re*

*Hooper*, Case No. 93-11599, 2001 WL 34054526, at * 9-10 (Bankr. E.D. Va. Oct. 29, 2001).

Furthermore, in the Fourth Circuit, attorneys fees are evaluated by the *Barber* factors

as well as the lodestar method. There is some debate over which test is superior; however,

the Fourth Circuit appears to use a "hybrid" of the *Barber* factors and lodestar method. *See,*

*e.g.*, *Equal Employment Opportunity Comm'n v. Serv. News Co.*, 898 F.2d 958, 965 (4th Cir.

1990); *In re Great Sweats*, *Inc.*, 113 B.R. 240, 241 (Bankr. E.D. Va. 1990). In *Barber v.*

*Kimbrell's*, *Inc.*, 577 F.2d 216 (4th Cir. 1978), *cert. denied*, 439 U.S. 934 (1978), the Fourth

Circuit held that courts must consider the twelve factors set forth in *Johnson v. Georgia*

*Highway Express*, *Inc.*, 488 F.2d 714 (5th Cir. 1974), when determining the reasonableness

of the fees requested. These twelve factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the
> questions raised; (3) the skill required to properly perform the legal services
> rendered; (4) the attorney's opportunity costs in pressing the instant
> litigation; (5) the customary fee for like work; (6) the attorney's
> expectations at the outset of the litigation; (7) the time limitations imposed
> by the client or circumstances; (8) the amount in controversy and the results
> obtained; (9) the experience, reputation and ability of the attorney; (10) the
> undesirability of the case within the legal community in which the suit
> arose; (11) the nature and length of the professional relationship between

attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber*, 577 F.2d at 226 n.28.  Applying these factors, attorneys' fees are to be evaluated by the lodestar method.  "[T]he product of reasonable hours and a reasonable rate constitutes the lodestar [method]."  *In re Harris*, Case No. 96-36765, 1998 WL 408896, at *3 (Bankr. E.D. Va. Apr. 14, 1998); *see also Serv. News Co.*, 898 F.2d at 965 (citing *Daly v. Hill,* 790 F.2d 1071 (4th Cir.1986) and *Blum v. Stenson*, 465 U.S. 886, 888 (1984)) (stating that "these [*Barber*] factors should be considered in determining the reasonable rate and the reasonable hours, which are then multiplied to determine the lodestar figure which will normally reflect a reasonable fee").

In addition, this Court is mindful of the Richmond Division Requirements for Supplemental Fee Applications in Chapter 13 Cases ("Guidelines").  These Guidelines were issued in 2001 by Chief Judge Tice and specifically state that "[t]he application must demonstrate that the total fees requested in the case are reasonable in light of all surrounding circumstances."  Furthermore, these Guidelines provide that "[a]ttachments to the application must include . . . (1) complete time records from commencement of attorney's services in representing debtor in bankruptcy case."[26]  United States Bankruptcy Court, Eastern District

---

[26] These Guidelines more fully provide:

A.   The application must demonstrate that the total fees requested in the case are reasonable in light of all surrounding circumstances. It should include basic information on the case, including the dates the case was filed and the plan confirmed.

B.   The application must be styled as a supplemental fee application and must clearly note the supplemental fees.  Additionally, all prior fee requests and payments must be shown.  Payments should be itemized in the billing

of Virginia, Richmond Division, Requirements for Supplemental Fee Applications in Chapter 13 Cases (published July 31, 2001), *available at* http://www.vaeb.uscourts.gov/notice/chap13suppfee.pdf.

The United States Trustee alleges that the contested supplemental fee applications at issue do not contain detailed actual time records, which the United States Trustee argues are necessary for the Court to determine the value and reasonableness of the services. Furthermore, the United States Trustee alleges that because the Boleman Firm relied on minimums, there is no acceptable or clear method for the Court to undertake calculations regarding time. In addition, the United States Trustee argues that all cases that discuss the

---

records included with the application.

C.  The cover sheet of the application shall contain a brief narrative statement of the following:

    l.  the nature and charge for services that were billed in the original fee;

    2.  the nature and charge for services billed as supplemental fee; and

    3.  a specific statement of why the supplemental services were necessary over and above the original services.

D.  Attachments to the application must include the following:

    1.  complete time records from commencement of attorney's services in representing debtor in bankruptcy case;

    2.  schedule of all attorneys and paralegals whose time is charged and their hourly rate; and

    3.  itemized list of costs, if requested.

E.  Time records, detail, and attorney or paralegal identification information are required even if initial fee charge was designated a 'flat fee.'

United States Bankruptcy Court, Eastern District of Virginia, Richmond Division, Requirements for Supplemental Fee Applications in Chapter 13 Cases (published July 31, 2001), *available at* http://www.vaeb.uscourts.gov/notice/chap13suppfee.pdf.

*Barber* factors start with time; therefore, the United States Trustee suggests that *Barber* and

other similar methodologies for analyzing compensation may not be relevant here since there

are no actual time records.

In contrast, the Boleman Firm contends that the firm should be reimbursed for their

actual and necessary fees and expenses; further, the firm argues that the supplemental fee

applications are sufficiently detailed for the Court to determine that the compensation

requested is reasonable.  Counsel for the Boleman Firm admits that, in creating these

supplemental fee applications, the firm relied on a different method for calculating fees and

costs than the traditional billing method.  However, counsel argues that the Boleman Firm

did not rely on an average or estimate in creating these supplemental fee applications; rather,

the firm relies on a "bare minimum," and thus the Court is presented with reliable records to

ascertain if the supplemental fees requested are reasonable.  Against this backdrop, the Court

must determine whether the fees and costs requested on the supplemental fee applications are

reasonable and necessary, and whether the Boleman Firm should be awarded additional

compensation beyond the "no-look" fee that the firm has already received.

### B. Requirements Regarding Time Records

Fee applications must be sufficiently detailed to allow the courts to make a

determination of what is reasonable and necessary.  *West Virginians for Life, Inc. v. Smith*,

952 F.Supp. 342, 345 (S.D. W. Va. 1996) (citing *Chalmers v. City of Los Angeles*, 796 F.2d

1205, 1210 (9th Cir.1986)) (discussing a motion for attorney fees and noting that "[t]he fee

applicant bears the burden of producing detailed time sheets sufficient to justify the amount

of hours he claims to have expended"); *In re Maxine's Inc.*, Case No. 99-5-3923, 2003 WL 23192656, at *3 (Bankr. D. Md. Sept. 30, 2003) (discussing that accurate and well-documented records are a requirement in fee application cases); *In re Meyer*, 185 B.R. 571, 574-75 (Bankr. W.D. Mo. 1995) (stating that fee applications must set forth with specificity the services rendered, time expended and expenses incurred, and providing that the failure to do so can lead to a reduction in compensation). Furthermore, courts have consistently held that "[t]he failure of the [a]pplicant to maintain contemporaneous time and expense records affects the reliability of the records." *In re Dawson*, 180 B.R. 478, 480 (Bankr. E.D. Tex. 1994); *see also In re Pinkins*, 213 B.R. 818, 824 (Bankr. E.D. Mich. 1997) (providing that "without an opportunity to review actual time records, it is impossible for the Court to determine whether any particular time entry is reasonable" and holding that a reduction of attorney fees by twenty percent was warranted); *In re S.T.N. Enters., Inc.*, 70 B.R. 823, 834 (Bankr. D. Vt. 1987) (discussing compensation regarding services to a Chapter 11 debtor and providing that "[d]etailed contemporaneous (not 'reconstructed') records of professional services and receipts for expenses must be available to the Court, which may demand their production").

It is factually uncontested that the supplemental fee applications at issue contain minimums rather than actual time records; however, the Boleman Firm contends that even though the firm did not keep or use actual time records in compiling the supplemental fee applications at issue, the firm does have contemporaneous records of all tasks completed in a given case, and these records are sufficiently detailed to justify compensation. This Court

37

is rather perplexed by the Boleman Firm's reliance on minimums.  The applicable Code provisions and case law instruct that a fee applicant must maintain actual and contemporaneous time records, and contemporaneous by its very definition means "originating, existing, or happening during the same time period." The Am. Heritage Dictionary (1982); *see also* Ballentine's Law Dictionary (3d ed. 1969) (similar definition).

Furthermore, this district has generally held that if a fee applicant is seeking additional compensation beyond the "no-look" fee, the applicant must present the Court with *actual* time records.  *See, e.g.*, United States Bankruptcy Court, Eastern District of Virginia, Richmond Division, Requirements for Supplemental Fee Applications in Chapter 13 Cases (published July 31, 2001), http://www.vaeb.uscourts.gov/notice/chap13suppfee.pdf (providing that an applicant must submit "complete time records from commencement of attorney's services in representing debtor in bankruptcy case"); *see In re Carter*, Case No. 02-67413, Memorandum Opinion & Order, at 6 (Bankr. E.D. Va. Mar. 31, 2003) (unpublished) (hearing on supplemental fee applications filed by Krumbein & Associates where the Court held that supplemental fee applications must include actual time records); *see also In re Harris*, Case No. 96-36765, 1998 WL 408896, at *2 (Bankr. E.D. Va. Apr. 14, 1998) (Chief Judge Tice provided that "[e]ven though the attorney initially charges a flat fee for services leading to the filing of a chapter 13 petition, all attorneys are expected to maintain time records of *all* services if they ever anticipate requesting the court to approve additional charges.").

Further, without *actual* time records, this Court is unsure how to begin analyzing the

fee applications, as time is a central factor to determining whether the fees and costs

requested are reasonable.  The court in *In re Roco Corp*. discussed this quandary and stated:

> 11 U.S.C. § 330(a) speaks of "reasonable" compensation, and seeks to
> measure it based on a variety of factors. "Time" is one of those factors -- a
> critically important one at that. There is simply no way accurately to
> measure the amount of time reasonably, necessarily, and productively
> expended in the absence of a proffer of detailed contemporaneous time
> records by the applicant.

*In re Roco Corp*., 64 B.R. 499, 503 (D. R.I. 1986).  Discussing compensation in a Chapter

11 case, Judge Krumm noted that "as indicated by Bankruptcy Rule 2016, it is necessary that

counsel keep contemporaneous time records of services rendered . . . ." *In re C & J Oil Co.*,

81 B.R. 398, 403 (Bankr. W.D. Va. 1987).  Further, discussing time records in a Chapter 13

supplemental fee case, one bankruptcy court commented that "[i]n order for the Court to

determine the actual time spent on the legal services, as well as the hours reasonably

expended, it is implicit that the attorney keep contemporaneous time records."  *In re

Newman*, 270 B.R. 845, 848 (Bankr. S.D. Ohio 2001) (citing 11 U.S.C. § 330; *In re Boddy*,

950 F.2d 334, 337 (6th Cir.1991)).  In addition, another bankruptcy court, discussing time

records regarding a Chapter 7 case, stated "attorneys must keep contemporaneous time

records if they seek to substantiate the fees they charge in bankruptcy cases.  Without such

time records, attorneys cannot carry their burden of justifying the fees charged or requested."

*In re Haynes*, 216 B.R. 440, 443 (Bankr. D. Colo. 1997).

Courts have also routinely have held that an "average" rather than *actual* times and

expenses is not sufficient.  *In re Dawson*, 180 B.R. 478, 480 (Bankr. E.D. Tex. 1994) (citing

11 U.S.C. § 330(a)) ("The Bankruptcy Code provides that professionals may seek compensation for their *actual* time and expenses that benefit the estate, not average time and expenses."); *see also In re Keatts*, Case No. 03-41428, Memorandum Opinion & Order, at 3 (Bankr. E.D. Va. Mar. 31, 2005) (unpublished) (supplemental fee applications filed by law firm of Chaplin, Papa & Gonet denied on the basis that time entries were estimates, and providing that "[t]he court cannot consider the value of the attorney's services when the attorney does not present the court with a statement of the actual services [it] has rendered"). Furthermore, Chief Judge Tice recently discussed that "Fed. R. Bankr. Proc. 2016(a) requires of attorneys a 'detailed statement of (1) the services rendered, time expended and expenses incurred . . . .' Rule 2016 does not provide for a detailed *estimate* of the services rendered, time expended and expenses incurred." *In re Keatts*, Case No. 03-41428, at 3; *see also In re Carter*, Case No. 02-67413, Memorandum Opinion & Order, at 4-6 (Bankr. E.D. Va. Mar. 31, 2003) (unpublished) (hearing on supplemental fee applications filed by Krumbein & Associates where Chief Judge Tice held that supplemental fee applications must include actual time records, not minimums or averages, in order to comport with the established procedures in this district).

The Boleman Firm alleges that their records are contemporaneous, as they contend that records are kept contemporaneously with the action taken; however, they acknowledge that these records do not contain actual time notations. The Boleman Firm argues that the fee applications submitted to the Court, even without actual time records attached, are sufficiently reliable because the fee applications were created by relying on established

minimums.  Further, the Boleman Firm alleges the "minimum" relied upon in creating these

applications is the minimum amount of time that it takes in order to complete a particular

task.  Pl. Post-Trial Mem., at 6.  However, even though the Boleman Firm contends this is

a factually determined minimum, the firm presented no evidence of an empirical study or

other method for determining that this minimum is *always* applicable.  Rather, the only

evidence presented regarding the establishment of said minimums is that the Boleman Firm

concludes that these minimums are proper given their years of practicing law.  Along these

lines, it is unclear how the Boleman Firm determines the minimum relied upon is the

minimum for all attorneys, even though there are as many as thirteen attorneys and nineteen

para-professionals within the firm with widely varying years of experience.[27]

The testimony of Guillena, Cabreros and Bates makes it clear to this Court that there

were times when a particular task was completed in less than the allotted minimum.[28]

---

[27] Presumptively, if the "minimum" time is calculated as represented by the Boleman
Firm, the "minimum" time to complete a task would have to be the time it took the most efficient
attorney or para-professional employed during the time the tasks were completed *ever* to do said
task.

[28] Cabreros and Bates testified at the hearing that initial client interviews often took
around one hour.  The United States Trustee alleges that the fact that 2.6 hours is attributed for
attorney time for the initial consultation on the supplemental fee applications shows that these
supplemental applications do not contain "bare minimums."  United States Trustee Post-Trial
Mem., at 10.

In contrast, the Boleman Firm alleges in its Post-Trial Memorandum that the testimony of
Cabreros and Bates that the initial client consultation was one hour "rests on a misapprehension
of testimony . . . The 'one hour' represented time actually spent with the client and did not
include all of the other services performed under the umbrella of 'Pre-Filing Services' found on
the first two pages of the spreadsheet included with each application."  Pl. Post-Trial Mem., at 7.

The Court finds this argument perplexing given that, if the testimony at the hearing was
inaccurate or based on a "misapprehension," this should have been addressed at the hearing
through further examination of the witnesses.  Furthermore, regardless of whether the testimony

Furthermore, while the credibility of Guillena and Cabreros was called into question, the

Court finds their testimony sufficiently credible, especially in light of Bates' testimony, and

the Court concludes that the testimony establishes that there were at least instances where

particular tasks were likely completed in significantly less time than said minimum.   In

addition, without detailed studies on all of the employees, past and present, of the Boleman

Firm, this Court has no way to determine if the minimum time allotted overall is really the

minimum for each individual attorney and administrator.[29]

In addition, while the Boleman Firm contends that the firm constantly updates said

minimums to ensure that these minimums are applicable, this Court was not presented with

any factual or empirical evidence regarding the changes or evolution of said minimums.   In

_____

was "misapprehended," the testimony clearly highlights the difficulty with relying on minimums
and the confusion that stems from not adhering to a more traditional billing system.  In addition,
it shines the spotlight on the exact problem the Court is being asked to solve - - how to determine
whether the minimums relied upon are always accurate.

   The Boleman Firm also reiterated in its Post-Trial Memorandum that Cabreros and
Guillena parted with the firm on unfavorable terms, and the Court should not rely on their
testimony.  *Id.* at 7, fn.7.  However, the Court concludes that while the witnesses may have been
inclined to testify unfavorably given their past relationship with the Boleman Firm, their
testimony was sufficiently credible given the fact that both witnesses, along with Bates, testified
that certain tasks could be done in less than the minimum time allocated.  Furthermore, the
witnesses' testimony was sufficiently detailed for the Court to conclude that they had some
understanding of the practices of the Boleman Firm.

   [29] It is particularly troubling to this Court that the testimony at the hearing reveals that
while there are numerous lawyers and administrators in the Boleman Firm working on each case,
one person is tasked with compiling these supplemental fee applications without the benefit of
actual time records for each individual employee.  This Court recognizes that Alridge testified
that the template she relies upon in creating these supplemental fee applications was created with
the input of others in the Boleman Firm; however, the Court is still troubled by the fact that
Alridge is preparing supplemental fee applications, without the benefit of actual time records, in
cases where she potentially had little or no involvement.

fact, when asked about the template which Alridge relies on regarding minimums, she testified that she does not retain old templates after the template has been updated as she "wouldn't want to make the mistake of using an old template." Tr. at 151. Boleman also testified that he does not keep records or notes regarding changes to the time-keeping methods and minimums. Therefore, while the Boleman Firm alleges said minimum is distinguishable from averages or estimates, given the testimony presented in this case, this Court concludes said minimums are estimates under a different name or terminology guise.

Chief Judge Tice has specifically held that estimates or averages are not acceptable and supplemental applications consisting of such time-keeping methods can, and should, be denied for failure to comply with Section 330(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2016(a). *In re Keatts*, Case No. 03-41428, Memorandum Opinion & Order, at 3 (Bankr. E.D. Va. Mar. 31, 2005) (unpublished); *In re Carter*, Case No. 02-67413, Memorandum Opinion & Order, at 4 (Bankr. E.D. Va. Mar. 31, 2003) (unpublished) (approving, in both cases, the "no-look" fee portion but rejecting the supplemental applications on the grounds that actual time records were not submitted to the Court).

The Boleman Firm argues that they have been filing supplemental fee applications in the Richmond Division for many years without objection from the Court, Chapter 13 Trustee, or United States Trustee, and the firm relied on this lack of objection. Boleman, while testifying about whether he provides directions to Alridge about preparing the supplemental fee applications stated, "she [Alridge] has managed the process for such a very long time and has such intimate knowledge through her relationship with Judge Tice's clerks and Judge

43

Shelley's clerks that I have always been reluctant to give any type of guidance, because I felt that she was receiving her's [*sic*] from a high power."  Tr. at 217-18.

However, this Court finds the Boleman Firm's reliance argument on the lack of objections misplaced.  The major flaw with this reliance argument is that, when one examines these supplemental applications on an individual basis, it is not clear that they are based on minimums.  Boleman admitted that the supplemental applications do not state that they are based on minimum calculations.  *Id.* at 218.  If this Court was not placed in the position of reviewing an extremely high number of applications in one sitting with the benefit of extensive examination of the process for completion of supplemental fee applications by the Boleman Firm, it would not have realized the calculations presented were based on minimums rather than actual contemporaneous time records.[30]  Further, examining one supplemental fee application individually is quite different than looking at eleven. When the eleven supplemental fee applications are examined conjunctively, it becomes apparent that the majority of the applications are practically identical on their face.  Therefore, it is highly unlikely it was previously apparent to the Court, the Chapter 13 Trustee, or the United States Trustee that the Boleman Firm was relying on minimums.

This reliance argument is also misplaced, as Chief Judge Tice has specifically stated

---

[30] *See In re Porcheddu* for a discussion regarding fee statements that initially appeared to the court to be actual contemporaneous records but were actually made after-the-fact and only in preparation of litigation.  *In re Porcheddu*, 338 B.R. 729 (Bankr. S.D. Tex. 2006).  The court went on to discuss that the attorney's "presentation did not allow the Court to meet its responsibility.  Instead, by adjusting after-the-fact time entries to [the attorney]'s view of reasonableness – and then holding the fee statements out to be [the attorney]'s business records – [the attorney] substituted its own judgment for that of the Court."  *Id.* at 734.

44

in numerous opinions that actual time records are required.[31]   Further, Chief Judge Tice

clearly provided that estimates are not an appropriate way to account for time.   In addition,

this Court believes that the Guidelines, promulgated by Chief Judge Tice, are explicit that

actual time records are required.   Boleman testified that the Boleman Firm was involved with

the creation of the Guidelines and Chief Judge Tice solicited the Boleman Firm's input on

these Guidelines.   *Id.* at 210.   While Boleman apparently disagrees with the United States

Trustee's interpretation of these Guidelines, the Guidelines clearly state: "Attachments to the

application must include . . . *Complete time records* from commencement of attorney's

services in representing a debtor in bankruptcy." *Id.* at 210-12; United States Bankruptcy

Court, Eastern District of Virginia, Richmond Division, Requirements for Supplemental Fee

Applications in Chapter 13 Cases (published July 31, 2001), *available at*

http://www.vaeb.uscourts.gov/notice/chap13suppfee.pdf (emphasis added).

---

[31] The United States Trustee questioned Boleman about various cases decided by Chief
Judge Tice; while Boleman disagreed with the United States Trustee's interpretation of these
cases, the Court concludes that Chief Judge Tice's rulings are unambiguous regarding the need
for actual time records.   Tr. at 210-14; *In re Harris*, 1998 WL 408896, at *2; *see also In re
Keatts*, Case No. 03-41428, at 3; *In re Carter*, Case No. 02-67413, at 4.
    Furthermore, this Court has examined *In re Moss*, a supplemental fee application case
decided by Chief Judge Tice in 2001, where the Boleman Firm represented the debtor and
requested additional compensation beyond the flat "no-look" fee.   In that case, Chief Judge Tice
did not explicitly state that actual time records are necessary; however, he did cite to *In re
Harris*, which states this requirement.   In addition, the language in the case implies that Chief
Judge Tice was unaware that the time and costs were "minimums" as he examined the "time
detail and billing records" in detail and made no mention of said "minimums."   *In re Moss*, Case
No. 98-38727, Memorandum Opinion & Order, at 1 (Bankr. E.D. Va. Feb. 13, 2001)
(unpublished) (granting supplemental fees but reducing the amount requested); *compare with In
re Carter*, Case No. 02-67413, at 4, *and In re Keatts*, Case No. 03-41428, at 3.

The Boleman Firm also argues that even if the Court determines "minimums" are not an acceptable way to account for time, the Court should still award supplemental fees because the fees and costs requested are reasonable.  Further, the Boleman Firm alleges that Section 330 requires the Court to consider "all relevant factors."  Pl. Post-Trial Mem., at 11. Additionally, the Boleman Firm cites cases where courts have awarded attorney fees,  even in the absence of contemporaneous records.  *Id.* at 11-12, fn.14.  In examining these cases cited by the Boleman Firm, it is important to first note, in some of these cases the courts reduced the fees because of the failure to keep contemporaneous records or demanded contemporaneous records in the future.  *See, e.g.*, *New York State Assoc. for Retarded Children*, *Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983); *In re Dawson*, 180 B.R. 478, 480 (Bankr. E.D. Tex. 1994).  Secondly, none of the cases cited by the Boleman Firm regarding the argument that "the lack of traditional time sheets is not the death knell claimed by the U.S. Trustee" are from the jurisdiction of the Fourth Circuit Court of Appeals.  Pl. Post-Trial Mem., at 11.  In this district, as discussed previously, Chief Judge Tice has consistently ruled that actual time records are required.  Furthermore, in *In re Grossman*, Judge Mitchell of this Court stated the same requirement when he provided "the practice in this district is to require attorneys who seek compensation beyond the flat fee amount to provide time records for the entire case."  *In re Grossman*, Case No. 04-13296, 2006 Bankr. LEXIS 357, at *9, fn.10 (Bankr. E.D. Va. Feb. 15, 2006).  The third distinction between the cases cited by the Boleman Firm and the case at bar is the fact that the present case involves compensation for a Chapter 13 supplemental fee.  In Chapter 13 supplemental fee cases in

this district as well as many other districts, the attorneys have already received some
compensation; therefore, the courts are not faced with the predicament that denial of the
compensation requests results in the attorney receiving no compensation at all for the case.

This Court is not alone in its recognition that Chapter 13 supplemental fee cases are
distinct and that if the debtor's counsel desires to receive compensation beyond the normal
and customary set fee, contemporaneous time records are required.[32] *See, e.g.*, *In re Johnson*,
331 B.R. 534, 536 (Bankr. W.D.N.Y. 2005) (discussing the need for time records when
requesting supplemental fees and providing "a fair consideration of the fee request is possible
only upon a review of time records of services rendered throughout the case"); *In re Dorsett*,
297 B.R. 620, 626 (Bankr. E.D. Cal. 2003) (referring to Chapter 13 Fee Guidelines for that
district and providing that if counsel applies for supplemental fees, counsel "'must attach
contemporaneous time records'"); *In re Newman*, No. 00-06154-8W3, 2003 WL 751327, at
*8 (Bankr. M.D. Fla. Feb. 18, 2003) (noting that "[a]s an alternative to relying on the
presumptively reasonable fees . . . an attorney representing a debtor in a chapter 13 case may
file a fee application in full compliance with the lodestar method to include time records

---

[32] The majority of Chapter 13 supplemental fee cases this Court reviewed held that denial
of compensation was warranted if the attorney failed to submit detailed contemporaneous time
records; however, this Court is aware of a small number of cases where compensation was
reduced rather than outright denied. *Compare In re Argento*, 282 B.R. 108, 117 (Bankr. D. Mass
2002) (reducing fees where the attorney billed his time in hourly increments as such billing
increments failed to comport with the requirements for fee applications, and providing those
requirements include "keeping contemporaneous time records that record time in tenths of
hours"), *and In re Pinkins*, 213 B.R. 818, 824 (Bankr. E.D. Mich. 1997) (reducing attorney fees
by twenty percent due to the attorney's "failure to keep contemporaneous time records and
resulting lack of detail in reconstructed records").

made contemporaneously at the time services are provided"); *In re Newman*, 270 B.R. 845, 847-49 (Bankr. S.D. Ohio 2001) (fee applications filed by attorneys for work done in Chapter 13 cases had to be denied to extent that attorneys sought compensation for work performed before their law firm began to keep contemporaneous time records); *In re Finlasen*, 250 B.R. 446, 449 (Bankr. S.D. Fla. 2000) ("the applicant must contemporaneously and accurately document time entries in support of a fee application"); *In re Yates*, 217 B.R. 296, 301-02 (Bankr. N.D. Okla. 1998) (absent contemporaneous time records, the court was unable to award fees in excess of the flat fee for Chapter 13 cases in that district); *O'Connell v. Mann* (*In re Davila*), 210 B.R. 727, 733 (Bankr. S.D. Tex. 1996) (denying supplemental fees in 155 cases and discussing the fact that none of the cases "reflect time actually expended on the tasks listed" and disagreeing with the argument that it is not feasible to keep records in a high volume Chapter 13 practice on the grounds that "numerous consumer-specialist attorneys handling heavy chapter 13 case loads are able to accomplish this task and regularly submit time records to this Court to justify fees").

Given all this, this Court concludes this district, as well as other districts, has consistently held that actual time records are a requirement when submitting supplemental fee applications. Without these actual time records, the Court is left without any sufficient way to begin analyzing and calculating the appropriate amount of fees. Almost all of the case law and Code provisions that discuss compensation do so in the context of fees being "reasonable and necessary;" however, in determining what is "reasonable and necessary," this Court concludes that time is the critical starting point. The Supreme Court of the United

States teaches that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). In the same Supreme Court opinion, then-Chief Justice Burger concurred and stated, "I read the Court's opinion as requiring that when a lawyer seeks [fees] . . . the lawyer must provide detailed records of time and services for which fees are sought." *Id.* at 440.

Further, it is not incidental or insignificant to this Court that the first factor listed in the *Barber* analysis or Section 330(a)(3) is "time." In addition, the lodestar figure is the product of time multiplied by rate; therefore, it appears axiomatic that in order to even begin a lodestar analysis, the Court must have actual and accurate time records. The court in *In re Newman* discussed this issue and provided: "Accordingly, it is well established that in order for a court to apply the lodestar method in determining fees, counsel must supply the court with contemporaneous time records describing in detail the dates, amounts and specific services provided." *In re Newman*, No. 00-06154-8W3, 2003 WL 751327, at *3 (Bankr. M.D. Fla. Feb. 18, 2003) (citing *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1300 (5th Cir. 1977); *In re Finlasen*, 250 B.R. 446, 448 (Bankr. S.D. Fla. 2000); *In re Howell*, 226 B.R. 279, 281 (Bankr. M.D. Fla. 1998)); *In re Newman*, 270 B.R. 845, 848 (Bankr. S.D. Ohio 2001) (citing 11 U.S.C. § 330; *In re Boddy*, 950 F.2d 334, 337 (6th Cir.1991)) (providing that in order for the court to determine reasonableness, the attorney must submit contemporaneous time records); *In re Howell*, 226 B.R. at 281 (discussing the requirement that Chapter 13 supplemental fee requests must be accompanied by contemporaneous time

49

records).  Further, the statutory necessity for contemporaneous time records has also been

recognized:

> The law firm does not have contemporaneous time records to show what actual work was performed either pre-petition or post-petition in this case. The response of the law firm to this is that if they are forced to keep time records it will increase the costs to the clients. That may be so, but Congress has now, in effect, substantially codified the holding in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), into § 330(a)(3) of the Bankruptcy Code. That section now requires, for better or worse, that this Court analyze requests for attorney's fees by taking into account, inter alia, the time spent on the services and the rates charged for such services. Thus, for better or worse, and whether it will be more costly to debtors in bankruptcy or not, attorneys must keep contemporaneous time records if they seek to substantiate the fees they charge in bankruptcy cases. Without such time records, attorneys cannot carry their burden of justifying the fees charged or requested. This fact alone precludes the approval of the fees charged in this case.

*In re Haynes*, 216 B.R. 440, 443 (Bankr. D. Colo. 1997); *see also In re Castorena*, 270 B.R.

504, 515 (Bankr. D. Idaho 2001) (citing §§ 330(a)(1)(A) and (a)(3)(A)) ("A starting point

for an evaluation of the reasonableness of the fees is an explanation that discloses what was

done, when it was done, by whom it was done, and how long it took (i.e., a description of the

'actual--services rendered.')); *O'Connell v. Mann* (*In re Davila*), 210 B.R. 727, 733 (Bankr.

S.D. Tex. 1996) (discussing the *Johnson* factors and finding no award of compensation was

appropriate: "[the attorney] has made no attempt to support an award of fees in any of the

subject 155 cases under these *Johnson* factors . . . [the attorney] has come forward with no

time records to substantiate any of the fees claimed . . . .").  Also, as one court aptly noted,

"[t]here is simply no way accurately to measure the amount of time reasonably, necessarily,

and productively expended in the absence of a proffer of detailed contemporaneous time

records by the applicant." *In re Roco Corp.*, 64 B.R. 499, 503 (D.R.I. 1986); *see also In re Sturgeon*, 242 B.R. 724, 727 (Bankr. E.D. Okla. 1999) (citing *In re Crivilare*, 213 B.R. 721, 725 (Bankr. S.D. Ill. 1997)) ("[T]he burden is on counsel to substantiate the reasonableness of their requested fee application by submitting written time records for the court's review.").

Given this Court's review of the case law, it is quite clear most cases start with time and actual contemporaneous records in determining reasonableness. *See Hale v. United States Trustee* (*In re Basham*), 208 B.R. 926, 935 (B.A.P. 9th Cir. 1997) (discussing that by failing to provide contemporaneous time records, the attorney failed to prove his fees were reasonable); *In re Howell*, 226 B.R. 279, 281 (Bankr. M.D. Fla. 1998) (discussing how awarding fees is a three-step process and "[t]o begin the fee award process, counsel has the initial responsibility to file an application containing sufficient documentation of the amount of time spent and the type of work performed"); *In re Harris*, Case No. 96-36765, 1998 WL 408896, at *2 (Bankr. E.D. Va. Apr. 14, 1998) (discussing the fact the attorneys must maintain time records of *all* services when supplemental fees are sought, and then discussing reasonableness of fees); *In re C & J Oil Co.*, 81 B.R. 398, 403 (Bankr. W.D. Va. 1987) (providing "as indicated by Bankruptcy Rule 2016, it is necessary that counsel keep contemporaneous time records of services rendered which are detailed and reveal the substance necessary for the bankruptcy court to make an informed ruling . . . ."); *see also In re Keatts*, Case No. 03-41428, Memorandum Opinion & Order, at 3 (Bankr. E.D. Va. Mar. 31, 2005) (unpublished) (providing that "[t]he court cannot consider the value of the attorney's services when the attorney does not present the court with a statement of the actual

51

services [the attorney] has rendered").

Given all this, without actual time records, this Court is at a loss regarding how to make a determination of reasonableness. The Boleman Firm alleges that the Court must consider "all relevant factors." Pl. Post-Trial Mem., at 11. However, while this Court recognizes that time is not the only factor that should be considered under the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, lodestar method, or the *Barber* factors, time remains the central starting place.[33] Without time records, this Court cannot begin to

---

[33] Without time records, many of the other factors become unassessable and irrelevant. For example, if the records of counsel do not reveal the actual time expended, this precludes the reasonable evaluation of many of the other *Barber* factors. Without such evidence, the Court cannot determine the time and labor expended, the customary fee for like work, or the attorneys' fee award in similar cases, especially where the fee award sought is supplemental in nature. The novelty and difficulty of the questions presented in these cases is similarly difficult to assess without accurate time records. Most of the tasks which the Boleman Firm cite to as supporting their entitlement to fees over and above the amounts heretofore received are not atypical of those occurring frequently in Chapter 13 cases, such as motions for relief from the automatic stay, objections to confirmation, objections to claims, or filing modified Chapter 13 plans. These tasks are hardly novel to a Chapter 13 debtor's attorney; their difficulty, however, is especially impossible to quantify without the accurate knowledge of how much time each task consumed.

The other *Barber* factors do not influence the Court to abandon its conclusion that the Boleman Firm has failed to convince the Court of its entitlement to fees in addition to those already received. The evidence is unconvincing regarding any sacrifice of opportunity costs in undertaking each of these eleven cases or that the cases are undesirable within the legal community, in that the Boleman Firm has elected to limit its practice to primarily the representation of debtors in Chapter 13 bankruptcy cases. The expectation at the outset of these cases is to receive the "no-look" fee and perhaps some additional amounts if a supplemental fee application is approved by the Court. The time limitations imposed are typical of those in all Chapter 13 filings, and the relationship of the Boleman Firm with its debtor-client is simply transactional in length, lasting for the duration of the bankruptcy itself. The results obtained in these cases appear to be satisfactory, as Chapter 13 plans were confirmed and continue to pay-out, and the Boleman Firm is experienced and enjoys a good reputation in its representation of Chapter 13 debtors. Here the fundamental question for the Court is whether the Boleman Firm is entitled to be paid more fees than it has already received because of additional tasks required in these cases. Without the measure of how long these tasks (and the tasks for which the firm has already been compensated) consumed, the assessment of additional fees cannot be objectively

determine reasonableness as the Court cannot determine a nonarbitrary way of calculating the fees without the presence of records detailing the actual time spent on individual tasks and services.  Similarly, there is also no way for the Court to determine the actual minimum for every task completed or cost expended.  Furthermore, the Court heard testimony from Hyman, White and Matson regarding the reasonableness of the fees and costs requested on the supplemental fee applications; however, the Court concludes these opinions lack adequate foundation because the fee applications and supporting documentation on which the testimony is based are flawed.  Without actual time records, these witnesses could not base their opinion on actual or factual evidence; rather, like the Court, the witnesses had no accurate documentation on which to rely to determine reasonableness.  In addition, this Court was unpersuaded by the argument that because White allegedly engages in similar billing practices as that used by the Boleman Firm, this makes the practice of using "minimums" a shared practice throughout the local community or an acceptable practice.[34]

This Court also has not been given the evidence necessary to determine whether the

---

quantified.

[34] In fact, this Court cannot help but note that if White is also relying on "minimums" in creating supplemental fee applications, he has something to gain from convincing this Court that the use of "minimums" should be considered an acceptable practice.  The Court in *In re McClanahan* rejected the use of expert testimony in one Chapter 13 case, partially on the grounds that "the testimony of [the attorney called as an "expert witness"] is obviously self-serving because if it is accepted, it certainly would be used by [the attorney] as a precedent when his law firm files a fee application in Chapter 13 cases."  *In re McClanahan*, 137 B.R. 73, 77 (Bankr. M.D. Fla. 1992).

fees and costs requested in some cases are excessive, redundant or unnecessary.[35]  Without

such evidence, this Court has no basis to award supplemental fees, as the Court cannot

determine in which cases the minimum is accurate and in which cases it is nothing more than

a generalization.  The suggestion of the Boleman Firm that the Court found its conclusions

of reasonableness and value of professional services performed upon the Boleman Firm's

own self-established, non-empirical notions of what the "minimum" amount of time a task

or series of tasks consumes is to remove any element of objectivity from the Court's review.[36]

---

[35] The court in *In re Porcheddu* has accurately described the dilemma of approving fees
without the benefit of contemporaneous time records:

> Courts decide disputes. Courts base their decisions on evidence. When the
> evidence is created after-the-fact to justify a litigant's foregone conclusion, the
> Court cannot perform its function. The problem is particularly perverse when the
> information is uniquely within the province of one of the litigants. The number
> of hours spent by [the attorney] on a particular task is really only known to [the
> attorney]'s timekeepers. The debtor and the creditors of the estate cannot
> reasonably challenge whether a paralegal spent 0.2 hours or 0.7 hours preparing
> a proof of claim. To make the system work, the Court relies on the time records
> maintained . . . .  Presumably, those records are generally accurate. What the
> Court has learned in this matter is that the "records" are not records at all. To be
> sure, [the attorney] maintained records of the tasks that it performed, but it did not
> record how much time was spent on those tasks. It "created" a time estimate only
> when the Court required a *Johnson* hearing.

*In re Porcheddu*, 338 B.R. 729, 737-38 (Bankr. S.D. Tex. 2006).

[36] The Boleman Firm's proposal would essentially place it insofar as awards of
supplemental fees in Chapter 13 cases on an "honor" system, which the Boleman Firm advocates
is appropriate at least for it in large part because of the generally excellent job it performs in the
course of its representation of many Chapter 13 debtors.  This rationale is misplaced; no
attorney, regardless of his or her professionalism, prowess or reputation in the legal community,
should be permitted compensation by utilization of a recording methodology which inherently
prevents the reviewing Court from calculation of actual time consumed in the performance of
tasks for which compensation is sought in a specific bankruptcy case.

Needless to say, the Court's review must be fueled by sufficient, objective factual information to make its assessment a meaningful and precise one.  To substitute this review with a different method than actual time records is inconsistent with the long-announced holdings in this district, and deprives the Court of any reasonable basis to conclude the Boleman Firm is entitled to any fees in addition to the amounts already received in these eleven cases.

Further, it is not overly burdensome to expect the Boleman Firm to keep contemporaneous and accurate time records for each individual case in which the firm seeks supplemental compensation; certainly, it is more practical to expect the applicant than the Court to justify fee awards.  *O'Connell v. Mann* (*In re Davila*), 210 B.R. 727, 733 (Bankr. S.D. Tex. 1996) (discussing the argument that in a volume practice it is not feasible to keep time records and providing "that numerous consumer-specialist attorneys handling heavy chapter 13 case loads are able to accomplish this task and regularly submit time records to [the court] to justify fees"); *In re Great Sweats, Inc.*, 113 B.R. 240, 245 (Bankr. E.D. Va. 1990) (quoting *In re Horn and Hardart Baking Co.*, 30 B.R. 938, 944 (Bankr. E.D. Pa. 1983)) ("'The court should not be required to indulge in guesswork, nor undertake extensive labor to justify a fee for an attorney who has not done so himself.'"); *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 736-37 (Bankr. N.D. Ill. 1988) (citing *In re Pettibone*, 74 B.R. 293, 302 (Bankr. N.D. Ill. 1987)) (stating "[i]t is not overly burdensome to require that a person seeking compensation from the bankruptcy estate adequately explain the time for which compensation is sought.  The court should not have to guess or spend excessive court

55

time to justify a fee for an applicant who has not itself done so"); *In re Affinito & Son, Inc.*,

63 B.R. 495, 498 (Bankr. W.D. Pa. 1986) ("This Court should not be required to guess the

amount of time expended on each activity . . . . ").  It is doubtless that practicing attorneys

universally find no professional task more odious than the pain-staking maintenance of daily

time records for their cases.  However dreadful and monotonous, contemporaneously

maintained time records are quite simply where every attempt to value an attorneys' efforts

begins, and the information contained in all eleven supplemental free applications along with

the evidence adduced at trial are insufficient to permit this Court to award additional fees in

each of these cases.

For all of the aforementioned reasons, the Boleman Firm did not meet their burden

regarding the fees requested on the supplemental fee applications; therefore, the Court must

deny the supplemental fees requested.

## C. Disclosure of Pre-Petition Payments & Costs

The United States Trustee alleges that the Boleman Firm failed to properly disclose

pre-petition funds paid by the debtors to the firm.  The Boleman Firm contends that it

properly disclosed said funds as costs and disclosed these costs in Question Nine on the

Statement of Financial Affairs.  The First Omnibus Objection failed to raise the issue of pre-

petition payments; however, the issue has since been raised in the Pre-Trial Memorandum,

at the hearing, and in the Post-Trial Memorandum.[37]  Furthermore, as already discussed,

---

[37] Further, it is worth noting the Boleman Firm has routinely said that it "welcomes" the
Court's review.  Pl. Pre-Trial Mem., at 1.  In addition, the Boleman Firm, while objecting to the

regardless of how the issue was raised, the Court has an independent duty under Section 330

of the Bankruptcy Code to review fee applications.  11 U.S.C. § 330 (2005).

By way of example, this Court will use the Vernon-Williams case to discuss the

competing arguments regarding disclosure.  In the Vernon-Williams case, the debtor agreed

to pay $156.00 for initial costs and $194.00 for the Bankruptcy filing fee.  Pl. Exh. 46.

Furthermore, the Boleman Firm received $1,780.00, which was paid through the Chapter 13

Trustee.  *Id.*  This $1,780.00 included the $1,500.00 "no-look" fee for a Chapter 13 case and

$280.00 in costs paid through the Chapter 13 Trustee.

On the Statement of Financial Affairs for the Vernon-Williams case, the Boleman

Firm listed that the debtor paid $156.00 to the firm.  Pl. Exh. 39, Question 9, at 3.  However,

this amount (the $156.00) was not disclosed on the Rule 2016 Disclosure Statement.  Pl. Exh.

40.  The Boleman Firm alleges that the failure to disclose was not intentional; rather, it was

based on the firm's understanding of Rule 2016(b) and local customs.  Leffler testified that

the Boleman Firm was under the impression that Rule 2016(b) only required that the firm

disclose fees, and since the firm considered the $156.00 to be allocated to costs, it did not list

the $156.00 on the Rule 2016 Disclosure Statement.  Tr. at 91-93.  Secondly, Leffler testified

that when he first moved to the Tidewater region, while the Boleman Firm did not list such

costs on the Rule 2016 Disclosure Statements filed in the Richmond Division, he believed

---

United States Trustee's Omnibus Objection at the hearing on December 16, 2005, conceded that
the Court has authority to review supplemental fee applications.  Therefore, the Court finds it is
appropriate that it review the issue of the disclosure of pre-petition payments made by the
debtors to the Boleman Firm.

that it was the practice to list such costs in cases filed in the Norfolk Division; however, he

claims that when he did list such costs, a Chapter 13 Trustee objected and said that only fees

needed to be included and costs should be disclosed elsewhere. *Id.* at 92.

The United States Trustee alleges that the failure to disclose costs is a larger issue than

inaccurate disclosure of costs, as some of these costs were "ultimately taken as fees." United

States Trustee Post-Trial Mem., at 13. If this is true, this raises additional disclosure issues,

because if such costs were taken as fees, the rules are clear that disclosure of those amounts

is mandatory. Rule 2016 requires "[d]isclosure of compensation paid or promised to attorney

for debtor." Fed. R. Bankr. Proc. 2016(b) (2005). Further, "[a]n attorney in a bankruptcy

case has an affirmative duty to disclose fully and completely all fee arrangements and

payments." *Henderson v. Kisseberth* (*In re Kisseberth*), 273 F.3d 714, 720 (6th Cir. 2001)

(citing *In re Plaza Hotel Corp.*, 111 B.R. 882, 883 (Bankr. E.D. Cal. 1990)). In addition,

failure to properly comply with such disclosure rules can justify denial or disgorgement of

fees. *See, e.g.*, *Mapother & Mapother*, *P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472 (6th

Cir. 1997); *Quiat v. Berger* (*In re Vann*), 986 F.2d 1431 (10th Cir. 1993) (unpublished table

decision); *In re Hooper,* Case No. 93-11599, 2001 WL 34054526, at *10 (Bankr. E.D. Va.

Oct. 29, 2001).

This Court has reviewed the eleven cases at issue, and frankly, is perplexed as to

whether the initial monies paid by the debtors were treated as fees or costs. As

aforementioned, the debtor in the Vernon-Williams case paid the Boleman Firm $156.00,

which the firm alleges was allocated for costs such as photocopies and postage. Pl. Exh. 46.

58

However, on the supplemental fee application, the $156.00 was listed as "Total Amount of Attorney Fees and Costs received prior to bankruptcy filing." Pl. Exh. 38, line 139. It is unclear as to why the $156.00 was labeled as "Fees and Costs received prior to bankruptcy filing," if it was intended to only cover costs. Pl. Exh. 38, line 139; Pl. Exh 46.

Further, the $156.00 appears to have been at least partially applied to attorney fees rather than treated separately as costs. Pl. Exh. 38, at line 140. For example, the Boleman Firm contends that total costs of $567.44 have been incurred to the date of the supplemental fee application in the Vernon-Williams case. Pl. Post-Trial Mem, at 9. Of that total, the Boleman Firm asserts that it incurred costs of $328.59 prior to the time period covered by the supplemental fee application. Pl. Exh. 38, line 135. However, if only $328.59 were incurred in initial costs, this means that the Boleman Firm received more funding for initial costs than the firm actually incurred. For example, taking the $280.00 in costs paid to the Boleman Firm through the Chapter 13 Trustee[38] and the $156.00 amount paid pre-petition by the client for costs, the Boleman Firm would have received $436.00 for costs initially. However, the Boleman Firm lists total initial costs as $328.59, which leaves an excess of $107.41. United States Trustee Post-Trial Mem., Exhibit 1; Pl. Exh. 38, line 135; attached Appendix. This begs the question of how the additional $107.41 was applied by the Boleman Firm.

This Court concludes from looking at the supplemental fee application that one

---

[38] In each of the eleven contested cases, the Boleman Firm has already received $1,780.00, which was paid through the Chapter 13 Trustee. This $1,780.00 includes the $1,500.00 "no-look" fee and $280.00 in costs. *See supra* pgs. 8-9, fn.7.

explanation is that the $107.41 was applied to fees, as the Court notes that the $156.00 was calculated in determining the "Total Additional Fees and Costs (above the initial sum allowed by the Court)."[39]  Pl. Exh. 38, line 140.  Therefore, the $156.00, and thus the $107.41, appears to have been accounted for under "Fees and Costs."  If even part of the $156.00 was accounted for as a fee, additional disclosure issues are then raised.  This potential blurring of fees and costs regarding the $156.00 on the supplemental fee application also begs the question of why the Boleman Firm contends the $156.00 was only intended as costs.

A similar issue regarding costs and whether part of the $156.00 was applied as fees is present in the Boleman Firm's contention that it has incurred total costs of $567.44 to the date of the supplemental fee application and requests $238.85 in costs on the supplemental fee application.  Pl. Post-Trial Mem., at 9; Pl. Exh. 38, lines 135-43 and line 211.  The Chapter 13 Trustee previously distributed $280.00 to the Boleman Firm for costs, and this Court calculates that $567.44 (total costs requested) less $280.00 equals $287.44.  If the Court applies the $156.00 to the $287.44 of costs, then the Boleman Firm should only have incurred an additional $131.44 in supplemental costs, not the $238.85 listed on the

---

[39] The Boleman Firm alleges that even before filing the supplemental fee application, the firm incurred $2,124.09 in total billable fees and costs.  Pl. Exh. 38, line 137.  In detailing the initial fees and costs, the Boleman Firm lists the $1,780.00 allowed by the Court ($280.00 for cost plus $1,500.00 "no-look" fee) and the $156.00 paid by the client.  Taking the total billable fees and costs ($2,124.09) and subtracting the $1,780.00 and the $156.00, leaves a remainder of $188.09.  *Id.* lines 137-40.  The Boleman Firm lists $188.09 as "Total Additional Fees and Costs (above the initial sum allowed by the Court)." *Id.* line 140.  *See infra* pg. 65, fn.43.

supplemental fee applications.[40]   However, the Court also notes that on the supplemental fee

application in the Vernon-Williams case, the Boleman Firm is not requesting total additional

fees and costs incurred; rather, it is requesting $800.00 of $1,017.85, which might attempt

to explain this confusion surrounding costs, except that the supplemental application blurs

fees and costs.  Pl. Exh. 38, lines 213-14.  Therefore, it is impossible to know whether the

firm properly accounted for the $156.00 as a cost, or whether the firm is requesting more in

costs than the firm incurred.

The Boleman Firm attempted to explain these discrepancies by asserting that the

supplemental fee application is merely a "snapshot in time."  Pl. Post-Trial Mem., at 8.

Further, Boleman also discussed this "snapshot" concept, stating costs are disclosed and "it's

disclosed for purposes that the supplemental is only prepared at a particular point in time."

Tr. at 216-17. However, even if the application is merely a "snapshot in time" as the

Boleman Firm alleges, it should present this depiction in a manner that the Court is able to

interpret and understand.  In addition, Alridge attempted to explain the calculation of the

costs in the Vernon-Williams case and testified that the $156.00 in the Vernon-Williams case

was intended to apply to costs for the entirety of case, not just the initial part.  However, if

that is the case, then it is not clear as to why the $156.00 was not deducted from the "total

---

[40] It is worth repeating that the primary reason the Boleman Firm alleges it did not list the
$156.00 on the Disclosure Statement is that the firm did not think it had to list costs.  Tr. at 92-
94; Pl. Exh. 40; Pl. Exh. 46.
      Furthermore, Alridge testified that if the $156.00 "was a fee," then the Boleman Firm
would have disclosed the fee on the Disclosure Statement; however, since zero was disclosed,
the $156.00 was intended only for costs.  Tr. at 154.

costs incurred" and why it was labeled "attorney fees and costs." Further, if these fees paid

by the debtor are supposed to apply to costs for the entirety of the case, the Court is still

without explanation as to why the Boleman Firm did not first apply the money paid by the

debtor to costs before asking for a distribution from the Chapter 13 Trustee or requesting

approval of any additional costs from the Court.

Examining the other supplemental fee applications at issue in the present case raises

the same confusion and aforementioned mathematical discrepancies. While the amounts

differ, the same perplexity is found regarding how the fees and costs were defined,

calculated, and applied in the majority of the eleven cases.[41] The Court does note that the

---

[41] In order to examine the eleven cases in their entirety, this Court prepared the attached Appendix. This Appendix reflects that in ten of the eleven cases, the Boleman Firm received pre-petition monies from the debtors. The Boleman Firm argues these pre-petition monies were intended to be applied to costs; however, if the monies were costs, in ten of the eleven cases, the Boleman Firm received more in initial costs than were actually incurred. For example, in each of these ten cases, the $280.00 plus the amount paid by the client-debtor pre-petition equals a number larger than the initial costs. *See* attached Appendix. The United States Trustee asked Alridge at the hearing, "If it ended up that the costs through the plan and from the debtor exceeded the actual costs as itemized in each [s]upplemental [a]pplication, what happened to the extra money?" Alridge responded, "Um, I don't know." Tr. at 155.

As previously stated, this Court is unclear regarding how the $280.00 was calculated. *See supra* pg. 9, fn.8. Determining why the Boleman Firm requested $280.00 in each case is especially perplexing since costs requested are supposed to be for "actual and necessary expenses;" yet, the attached Appendix suggests that the Boleman Firm did not always incur $280.00 in initial costs once the amount paid by the client pre-petition is deducted from the initial costs. *See* attached Appendix; Local Bankruptcy Rule 2016-1 (2005).

This Court does recognize that in eight of the eleven cases, the Boleman Firm incurred more in total costs (initial costs plus subsequent costs) than it initially received in total from the client-debtors and the Chapter 13 Trustee. However, this fact alone does not explain why, if these monies paid by the debtors were for the costs, the Boleman Firm requested and received more in initial costs than it incurred initially, nor does it explain the blurring of fees and costs on the supplemental fee applications or the how pre-petition monies paid by the debtors were calculated.

Doelling case appears distinguishable from the other ten cases, as the debtors in that case did not pay any pre-petition monies for costs; therefore, the disclosure issue surrounding pre-petition monies does not exist in that case. Pl. Exh. 112; Pl. Exh. 105, line 139. Nevertheless, the fact that the Court is unable to distinguish costs from fees on the supplemental applications further raises disclosure issues and reaffirms this Court's view of why such fees (or costs) paid by the client need to be disclosed in the Chapter 13 Plan, Rule 2016 Disclosure Statement and supplemental fee application.

Furthermore, the allegation was made that the Modified Plans submitted in conjunction with these eleven cases are inaccurate. Looking at the Vernon-Williams case again, the Modified Plan states a balance due the Boleman Firm of $1,780.00 and does not include the $156.00. Pl. Exh. 42, B-2, at 2. This Court concludes that the Boleman Firm should have disclosed the receipt of all monies received as it is potentially misleading when such additional fees and costs are omitted from the Chapter 13 Plan. Further, the Court recognizes that, through its Consent Order with the United States Attorney, the Boleman Firm has already agreed to disclose "the receipt of all moneys received from their clients, whether donated as fees, costs or otherwise, in the S.O.F.A. [Statement of Financial Affairs] and in the Chapter 13 Plans filed with the Court." Consent Order Resolving IRS Obj., at 3.

Finally, this Court thinks it would be remiss if it did not restate the extreme and utmost importance of disclosure of fees and costs received. When revealing fees, disclosure is not permissive, but rather is mandatory. As Judge Mitchell of this Court has aptly noted:

[T]he Rule 2016 statement is not merely an incidental piece of paperwork.

63

> Quite the contrary: it is central to the court's ability to review bankruptcy fees for excessiveness, a matter that concerns not only the debtor and creditors, but also public perception of the bankruptcy system. Without complete and timely disclosure by the debtor's attorney, neither the United States Trustee nor this court can effectively exercise their respective oversight responsibilities.

*In re Hooper*, No. 93-11599, 2001 WL 34054526, at *10 (Bankr. E.D. Va. Oct. 29, 2001);

*see also In re Argento*, 282 B.R. 108, 115 (Bankr. D. Mass. 2002) (discussing Rule 2016 disclosure requirements and providing "[t]he disclosure requirements are intended to provide information sufficient for any party to scrutinize the fees paid or to be paid"). Given the confusion surrounding disclosure and these supplemental fee applications, this Court is unable to effectively exercise proper oversight. This Court should not be placed in a position of having to guess whether monies received from the client-debtor were applied as fees or costs, nor should the Court be unable to glean, from the face of the supplemental fee applications, whether said monies should have been disclosed.

### D. Request for Compensation for Costs

The Boleman Firm alleges that all fees and costs requested by the firm are reasonable, and thus, the firm should be reimbursed for all costs incurred. The United States Trustee contends that the Boleman Firm did not properly account for costs nor did the firm keep detailed records of its costs. Given these competing arguments, the Court must examine the costs requested for reimbursement to determine both how the costs were accounted for and whether the costs requested are reasonable.

This Court is nonplussed regarding where to start in analyzing the fee applications

64

given the aforementioned confusion surrounding the disclosure issues of the alleged costs.[42]

As previously discussed, looking at the Vernon-Williams case, the Boleman Firm testified

that the $156.00 payment from the client-debtor was allocated to costs; however, on the

supplemental fee application for the Vernon-Williams case, the firm listed the $156.00 as

"Total Amount of Attorney Fees and Costs received prior to bankruptcy filing" and appears

to have subsumed the $156.00 into "Fees and Costs" that were "above the initial sum allowed

by the Court."  Pl. Exh. 38, lines 137-40.[43]  Therefore, given the lack of clarity and

explanation regarding the application of the $156.00 on the supplemental fee application, it

is difficult for the Court to distinguish between costs and fees requested.  Further, while the

amounts differ, the same pattern appears in nine of the other ten cases.[44]

For example, the United States Trustee questioned Boleman at the hearing regarding

_____

[42] *See supra* pgs. 56-64 for a discussion regarding disclosure issues and the difficulty of distinguishing costs from fees given the way the Boleman Firm accounted for costs and fees on the contested supplemental fee applications.

[43] Lines 137 through 140 of the exhibit attached to the supplemental fee application filed in the Vernon-Williams case reads as follows:

| | |
|---|---|
| Line 137: Total Billable Fees and Costs | $2,124.09 |
| Line 138: Total Initial Amount Allowed by the Court | $1,780.00 |
| Line 139: Total Amount of Attorney Fees and Costs | |
| received prior to bankruptcy filing | $  156.00 |
| Line 140: Total Additional Fees and Costs | |
| (above the initial sum allowed by the Court) | $  188.09 |

Pl. Exh. 38, lines 137-40.

[44] The sole differing case is the Doelling case.  The Doelling case is distinguishable because the debtors did not pay the Boleman Firm any pre-petition monies for costs.  Pl. Exh. 104; Pl. Exh. 112.

the Barakhyahu case (Pl. Exh. 82); however, this Court is unable to reconcile the testimony

of Boleman with the direct evidence on the supplemental fee application. Tr. at 223-36. The

supplemental fee application in the Barakhyahu case provides that total costs incurred prior

to incurring the costs requested in the supplemental fee application were $330.27. Pl. Exh.

82, line 136. The Boleman Firm allegedly received $280.00 in costs through the Chapter 13

Trustee and $140.00 in costs from the debtors pre-petition. The Boleman Firm contends that

the $140.00 payment from the client-debtor was applied to costs, not fees; however, $420.00

($280.00 + $140.00) is greater than the approximately $330.00 initially incurred in costs.

Therefore, the Boleman Firm initially received $89.73 ($420.00 - $330.27) above their

initially incurred costs. This Court is unclear as to how the remainder of the $420.00 (the

$89.73) was applied by the Boleman Firm. Further, the Boleman Firm contends that total

costs incurred to date of the supplemental fee application are $715.54 in the Barakhyahu

case, of which $385.27 is listed as the supplemental costs on the fee application. Pl. Pre-

Trial Mem., at 9; Pl. Exh. 82, line 207. If the Court applies the excess amount of $89.73 to

the amount of costs the Boleman Firm incurred and are requesting in the supplemental fee

application, then the Boleman Firm should only be requesting an additional $295.54 in costs,

not $385.27.[45]

     This Court recognizes that the Boleman Firm appears to have accounted for the

---

[45] The $295.54 figure is calculated by taking the $715.54 (total costs incurred to date of
the supplemental fee application) less the $280.00 (costs paid through the Chapter 13 Trustee)
and the $140.00 (pre-petition monies paid by the debtors).

$140.00 by calculating said money into the "Total Additional Fees and Costs (above the initial sum allowed by the Court)." Pl. Exh. 82, line 141.[46] Furthermore, this Court also notes that on the supplemental fee application, the Boleman Firm claims it incurred $1,382.27 in "Additional Fees and Costs (above the initial sum allowed by the Court); however, the firm is only requesting $850.00 in "Additional Fees and Costs Requested for Allowance by the Court." *Id.* lines 209-10. These calculations might explain the aforementioned cost discrepancy; however, accounting for the application of funds in this way blurs the distinction between fees and costs and makes it impossible for the Court to calculate costs separate from fees.

This Court is further concerned by what appears to be an overage awarded by the Chapter 13 Trustee to the Boleman Firm for initial costs in the majority of the cases. In addition, in three of the cases, even before examining the supplemental fee request, it appears that the Boleman Firm received more already for costs than the firm actually incurred in total

---

[46] Lines 138 through 141 of the exhibit attached to the supplemental fee application filed in the Barakhyahu case read as follows:

| | |
|---|---|
| Line 138: Total Billable Fees and Costs | $2,125.77 |
| Line 139: Total Initial Amount Allowed by the Court | $1,780.00 |
| Line 140: Total Amount of Attorney Fees and Costs | |
|      Received Prior to Bankruptcy Filing | $ 140.00 |
| Line 141: Total Additional Fees and Costs | |
|      (above the initial sum allowed by the Court) | $ 205.77 |

Pl. Exh. 82, lines 138-41.

costs.[47]   The United States Trustee alleges that there are cases where the Boleman Firm

"requested and received more than their 'actual and necessary' costs . . . ."   United States

Trustee Post-Trial Mem., at 13 and Exhibit 1 to United States Trustee Post-Trial Mem.

Further, the United States Trustee asked Alridge at the hearing, "If it ended up that the costs

through the plan and from the debtor exceeded the actual costs as itemized in each

[s]upplemental [a]pplication, what happened to the extra money?"   Alridge responded, "Um,

I don't know."   Tr. at 155.

The Boleman Firm alleges that the United States Trustee's understanding or view of

how the costs are handled is inaccurate, and the "U[nited] S[tates] Trustee's exhibit offers

a blurred image of how costs are handled."   Pl. Post-Trial Mem., at 8.   Further, the Boleman

Firm argues, "[i]n part, this may arise out of the format of the application itself . . . . "   *Id.*

However, the Boleman Firm does not offer any alternative mathematical explanation.[48]

---

[47] In the Pyles, Childrey, and Lipscomb cases, the Court calculates that the Boleman Firm
has already received more in costs (from the Chapter 13 Trustee and the debtors) than the firm
incurred in total costs (initial costs plus subsequent costs).   *See* attached Appendix.

[48] The Boleman Firm alleges that Exhibit 1, submitted as part of the United States
Trustee's Post-Trial Memorandum, contains a number of mistakes.   Pl. Post-Trial Mem., at 8,
fn.10.   The Boleman Firm cites the Pyles case as an example.   The Boleman Firm does not
provide any details or calculations regarding the Pyles case; therefore, this Court does not know
if the United States Trustee made a mistake in its calculations.   However, this Court notes the
disagreement over the calculations in the Pyles case might stem from the fact that Plaintiff's
Exhibit 67, which is the Boleman Firm's internal receipt for monies received from the client-
debtor, depicts that the Boleman Firm received $50.00 from the client-debtor while the
supplemental fee application lists $200.00 as the "Total Amount of Fees and Costs Paid Prior to
Bankruptcy Filing."   Pl. Exh. 67; Pl. Exh. 60, line 139.
This Court is unsure if this explains the aforementioned disagreement regarding the
United States Trustee's Exhibit 1.   Regardless, the Court relies on its own calculations when
examining these supplemental fee applications and in calculating monies received, and the Court
relies on what the Boleman Firm provided in their supplemental fee application, Statement of

Nevertheless, given these competing views of how costs are handled, this Court will examine one case where it does appear the Boleman Firm has already received more monies in costs than the firm actually incurred and perform its own mathematical analysis.

Looking at the supplemental fee application in the Childrey case (Pl. Exh. 155), by way of example, the Boleman Firm alleges that the firm's total costs incurred to date of the fee application equal $281.87.  Pl. Post-Trial Mem., at 9.  The supplemental fee application in this case provides that initial costs were $250.58.  Pl. Exh. 115, line 135.  The Boleman Firm received $280.00 from the Chapter 13 Trustee for costs and $140.00 from the debtors for costs.  Pl. Exh. 123.  Therefore, the Boleman Firm initially received a total of $420.00 for costs, which is $169.42 above the actual costs initially incurred of $250.58.  Further, for supplemental costs, the Boleman Firm requests $31.29, despite the fact that the Boleman Firm already received an excess of monies for costs in this case.  Taking the total monies received for costs ($420.00) and subtracting the total costs requested ($281.87), leaves a remainder of $138.13, and accordingly it is confounding as to why the Boleman Firm is even requesting supplemental costs in the Childrey case.[49]

---

Financial Affairs, and Rule 2016 Disclosure Statement.  Therefore, given that the Boleman Firm listed that it received $200.00 from the client-debtor on the supplemental fee application and the Statement of the Financial Affairs, the Court will rely on the $200.00 in performing its calculations.

[49] The same is true for the Lipscomb case.  The Boleman Firm initially received $280.00 (initial amount approved for costs through the Chapter 13 Trustee) plus $140.00 (amount paid by client pre-petition).  The Boleman Firm alleges its total costs incurred to date of the fee application in the Lipscomb case are $407.86; therefore, it is non-sensical that the Boleman Firm is requesting supplemental fees in that case, as the firm has already received more for costs ($420.00) than its total costs incurred to date of the supplemental fee application ($407.86).  *See*

69

In fact, in the Childrey case, it is dubious why the Boleman Firm ever requested $280.00 in costs to be paid through the Chapter 13 Trustee, given that the Boleman Firm had already received $140.00 from the client.  The United States Trustee asked Alridge about costs advanced from the client, specifically asking: "Would you also agree that the plan that when it requests reimbursement for the $280.00, does not give any credit for advanced costs paid by the debtor?" Alridge responded, "That's correct." Tr. at 154.  Given the aforementioned mathematical discussion, it appears to the Court that the Boleman Firm should have applied the $140.00 to the $250.58 in incurred costs prior to requesting any disbursement from the Chapter 13 Trustee.  If the $140.00 had been applied to the costs initially incurred (the $250.58), then the Boleman Firm should have only requested approximately $110.58 for initial costs.  However, this case again contains a blurring of fees and costs as the $140.00 was apparently used in calculating "Total Additional Fees and Costs (above the initial sum allowed by the Court)."[50] Pl. Exh. 115, lines 137-40.  If an intermixing of fees and costs did occur, it potentially suggests the Boleman Firm was taking costs as fees, without the Court's permission and without proper disclosure.

As discussed earlier in the section on pre-petition disclosures, the Boleman Firm attempted to explain these discrepancies by stating the pre-petition costs received from the

---

Pl. Pre-Trial Mem., at 9; Pl. Exh. 93.

[50] This Court calculates that the "Total Additional Fees and Costs (above the initial sum allowed by the Court)" should be $197.08, not the $187.08 listed on the supplemental fee application, as $2,117.08 (total billable fees and costs) minus $1,780.00 (total initial amount allowed by the Court) minus $140.00 (costs paid by debtor) equals $197.08.  Pl. Exh. 115, lines 137-40.

debtor are intended to apply to the entire case.  Boleman testified "costs run all the way through discharge." Tr. at 215.  However, this explanation does not explain why the initial monies paid by the debtor for costs were not deducted from the initial costs requested to be paid through the Chapter 13 Trustee.  In addition, Alridge's testimony regarding these initial monies received from the debtors adds further confusion to that explanation.  At the hearing, the United States Trustee asked her, "Is there a reason to why [the] amount on line 139 [Total Fees and Costs Received Prior to Bankruptcy Filing] is applied to the initials and not the supplemental costs and services?" *Id.* at 157.  Alridge responded, "Because we got that money at the beginning of the case.  And the initials are about things in the beginning of the case." *Id.*

Given this confusion and blurring of costs and fees, this Court is unable to determine how to quantify a reasonable amount to award as supplemental costs.  Furthermore, supplemental fee applications need to be sufficiently clear for the Court to be able to evaluate their reasonableness.  *In re S.T.N. Enters.*, 70 B.R. 823, 834 (Bankr. D. Vt. 1987) (citing extensive case law and providing "[w]e shall refuse compensation or reimbursement when the supporting records are unreliable or lack specificity").

In addition to this difficulty of distinguishing fees from costs, this Court also finds problematic the way some costs were handled and assigned a pre-determined fee.  While the amount of initial costs requested varies, the supplemental fee applications appear to use the same format for initial costs.  *See, e.g.*, Pl. Exh 38, line 116; Pl. Exh. 60, line 116; Tr. at 165. The use of a standardized format for completing the supplemental fee applications is not *per*

71

*se* troubling to the Court; however, it is a concern that the calculations for completing the

supplemental fee applications were done after-the-fact.  For example, Alridge testified that

the way she determines the costs to request regarding photocopies and faxes is by counting

the number of them in the file.  Tr. at 142-43, 165-67.  In addition, Alridge testified that the

Boleman Firm always charges $7.00 per client for PACER; however, the Court was not

given any credible explanation, records, or empirical evidence regarding how the firm has

determined that it always expends at least $7.00 for PACER charges in each case.  *Id.* at 143-

45, 167-68.  Furthermore, the Court is reluctant to accept that the Boleman Firm *always*

needs to print five copies of the Bankruptcy Plan, given that the testimony was that three

were draft copies.  *Id*. at 165-67; *see, e.g.*, Pl. Exh. 38, line 122; Pl. Exh. 71, line 122.  Surely

there must be times where fewer drafts are needed, just as this Court believes that there must

be times where more drafts are probably required.  Even if there are some cases in which the

Boleman Firm prints more than five copies and does not get reimbursed while in other cases

it prints fewer than five copies but gets reimbursed for five, thereby "averaging out," this

approach is unfair to the individual debtors and creditors, whose interests are case-specific.

Further, this contravenes the basic policy that costs requested must be only for those which

are *actually* incurred.  *In re Williams*, 102 B.R. 197, 199 (Bankr. N.D. Cal. 1989) (discussing

a compensation request from the trustee and holding "[a]s a matter of law, the Court finds

that an expense is not 'actual,' and therefore not reimbursable under section 330(a)(2), to the

extent that it is based on any sort of guesswork, formula, or pro rata allocation"); *In re*

*Marsh*, 14 B.R. 615, 617 (Bankr. E.D. Va. 1981) (discussing a report of the trustee for

72

compensation and stating that "expenses must be actual, not estimates").

The Court can only award costs to items it can clearly decipher.  Taken alone, these few lumped or average costs may have resulted in the Court granting costs in a reduced amount; however, taken in the context of the blurring of fees and costs on the supplemental fee applications, this Court must deny all requested costs.  Given that the Court cannot determine how much of the costs received pre-petition were  not properly accounted for, this Court is unable to evaluate the reasonableness of the costs requested in the supplemental fee applications.  If the Court cannot effectively exercise its oversight responsibilities, it has no choice but to deny compensation requests which it cannot evaluate properly.  Ultimately, the burden rests with the Boleman Firm to justify the supplemental costs requested, and this burden has not been met.

E. The Exercise of Billing Judgment And Fees & Costs "Waived" or "Discounted"

The exercise of "billing judgment" is a consistent requirement imposed upon all firms who seek an award of attorney fees.  *See, e.g.*, *In re Great Sweats*, *Inc.*, 113 B.R. 240, 242-44 (Bankr. E.D. Va. 1990).  "[B]illing judgment is the voluntary reduction of a fee by counsel to a private client for services either conferred a negligible benefit or were excessive."  *In re Maxine's Inc.*, 304 B.R. 245, 249 (Bankr. D. Md. 2003) (citing *In re Leonard Jed Co.*, ("*Jed I*"),103 B.R. 706, 713 (Bankr. D. Md. 1989)).  A fee application must indicate the exercise of "billing judgment" by disclosing the number of hours "written off" of the requested fee.  *Id.*

The Boleman Firm contends that it is the practice of the firm to not bill for certain

73

services and costs it provides to debtors.  Leffler testified that the Boleman Firm engages in

billing judgment whereby the Boleman Firm ends up "waiving fees."  Tr. at 94.  Leffler

testified that "[t]here's a whole, um, category, you might say, of work that we do for clients

that you won't find in the fee applications . . . ."  *Id.* at 95.  For example, Leffler testified that

an administrator attends the Section 341 Meeting of Creditors along with the attorney;

however, the firm only bills for the attorney's time.  Furthermore, the Boleman Firm

contends the firm provides supplemental services in ninety-nine percent of its cases, but only

seeks reimbursement in approximately ten percent of its cases.[51]  Pl. Post-Trial Mem., at 5.

---

[51] The testimony of the Boleman Firm suggests the reason that the firm does not seek
supplemental compensation in more cases is due to the fact that funding is not available in those
cases.  Leffler and Alridge both testified regarding how the Boleman Firm decides the cases in
which to file supplemental fee applications.  Leffler testified that the firm relies on the Control
Sheet and this sheet is used to determine whether to file a supplemental fee application.  *See,
e.g.*, Pl. Exh. 37.  Further, he testified that "this [fee application control sheet] is used in deciding
whether or not to file a fee application.  And it's used to determine how much, to what extent the
plan may be overfunded, um, and allow, which would allow, um, for a request for, um, for fees,
supplemental fees."  Tr. at 107.

In an instance where a plan is "over-funded," *i.e.*, fewer claims or claims in amounts
lesser than anticipated by the debtor are filed in the case, this "additional" amount inures to the
benefit of creditors who have filed allowed claims and increases the percentage of their pro-rata
recovery.  To describe a plan as "over-funded," however, is somewhat of a misnomer in the
Eastern District of Virginia.  As Judge Mitchell of this Court has explained:

> The standard form of plan is this district is a so-called "pot" plan rather than a
> "percentage" plan.  In a percentage plan, creditors receive a set percentage of their
> allowed claims while leaving the exact amount the debtor will pay in flux until
> all claims are resolved.  In a pot plan, by contrast, the debtor pays a fixed amount,
> and unsecured creditors are paid pro rata from the "pot" that remains after
> payment of priority and secured claims. The form plan in this district requires the
> debtor to provide a good-faith estimate of the dividend on unsecured claims, but
> the percentage shown is simply an estimate, and the actual dividend may be either
> higher or lower depending the amount of claims that are ultimately filed and
> allowed.

The Boleman Firm also alleges that the rates the firm charges are on the "low-end" for the market.

The Court does not dispute the fact that the Boleman Firm likely engages in some practices that are beneficial to the debtor yet the debtor is not billed for such services. The Court also does not dispute the fact that the overall hourly billing rates for the Boleman Firm in these eleven cases are quite reasonable.[52] That said, the Boleman Firm has not presented the Court with any opportunity to examine or quantify these "waived" or "discounted" fees and costs. The Boleman Firm submitted two charts in its Pre-Trial Memorandum, which purport to depict "fees & costs waived." Pl. Pre-Trial Mem, at 3 and 15. This Court was unable to determine how said "waived" numbers were calculated, and the Pre-Trial Memorandum did not provide any explanation. *Id.* Further, none of the testimony during the hearing explained such calculations; therefore, the Court asked counsel for the Boleman

---

*In re Murphy*, 327 B.R. 760, 763 n.3 (Bankr. E.D. Va. 2005) (citing *In re Witkowski*, 16 F.3d 739, 741, 746 & n.11 (7th Cir.1994)) (explaining difference between a "pot" and "percentage" plan).

Accordingly, in a Chapter 13 case where fewer allowed claims or claims in amounts lesser than anticipated by the debtor are filed, the filing creditors receive a higher percentage of distribution from the Chapter 13 Trustee and more of their claims are paid, unless the Court approves additional administrative expenses, such as the supplemental fees and costs sought by the Boleman Firm, which then are paid and reduce or eliminate the amount paid to the creditors filing allowed claims. *In re Porcheddu*, 338 B.R. 729, 735 (Bankr. S.D. Tex. 2006) ("If more is paid on attorneys fees, less is available for unsecured creditors.").

[52] At the time these eleven contested supplemental fee applications were compiled, the hourly rate used to calculate attorney fees by the Boleman Firm appears to be a "blended" rate of $165.00. Tr. at 95; *see, e.g.*, Pl. Exh. 38. This Court does not dispute that an hourly rate of $165.00 is quite reasonable and given the previously discussed problems associated with the reliance on "minimums," this Court does not need to decide whether the use of a "blended" rate is appropriate.

Firm about their charts during closing arguments.  Counsel for the Boleman Firm never explained how these numbers were calculated; therefore, the Court was left without a satisfactory explanation of these calculations.[53]

In looking at the applications, this Court does note that the total fees and costs requested are less than the alleged total additional fees and costs incurred.  For example, in the Vernon-Williams case, the  Boleman Firm alleges that its total fees and costs above the initial sum allowed by the Court equal $1,017.85; however, the Boleman Firm is only requesting $800.00.  Pl. Exh . 38, lines 213-14.  On a chart prepared by the Boleman Firm as part of the Plaintiff's Pre-Trial Memorandum, the Boleman Firm alleges its "fees & costs waived" in the Vernon-Williams case equal $110.44.  Pl. Pre-Trial Mem, at 3 and 15.  Obviously, $110.44 is not the difference between $1,017.85 and the $800.00 fee requested; however, no explanation was provided as to the difference in these amounts.

Furthermore, Alridge testified that the Boleman Firm discounted $295.50 in the

---

[53] In addition, according to the testimony at the hearing, the Boleman Firm uses a Control Sheet to help the firm in calculating discounts and exercising billing judgment.  Plaintiff's Exhibit 37 was admitted as an example of said Control Sheet.  Pl. Exh. 37.

Alridge testified on cross-examination that the Control Sheet would show whether there was a voluntary discount or billing judgment exercised in a given case.  However, she also testified that she does not know which of the eleven contested cases have such Control Sheets in the case files.  Tr. at 170-73.  Further, Leffler also testified this Control Sheet is "used to determine how much to write off." *Id.* at 107-08.  In addition, he testified this Control Sheet is used in cases where supplemental events have occurred.

Nevertheless, while the testimony of Leffler and Alridge leads the Court to conclude these Control Sheets are instrumental in determining discounts and waivers, this Court was not given copies of the completed Control Sheets from the eleven cases at issue.  The United States Trustee asked Leffler why these Control Sheets were not turned over in response to the United States Trustee's discovery request, and Leffler responded that he did not know.  *Id.* at 108.

Vernon-Williams case for initial non-supplemental services.  Tr. at 146.  For example, she

testified that the Boleman Firm received $1,500.00 in fees as that is the customary "no-look"

fee awarded; however, the Boleman Firm incurred $1,795.50 in fees during this period.  *Id.*

She alleges that the only legal fees the Boleman Firm asks for in the initial portion is the

$1,500.00 thereby producing the $295.50 discount.  Tr. at 146; Pl. Exh. 38, line 114.

However, this testimony is problematic as the supplemental fee application in the Vernon-

Williams case specifically states that "Total Additional Fees and Costs (above the initial sum

allowed by the Court)" equals $188.09."  Pl. Exh. 38, line 140.[54]

Therefore, even if the Boleman Firm does engage in cost cutting or "discounting,"

given the confusion surrounding the calculations of these "discounts," this Court cannot

determine how to take the waiver of fees and costs into consideration when reviewing the

supplemental fee applications.  Furthermore, even if the Court could determine how to

account for such calculations, the Court would still be faced with the problems created by the

---

[54] It appears this $188.09 was calculated by taking total initial billable fees and costs
($2,124.09) and subtracting the total initial amount allowed by the Court ($1,500.00 "no-look"
fee and $280.00 in costs) and then subtracting the total amount of attorney fees and costs
received prior to the Bankruptcy filing from the debtor ($156.00).  Pl. Exh. 38, lines 137-40.  *See
supra* pg. 65, fn.43.

To further complicate matters, if one relies on Alridge's testimony and determines that
the firm "discounted" $295.50 rather than $188.09, then there is again an issue of how the
Boleman Firm accounted for the $156.00.  As discussed earlier, the client allegedly paid $156.00
to be allocated to costs.  However, at least part of the $156.00 appears to have been subsumed
into fees.  *See* fn.39 and accompanying text, *supra* at pgs. 59-60.  If $295.50 is the correct
discount, then the excess of the $156.00 (the $107.41, which remained after the $280.00
distributed by the Chapter 13 Trustee and the $156.00 were applied to initial costs) should have
been subtracted from the supplemental costs requested.  *See supra* pgs. 59-60 for a discussion of
the aforementioned calculations.

Boleman Firm's reliance on "minimums" and the intermingling of fees and costs on the supplemental fee applications.

### F. Services Included in the "No-Look" Fee and Clerical Services

The Boleman Firm has already received monies in each case at issue here, having been paid the $1,500.00 plus $280.00 in costs as part of the "no-look" fee. The Boleman Firm also generally receives additional sums paid by the debtor, such as in the Vernon-Williams case, where the Boleman Firm received $194.00 for the filing fee and $156.00 for costs from the debtor. These aforementioned four sums equal $2,130.00, and thus, the Boleman Firm already received $1,932.00 ($2,126.00 less the $194.00 filing fee) of said total for its fees and costs. And while the amounts vary, the same patterns exist in the other cases; therefore, the Boleman Firm has already received at least $1,780.00 to $1,900.00 in each case.

The United States Trustee alleges that the Boleman Firm has requested supplemental fees for services that should have been compensated for by the $1,500.00 "no-look" fee. Furthermore, the United States Trustee alleges that the Boleman Firm improperly bills for clerical services. In contrast, the Boleman Firm contends that its staff is highly skilled and that such services rendered were reasonable and necessary. Further, the Boleman Firm contends that the firm only files supplemental fee applications in a minority of cases, and that the filing of supplemental applications is only intended to recover fees and costs for cases where the firm performed the work and deserves compensation.

Given the Court's inability to decipher the supplemental applications because of the

lack of actual time records, confusion surrounding costs and general mathematical discrepancies, this Court cannot likewise evaluate whether any of the fees should be denied because said fees should be consumed in the "no-look" fee or are clerical in nature.

## V.
## SUMMARY

The award of fees in bankruptcy cases requires the Court to balance two essential yet potentially competing concerns: moderation in the interest of the estate and its creditors and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require. *In re Yale Express Sys.*, 366 F. Supp. 1376, 1381 (S.D.N.Y. 1973). "Thus . . . the compensation awarded must be for actual and necessary services, and must not exceed that which is reasonable." *In re Hamilton Hardware Co.*, 11 B.R. 326, 329 (Bankr. E.D. Mich. 1981). This Court is not unmindful of the extensive evidence adduced here that the Boleman Firm enjoys an excellent reputation for the performance of its duties in representing debtors. The Boleman Firm's commitment to continuing legal education and community outreach is laudable. A well-deserved reputation for competence, however, does not obviate the need to present this Court with sufficient documentation to permit an objective and methodical review of the firm's entitlement to compensation. Chief Judge Tice's earlier observations concerning a debtor's counsel regretfully are apt to describe the Court's dilemma in the instant matter: "The court does not doubt that counsel serves his clients well. However, he seems to bypass the established procedures by which courts in this district measure chapter 13 attorney fees." *In*

79

*re Carter*, Case No. 02-67413, Memorandum Opinion & Order, at 5 (Bankr. E.D. Va. Mar.

31, 2003) (unpublished).

Here the Court is simply unable to award the Boleman Firm additional fees and costs

in each of these eleven cases where the evidence and documentation utilized in supporting

its applications was produced without the benefit of contemporaneously recorded actual time

attributed to any of the endeavors.  This is especially difficult for the Court in the instances

here, where in each of the eleven cases the Boleman Firm has heretofore received

compensation.  It is axiomatic that in order to approve an award of supplemental

compensation in a Chapter 13 case, the Court must not only be persuaded of the entitlement

to the additional compensation sought, but that the original fees awarded without the benefit

of a formal fee application were fully earned.  This cannot be done here.

The Boleman Firm has argued the records it maintains are sufficient to establish the

actual and contemporaneous time records consistently required by this Court as articulated

in both its decisions and its Guidelines.  The use of the unauthenticated "minimums" by the

Boleman Firm as its substitute for actual time records is tantamount to the use of "averages"

or "estimates" by counsel, which have been consistently rejected as unsatisfactory by this and

many other courts.  Further, the evidence adduced at the hearing casts substantial doubt that

the "minimums" contained in the unproduced Boleman template are anything more than an

estimate of the time consumed by the tasks performed.

The Boleman Firm has also argued that, even if the Court deems its documentation

insufficient, nonetheless it should award the additional compensation sought because the evidence establishes these fees were reasonable and necessary.  However, the record is barren of any evidence to provide a quantifiable foundation for this conclusion.  The Boleman Firm surely performed a number of tasks in each of these cases; the Court simply has not been provided a reasonable basis to value these tasks when the attorney has already received significant compensation in each instance and provided no contemporaneous time records to support the performance of these activities.

The burden of proof regarding these contested fee applications resides with the Boleman Firm and because the Court could not decipher the firm's request given the "minimums" calculated after-the-fact and the blurring of fees and costs, the Boleman Firm did not meet their burden regarding these supplemental fee applications.  Therefore, given all of this, the Court denies the supplemental fee requests in these eleven cases.[55]

A separate order will issue.

The Clerk shall deliver copies of this Memorandum Opinion to C. Thomas Ebel, Jeffrey H. Geiger, and William A. Gray, Counsel for the Boleman Law Firm, P.C.; John R. Byrnes, Assistant United States Trustee; the Debtor in the Vernon-Williams case and the first ten

---

[55] While some other courts, in rejecting the fee applications, have given the debtor's counsel permission to resubmit the fee applications with actual time and expense records, this Court does not think that would be a worthwhile alternative in this case because the evidence is uncontested that actual contemporaneous time records do not exist.  Further, any attempt of clearing up the confusion surrounding how the Boleman Firm accounts for pre-petition costs, discloses costs, and determines discounts should have occurred during the one and one-half day hearing that ensued regarding these eleven cases or in the Post-Trial Memorandum that the Court allowed the parties to submit.

Debtors listed in attached Exhibit A, who are the Debtors listed in the above-captioned proceeding; and all Debtors who have requested notice and are listed in attached Exhibit B.

Entered:   *April 27, 2006*

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

## APPENDIX: COST ANALYSIS

| Debtor | Initial Amount Approved | Amount Paid by Client Pre-Petition* | Total Received (Approved + Paid) | Initial Costs (Through 341 Mtg) | Initial Cost Less Amount Client Paid | Amount Received Less Initial Costs |
|---|---|---|---|---|---|---|
| Vernon-Williams | $280.00 | $156.00 | $436.00 | $328.59 | $172.59 | $107.41 |
| Doelling | $280.00 | $0.00 | $280.00 | $415.80 | $415.80 | -$135.80 |
| Pyles | $280.00 | $200.00 | $480.00 | $270.46 | $70.46 | $209.54 |
| Markins | $280.00 | $200.00 | $480.00 | $362.41 | $162.41 | $117.59 |
| Lipscomb | $280.00 | $140.00 | $420.00 | $270.07 | $130.07 | $149.93 |
| Childrey | $280.00 | $140.00 | $420.00 | $250.58 | $110.58 | $169.42 |
| Barakhyahu | $280.00 | $140.00 | $420.00 | $330.27 | $190.27 | $89.73 |
| Wood | $280.00 | $200.00 | $480.00 | $467.76 | $267.76 | $12.24 |
| Jarrell | $280.00 | $150.00 | $430.00 | $259.76 | $109.76 | $170.24 |
| Ranicki | $280.00 | $140.00 | $420.00 | $254.83 | $114.83 | $165.17 |
| Berryman | $280.00 | $140.00 | $420.00 | $285.34 | $145.34 | $134.66 |

* The Court relied on the amount listed on the supplemental fee applications in determining amount paid by client pre-petition.

| Subsequent Costs (Post-341 Mtg) (Supplemental Costs) | Total Costs | Amount Received Less Total Costs (Over- or Underpaid) (applied to fees) |
|---|---|---|
| $238.85 | $567.44 | -$131.44 |
| $594.09 | $1,009.89 | -$729.89 |
| $2.86 | $273.32 | $206.68 |
| $254.21 | $616.62 | -$136.62 |
| $137.79 | $407.86 | $12.14 |
| $31.29 | $281.87 | $138.13 |
| $385.27 | $715.54 | -$295.54 |
| $20.86 | $488.62 | -$8.62 |
| $197.12 | $456.88 | -$26.88 |
| $290.36 | $545.19 | -$125.19 |
| $150.33 | $435.67 | -$15.67 |

## Exhibit A

| Case # | Name |
|---|---|
| 03-32020 | Doelling |
| 03-32251 | Pyles |
| 03-34259 | Markins |
| 03-35603 | Lipscomb |
| 03-37186 | Childrey |
| 03-37623 | Barakhyahu |
| 03-37772 | Wood |
| 03-37773 | Jarrell |
| 03-38152 | Ranicki |
| 03-39422 | Berryman |
| 03-40426 | Gaines |
| 03-40947 | Randall |
| 03-41057 | Mootz |
| 03-41456 | Murrell |
| 03-41735 | Boxley |
| 04-30084 | Harris |
| 04-30146 | Paige |
| 04-30279 | Hobbs |
| 04-30403 | Watson |
| 04-30481 | Womack |
| 04-30497 | Hall |
| 04-31093 | Carlton |
| 04-31160 | Lawson |
| 04-31202 | Watts |
| 04-31206 | Mason |
| 04-31251 | McMillan |
| 04-31276 | Fuller |
| 04-31320 | Blow |
| 04-31537 | Carey |
| 04-32145 | Rouse |
| 04-32203 | Gray |
| 04-32265 | Hague |
| 04-32421 | Houston |
| 04-32429 | Thompson |
| 04-32430 | Gray |
| 04-32592 | Nixon |
| 04-32600 | Williamson |
| 04-32730 | Warren |
| 04-32870 | Douglas |
| 04-32975 | McGuire |
| 04-33056 | Lowell |
| 04-33062 | Keck |
| 04-33102 | Stidham |
| 04-33260 | Riedmuller |
| 04-33355 | Harrington |
| 04-33438 | Powell |
| 04-33467 | Perkins |
| 04-33942 | Thompson |

| 04-34321 | Pensabene |
|----------|-----------|
| 04-34355 | Portis |
| 04-34431 | Stockwell |
| 04-34543 | Allen |
| 04-34551 | LaPierre |
| 04-34659 | Richerson |
| 04-34756 | Cosby |
| 04-35223 | Harrison |
| 04-35376 | Williams |
| 04-35601 | Russell |
| 04-35657 | Shields |
| 04-36026 | Jones |
| 04-36261 | Gray-Hurst |
| 04-36292 | Burnett |
| 04-36392 | Witcher |
| 04-36550 | Snyder |
| 04-36598 | Ford |
| 04-36838 | Everett |
| 04-36868 | Johnson |
| 04-36881 | Bowman |
| 04-36886 | McFarland |
| 04-36999 | Campbell |
| 04-37223 | Williams |
| 04-37285 | Harrison |
| 04-37303 | Johnson |
| 04-37349 | Perkins |
| 04-37352 | Jasper |
| 04-37360 | Taylor |
| 04-37392 | Corral |
| 04-37498 | Lewis |
| 04-37683 | Bell |
| 04-37747 | Collins |
| 04-37829 | Moore |
| 04-37839 | Talbott |
| 04-37921 | Dupree |
| 04-38054 | Adair |
| 04-38066 | Cox |
| 04-38067 | Parsons |
| 04-38072 | Harrison |
| 04-38075 | Freeman |
| 04-38256 | Mack |
| 04-38284 | Saintsing |
| 04-38337 | Gaddy |
| 04-38350 | Singleton |
| 04-38379 | Thomas |
| 04-38422 | Tisdale |
| 04-38439 | White |
| 04-38676 | Johnson |
| 04-39352 | Jackson |
| 04-39532 | Hostelka |
| 04-39777 | Garnes |
| 04-39796 | Cullom |

| | |
|---|---|
| 04-39893 | Archer |
| 04-40019 | Stratton |
| 01-31735 | Edwards |
| 01-32300 | Burton |
| 01-35006 | Davis |
| 01-35656 | Johnson |
| 01-36878 | Collins |
| 02-64916 | Griffith |
| 02-65512 | Odango |
| 02-67376 | Braxton |
| 03-31603 | Pelham |
| 03-31610 | Gentry |
| 03-31771 | Jenkins |
| 03-33220 | Hill |
| 03-37395 | Baugh |
| 03-38811 | Wyatt |
| 04-31509 | Sarnowski |
| 04-32002 | Smith |
| 04-32818 | Broyles |
| 04-33142 | Graf |
| 04-33210 | Geyer |
| 04-33909 | Puetz |
| 04-35411 | Wilson |
| 04-35414 | Gates |
| 04-35659 | Wynn |
| 04-36423 | Honeycutt |
| 04-36669 | Rodriguez |
| 04-36932 | Jones |
| 04-37133 | Wilkerson |
| 04-38211 | Kenney |
| 04-38510 | Hill-Johnson |
| 04-38653 | Fauntleroy |
| 04-39846 | Perry |

**Exhibit B**
**Debtors' Requests for Notice Filed in Case 04-37223, Vernon-Williams**

| | |
|---|---|
| 1)Martha Lee Allen | 04-34543 |
| 2)Abraham Barakhyahu | 03-37623 |
| 3)Linda D. Bell | 04-37683 |
| 4)Angelia Braxton | 02-67376 |
| 5)Crezone T. Burton | 01-32300 |
| 6)Rebecca S. Cox | 04-38066 |
| 7)George A. Ford | 03-36598 |
| 8) Mark Fuller | 04-31276 |
| 9)Kimberly Garnes | 04-39777 |
| 10)Alma Campbell Gates | 04-35414 |
| 11) Hilary L. Graf | 04-33142 |
| 12)Susan S. Gray-Hurst | 04-36261 |
| 13)Jennifer Griffith | 02-64916 |
| 14)Shirley D. Harrison | 04-38072 |
| 15)Tracy & Wayne Harrison | 04-35223 |
| 16)David & Sarah Hill | 03-33220 |
| 17)Wayne L. Johnson | 04-38676 |
| 18)Gerald D. LaPierre | 04-34551 |
| 19)Cheryl A. McGuire | 04-32975 |
| 20)Bruce & Holly Paige | 04-30146 |
| 21)Marlene Pelham | 03-31603 |
| 22)Bascom & Helen Perkins | 04-33467 |
| 23)Dawn S. Randall | 03-40947 |
| 24)Lance Singleton | 04-38350 |
| 25)Stanley Taylor | 04-37360 |
| 26)Kenneth Wilkerson | 04-37133 |
| 27)Vernon & Debra Womack | 04-30481 |