# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | | |
|---|---|---|---|
| In re: | ) | | |
| | ) | | |
| ELLEN LUCILLE VERNON-WILLIAMS, | ) | Case Nos.: | 04-37223-DOT |
| GERALD & VICKI DOELLING, | ) | | 03-32020-DOT |
| JIMMY & DEBORAH PYLES, | ) | | 03-32251-DOT |
| GERALDINE BESSIE MARKINS, | ) | | 03-34259-DOT |
| MICHAEL LEE LIPSCOMB, JR., | ) | | 03-35603-DOT |
| THOMAS D. CHILDREY, IV, | ) | | 03-37186-DOT |
| A'BRAHAM BARAKHYAHU, | ) | | 03-37623-DOT |
| CARROL & MELINDA WOOD, | ) | | 03-37772-DOT |
| ZOE LAQUANDA JARRELL, | ) | | 03-37773-DOT |
| MARY LOU ANN RANICKI, | ) | | 03-38152-DOT |
| CELESTINE BERRYMAN, | ) | | 03-39422-DOT |
| | ) | | |
| *Debtors.* | ) | | |
| | ) | Chapter 13 | |

## MEMORANDUM OPINION
## CONCERNING SUPPLEMENTAL FEES

These matters come before the Court upon remand from the United States District Court for

the Eastern District of Virginia.  On November 28, 2006, the United States District Court issued a

Memorandum Opinion and Order in the above captioned matters which affirmed in part and reversed

in part this Court's Order Denying Supplemental Fees and Costs entered on April 27, 2006.

Hearings were held on April 30, 2007.  At the conclusion of the hearings, the Court took these

matters under advisement.  The Court has jurisdiction over these proceedings pursuant to 28 U.S.C.

§§ 157(b)(2) and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Upon

consideration of the evidence and arguments presented by counsel at the hearings and the pleadings

submitted, the Court makes the following findings of fact and conclusions of law.

## I.  PROCEDURAL HISTORY

The procedural history and applicable facts of these cases were thoroughly discussed in this

Court's previous Memorandum Opinion. *See In re Vernon-Williams*, 343 B.R. 766, 770-81 (Bankr. E.D. Va. 2006), *aff'd in part, rev'd in part and remanded sub nom. The Boleman Law Firm, P.C. v. United States Trustee*, 355 B.R. 548 (E.D. Va. 2006). Thus, the Court will not repeat them here and recites the applicable procedural history which has occurred since the issuance of the Court's previous Memorandum Opinion.[1]

On May 8, 2006, counsel for The Boleman Law Firm, P.C. (the "Boleman Firm") timely filed the firm's Notice of Appeal with the Court. On May 18, 2006, the Boleman Firm filed its Statement of Issues Presented, which listed ten issues for the United States District Court to determine on appeal. Those issues included whether this Court erred in holding "that funds received as reimbursement for costs were actually applied to fees" and in holding "that all requested costs must be denied despite relevant, trustworthy and persuasive evidence that costs were incurred in providing required services." Statement of Issues Presented, filed by The Boleman Law Firm, P.C., May 18, 2006, Docket Entry 208, at 2.[2] In its brief filed in the District Court, the Boleman Firm stated with regard to the cost issues:

> While Boleman initially appealed the Bankruptcy Court's rulings denying both fees and costs, this brief—and the appeal—are limited solely to the issue of the Bankruptcy Court's denial of supplemental attorneys' fees. Boleman intends to submit additional cost information to the Bankruptcy Court, at least with respect to the remaining 122 cases. . . .

Excerpt of Brief of Appellant, The Boleman Law Firm, P.C., in Support of its Appeal from the

---

[1]  The procedural history since the issuance of the Court's previous Memorandum Opinion is also contained in the Court's Memorandum Opinion Concerning Reconsideration of Costs, issued concurrently.

[2]  Unless otherwise noted, all pleadings cited were filed in the case of Ellen Lucille Vernon-Williams, Case No. 04-37223-DOT, which was designated as the lead case by the Court for these proceedings.

United States Bankruptcy Court, filed May 2, 2007, Docket Entry 257.[3]

While the appeal was pending, this Court held a Status Hearing on June 23, 2006, with regard to the remaining cases associated with the United States Trustee's First and Second Omnibus Objections to Supplemental Fee Applications of the Boleman Law Firm.  As a result of the status hearing, the Court determined that it was appropriate to continue the remaining related cases generally pending the ruling of the appellate court.  The Court also directed the Chapter 13 Trustee to maintain and reserve funds in his trust account for attorney fees in the related cases and allowed the Chapter 13 Trustee to proceed with the dismissal, closing, or conversion of cases, as appropriate.

On November 28, 2006, Chief United States District Judge James R. Spencer issued a Memorandum Opinion and Order affirming in part, reversing in part, and remanding  the cases for further proceedings consistent with the opinion.  *The Boleman Law Firm, P.C. v. United States Trustee*, 355 B.R. 548 (E.D. Va. 2006).  The District Court affirmed this Court's denial of the Boleman Firm's Motion to Quash and Overrule the Omnibus Objection, finding that the Court was significantly aided by the United States Trustee in exercising its duty to review the reasonableness of compensation.  *Id*. at 551-52.  With regard to the Boleman Firm's contention that the Bankruptcy Court committed error by disallowing expert testimony by Bruce Matson, Esquire, the District Court found that this Court did not abuse its discretion in disallowing such testimony when it reasoned that because Mr. Matson served not as a Chapter 13 Trustee, but instead as a Chapter 7 Trustee, Mr.

---

[3]  At the conclusion of the hearings held on April 30, 2007, the Court directed counsel for the Boleman Firm to file as an exhibit in the instant case the portion of the firm's Appellant Brief filed with the United States District Court which stated that the firm was not going to proceed on its appeal of the issue of reimbursement of costs, so as to aid the Court in its determination of whether the Court could reconsider the issue of reimbursement of costs allegedly incurred in these cases.

Matson did not possess the requisite experience in Chapter 13 bankruptcy cases. *Id*. at 552.  The

District Court found that the Bankruptcy Court committed error in holding that traditional

contemporaneous time records must be present for the Court to perform the lodestar analysis and

reversed and remanded the matters to the Bankruptcy Court. *Id*. at 553.  In so holding the District

Court reasoned that while "actual time records are the preferred starting point in the lodestar analysis

. . . [t]heir unavailability . . . does not preclude further analysis—especially when, as in this case, it

is undisputed that the work for which compensation is sought was performed." *Id*.  The Court

further directed that "[s]uch inadequate documentation is clearly 'a proper basis for reducing a fee

award.'" *Id*. (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Guidry v. Clare*, 442 F. Supp.

2d 282, 294 (E.D. Va. 2006)).  The District Court instructed that when a court is presented with

inadequate time records, it must independently determine the reasonableness of the hours spent in

the case by utilizing the twelve *Johnson* factors[4] and "'other considerations,'" and then reduce the

---

[4]  In *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978), *cert. denied*, 439 U.S. 934
(1978), the Fourth Circuit held that courts must consider the twelve factors set forth in *Johnson
v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), when determining the
reasonableness of the attorney fees requested.  These twelve factors, commonly referred to as the
"*Johnson* factors," include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered;
> (4) the attorney's opportunity costs in pressing the instant litigation; (5) the
> customary fee for like work; (6) the attorney's expectations at the outset of the
> litigation; (7) the time limitations imposed by the client or circumstances; (8)
> the amount in controversy and the results obtained; (9) the experience,
> reputation and ability of the attorney; (10) the undesirability of the case within
> the legal community in which the suit arose; (11) the nature and length of the
> professional relationship between attorney and client; and (12) attorneys' fees
> awards in similar cases.

*Barber*, 577 F.2d at 226 n.28.  These factors were also discussed with regard to the lodestar
analysis in this Court's previous opinion in these proceedings.  *See In re Vernon-Williams*, 343

fee award by either reducing the hours that are not adequately documented or by reducing the award by a fixed percentage. *Id.* (citing *Guidry*, 442 F.Supp.2d at 294).

On January 10, 2007, counsel for the Boleman Firm filed a Motion to Rescind Order Continuing Generally All Cases and for Order Allowing All Pending Supplemental Fee Applications with a Ten Percent (10%) Downward Adjustment or, in the Alternative, to Set All Pending Supplemental Fee Applications for Trial ("Motion to Rescind"). The Boleman Firm requested that the Court's previous order continuing generally the remaining cases associated with the United States Trustee's First and Second Omnibus Objections to Supplemental Fee Applications of the Boleman Law Firm be rescinded and that the firm's request for supplemental fees in those cases be approved, less a ten percent reduction to account for the firm's failure to "maintain traditional time records for these cases" so as to be consistent with the ruling by the United States District Court and to "provide[] a mechanism by which the voluminous pending Supplemental Fee Applications can be resolved without undue burden on the Court and other affected parties . . . ." Motion to Rescind, filed Jan. 10, 2007, Docket Entry 230, at 3-4.

The United States Trustee filed a response to the Motion to Rescind on February 12, 2007. The United States Trustee opposed the suggestion to approve the fee applications subject to a ten percent reduction, arguing that the request "completely ignores the extensive legal process that has taken place so far and glosses over serious deficiencies and irregularities in the Boleman system of keeping time records . . . ." Response by United States Trustee to Motion to Rescind, filed February 12, 2007, Docket Entry 233, at 1-2.

On March 13, 2007, this Court conducted a Status Hearing with regard to the Motion to

---

B.R. 766, 786 (Bankr. E.D. Va. 2006).

Rescind and the Court's previous order continuing generally the remaining cases associated with the United States Trustee's First and Second Omnibus Objections.  Upon consideration of the representations made by counsel for both the Boleman Firm and the United States Trustee of their desire to set all of the pending Supplemental Fee Applications for hearings, the Court set the remanded cases as well as all pending Supplemental Fee Applications for evidentiary hearings for April 30, 2007, thereby granting in part the Boleman Firm's Motion to Rescind.  By request of the parties, this Court held a telephonic hearing on April 5, 2007, during which the parties moved to restrict the hearings scheduled for April 30, 2007, to those cases which were the subject of the remand of the District Court and to continue generally the remaining cases associated with the United States Trustee's First and Second Omnibus Objections.  The Court granted the parties' request.

On April 20, 2007, the Boleman Firm filed its lists of exhibits, numbered 1R through 19R,[5] and witnesses with the Court.  On April 22, 2007, the United States Trustee filed a Statement Concerning Exhibits and Witnesses, stating that he had no exhibits or witnesses to identify pursuant to Federal Rule of Civil Procedure 26(a)(3) and Federal Rule of Bankruptcy Procedure Rule 7026(a)(3).  The United States Trustee objected to the nineteen exhibits proposed by the Boleman Firm on April 23, 2007, in which he argued that eleven of the exhibits addressed the issue of reimbursement of costs, which issue was not reversed by Chief Judge Spencer, and thus were irrelevant and outside the scope of the Court's inquiry on remand.  Thus, "[t]he Bankruptcy Court's denial of the requested costs still stands as the law of this case . . . ."  Objection of the United States

---

[5]  The exhibits offered by the Boleman Firm were so designated with the letter "R" to differentiate the exhibits offered at the April 30, 2007, hearings from those offered at the hearings held on March 7-8, 2006.  *See* Transcript of April 30, 2007, hearings, at 29.

6

Trustee to the Admission into Evidence of Exhibits 1-19, filed April 23, 2007, Docket Entry 252, at 1. He also argued that those exhibits were inadmissible because they were not in existence at the time of the initial trial in 2006. The United States Trustee objected to the remaining eight exhibits as also being irrelevant because the time and tasks described therein occurred subsequent to the submission of the Supplemental Fee Applications in question and had no bearing on the fee applications currently before the Court. *Id*. at 1-2. The Boleman Firm filed a Trial Memorandum on Remand on April 27, 2007.

Hearings were held and concluded on April 30, 2007. The Court denied the Boleman Firm's request to approve the Supplemental Fee Applications subject to the suggested ten percent reduction. The Court provisionally admitted the Boleman Firm's Exhibits 1R through 19R. The Court also admitted the Boleman Firm's Exhibits 20R through 30R which were offered during the hearing. At the conclusion of the hearings, the Court directed the parties to submit concurrent briefs within thirty days regarding: (1) whether the Court should be permitted to accept the additional evidence offered by the Boleman Firm so as to supplement the evidence before the Court; and (2) whether the Court has jurisdiction to revisit its previous denial of costs in the eleven remanded cases, as sought by the Boleman Firm. The Court also directed that the parties submit their closing arguments in concurrent briefs within the thirty-day period following the hearing. The Court ordered that concurrent reply briefs were due within fifteen days after the filing of the initial concurrent briefs. Finally, the Court directed counsel for the Boleman Firm to file as an exhibit with the Court the relevant portion of the firm's appellate brief filed with the District Court, so as to aid the Court in its determination of whether the Court could reconsider at this stage of the proceedings the issue of reimbursement of costs allegedly incurred in these cases.

Prior to the submission of briefs, the parties submitted to the Court a stipulation and consent order with regard to the taking of new evidence on remand. In that stipulation, the United States Trustee agreed to withdraw its objection to the admission of the Boleman Firm's Exhibits 1R through 19R which the Court provisionally admitted at the April 30, 2007, hearings. The parties further agreed that the Court should consider all of the evidence submitted to the Court at the hearings. The Court accepted the stipulation and entered the consent order on May 29, 2007, which admitted all evidence previously provisionally admitted by the Court and removed the requirement for the parties to submit post-hearing briefs on the issue of whether the Court should be permitted to accept the additional evidence offered by the Boleman Firm. The excerpt of the Boleman Firm's appellate brief as well as the parties' briefs were timely received by the Court.

This opinion addresses the issue of whether the Court should award supplemental compensation to the Boleman Firm. The Court concurrently issued a separate Memorandum Opinion Concerning Reconsideration of Costs.

## II. FINDINGS OF FACT

This Court makes the following findings of fact based upon the testimony given by the sole witness at the hearing, Mark Leffler ("Leffler"), an attorney at the Boleman Firm,[6] and exhibits submitted at the April 30, 2007, hearings. These findings of fact supplement the factual findings made by this Court in its previous Memorandum Opinion issued April 27, 2006, and include references to the Court's previous findings as necessary.

---

[6] Mr. Leffler provided testimony at the hearing held on March 7-8, 2006. Mr. Leffler is a five percent shareholder of the Boleman Law Firm and has worked at the firm since 2000. *In re Vernon-Williams*, 343 B.R. 766, 772-73 (Bankr. E.D. Va. 2006); *see also* Tr. at 42.

8

A. *Ellen Lucille Vernon-Williams*, 04-37223-DOT

Ellen Lucille Vernon-Williams was subject to a number of collection actions when she engaged the Boleman Firm to represent her in her Chapter 13 bankruptcy case. These actions included a warrant in debt; two payroll levies; and the imminent repossession of her automobile. Transcript of April 30, 2007, hearings, at 43-44 (hereinafter "Tr."). According to Leffler, in addition to providing services that the firm typically considers to be "no-look services,"[7] the firm also provided supplemental services,[8] including halting pre-petition collections activities by immediately communicating to those creditors that Ms. Vernon-Williams had filed bankruptcy. *Id.* at 44-45. The firm also addressed an objection to confirmation of the debtor's initial Chapter 13 plan filed by the Internal Revenue Service ("IRS") on the basis that the plan did not provide for the secured claim of the IRS. *Id.* at 45. The firm, after reviewing Ms. Vernon-Williams' credit report, which they had accessed prior to filing her petition but which did not reflect the IRS lien, agreed with the IRS that the objection should be sustained as to the original Chapter 13 plan and that a modified Chapter 13

---

[7] As explained in this Court's earlier opinion, this Court routinely approves a Chapter 13 fee request that is at or below the amount permitted under this Court's Local Bankruptcy Rule 2016-1 ($1,500.00), and the general custom in this district is that the fee is approved without a hearing. This request is typically referred to in the district as the "no-look" fee. *In re Vernon-Williams*, 343 B.R. at 785 (citing *In re Roman*, Case No. 05-31472, 2005 WL 3736305, at *1 (Bankr. E.D. Va. June 27, 2005)). When a case involves routine, customary services, a supplemental fee application should not be necessary. *Id.* Chief Judge Tice has discussed that the "no-look" fee should "cover interviews with the client, contacting creditors when necessary and verifying other information for the statements and schedules, preparation of petition, schedules and a confirmable plan, attendance at the § 341 meeting of creditors, and, finally, attendance to other routine matters encountered in the case." *In re Harris*, Case No. 96-36765-T, 1998 WL 408896, at *1 (Bankr. E.D. Va. 1998).

[8] While several references within the findings of fact speak of "supplemental services," this terminology is used only to indicate the designation given to those services by Leffler within his testimony. The Court makes no finding in this section as to whether the services deemed to be "supplemental" in nature by the Boleman Firm are properly classified as such.

plan should be filed.  *Id.* at 46.

Leffler agreed that at least 3.2 hours of the time spent performing supplemental services in the Vernon-Williams case was spent within two days of filing the petition.  *Id*. at 57-58.  Leffler explained that the firm contacted the creditors that were taking collection action against the debtor on or about the same date on which the petition was filed.  *Id*. at 58.  He testified that certain services are determined to be supplemental in nature and beyond those services included in the "no-look" fee based upon "the history of fee applications in the Richmond Division, and the fact that those services have quite frequently been treated as supplemental services by the Court in its review of applications."  *Id.* at 46-47; *see also id.* at 58-59 (similar testimony).  By example, he cited to the objection by the IRS in the Vernon-Williams case as "one of these types of services that here in the Richmond Division, and I believe elsewhere, is typically treated and considered to be a supplemental service."  *Id*. at 47.  On cross-examination, Leffler further stated that the firm approached the process of determining which services to include in a supplemental fee application (as opposed to the services included in the "no-look" portion of the fees) based upon the historical rulings of and instruction by this Court.  *Id*. at 58-59.

Leffler also testified regarding the general timekeeping manner at the Boleman Firm, referencing the Supplemental Fee Application filed in the Vernon-Williams case.[9]  When asked whether the amounts of 3.1 hours each billed by the individuals identified by the initials "RA" and "PK" was accurate, Leffler stated that time is recorded in tenths of an hour and that if the hours spent were multiplied by the 6-minute increment, the total may exceed the time actually spent.

---

[9]  The Supplemental Fee Application filed in the Vernon-Williams case was submitted as Exhibit 38 to the Court during the course of the March 7-8, 2006, hearings.

10

Leffler qualified his statement, however, noting that he did not meet with Ms. Vernon-Williams, and he did not prepare the fee application in that case. *Id*. at 60-61.

Both attorneys and administrative staff at the Boleman Firm keep time for all tasks performed, including performing legal work and executing clerical duties such as making and serving copies of documents. *Id*. at 64, 67. Leffler confirmed that photocopies were made of various documents during the course of a bankruptcy case, including the debtor's driver's license; pay stubs; Kelley Blue Book values; and Chapter 13 plans. *Id*. at 65. Leffler stated his belief that it was proper to bill for the time spent making photocopies because of the requirements in the Federal Rules for serving documents on parties in interest. *Id*. at 66. When asked whether any tasks performed at the Boleman Firm would be considered overhead, Leffler stated that "things that are of a general nature that address the business needs of our firm" would be considered such, but that time is kept for every task performed, unless the task is *de minimus*, such as receiving a telephone call from a client on a matter not related to the bankruptcy case. *Id*. at 67.

Regarding the Vernon-Williams case in particular, Leffler stated that the four separate creditor actions the debtor was facing "required our firm to act rapidly in taking Ms. Vernon-Williams from the initial consultation to the bankruptcy filing, just two days later." *Id*. at 47. He went on to state that the number of creditors pursuing collection from Ms. Vernon-Williams was "a bit above and beyond the typical bankruptcy case." *Id*. Leffler also believed that the response to the objection to confirmation by the IRS should properly be considered supplemental because the firm followed their "normal procedures" in accessing the debtor's credit report to address any issues before they arose but that in the Vernon-Williams case, the IRS lien was not reflected. As a result, the firm was required to communicate with counsel for the IRS and with the debtor; attend Court

11

on her behalf; and file a modified Chapter 13 plan, which was confirmed. *Id*. at 47-49. Regarding the current status of the Vernon-Williams case, Leffler represented that the debtor was current in making her Chapter 13 plan payments to the Trustee and that she would receive her discharge in approximately May 2008, following the final plan payment. *Id*. at 70-71.

Leffler discussed the Boleman Firm's Exhibit 20-R with relation to the Vernon-Williams case. According to Leffler, he reviewed the Supplemental Fee Application and verified that the numbers contained on Exhibit 20-R matched those contained in the Supplemental Fee Application. *Id*. at 53. Leffler explained that the third section of the document reflected the total amount that was requested in the application; the voluntary reduction by the Boleman Firm attributable to their "good billing judgment"; and the overall percentage and amount of that reduction attributable to the fees. *Id*. at 54-55 (referencing Exhibit 20-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 04-37223-DOT, Ellen Lucille Vernon-Williams). As the exhibit reflects, the total fees sought by the Boleman Firm as of the date of the Supplemental Fee Application was $2,574.50, comprised of the amount from Line 114 ($1,795.50) and Line 204 ($779.00) of the document attached to the Supplemental Fee Application. When the "no-look" amount of $1,500.00 is subtracted, the net fee is $1,074.50.[10] The exhibit further shows that the total amount of fees and costs requested in the application was $800.00, reduced by $426.98 from the total fees and costs of $1,226.98. The firm calculated that 88% of the total amount sought related to the firm's fees, resulting in the portion of the total amount requested attributable to fees as $704.00. *See Boleman*

---

[10] Costs incurred by the Boleman Firm, according to Exhibit 20-R, totaled $782.48. Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate. The firm represents that it received $350.00 from Ms. Vernon-Williams that it applied to costs. Thus, a balance of $152.48 remained for costs.

Law Firm Exhibit 20-R.

## B.  *Gerald & Vicki Doelling*, 03-32020-DOT

Gerald and Vicki Doelling had been recently evicted from their home and owed a significant debt to the Internal Revenue Service when they met with Leffler.  Mr. Doelling had suffered from extensive serious illnesses and was receiving disability payments, and Mrs. Doelling was unemployed at that time.  The Doellings were referred to the Boleman Firm by a local charity that often refers clients to the firm.  Tr. at 73.

Leffler reviews every fee application made in a consumer bankruptcy case that appears on the Court's docket in the Richmond, Norfolk, and Newport News divisions.  Based upon his review of those applications, he does not see anything on the Supplemental Fee Application filed in Doelling case that is inconsistent with general billing practices.  *Id*. at 75-76.  The supplemental services provided by the firm to the Doellings consisted of responding to a Motion for Relief from the Automatic Stay; responding to multiple objections by the Internal Revenue Service to confirmation of the Chapter 13 plans; filing modified Chapter 13 plans; and responding to two Motions to Dismiss filed by the Chapter 13 Trustee.  *Id*. at 74.  According to Leffler, these matters necessitated attendance at court hearings and are routinely considered to be supplemental services in general by the Richmond bankruptcy bar.  *Id*. at 74-75.  The Motion for Relief was filed "a couple of months" after the Doellings' Chapter 13 case was filed and related to an automobile that the Doellings co-owned with their son and daughter-in-law.  Leffler testified that the automobile was not provided for in the Doellings' Chapter 13 plan, since they did not drive it.  Nonetheless, the firm represented the Doellings at the hearing on the Motion for Relief, which resulted in the granting of relief in favor of the creditor.  *Id*. at 81.

13

The objection to confirmation filed by the IRS, relating to the failure to provide for the priority tax debt owed to the agency and the general tax lien secured by the Doellings' property, was the "primary" focus of the effort expended on behalf of the Doellings. *Id*. at 81. Leffler initially believed that, although a large amount of tax debt was owed to the IRS, none of that debt was incurred within the priority time period prescribed by the Bankruptcy Code. However, the IRS cited in its objection to confirmation that the Doellings had not filed several tax returns. Members of the Boleman Firm other than Leffler consulted with the Doellings regarding the tax lien. The objection was sustained by the Court, and the Doellings filed a modified plan. *Id*. at 81-83. The modified plan did not reflect the tax lien, which the IRS indicated had been filed in Kansas, but where the Doellings insisted they had never lived. The IRS objected to the modified plan on the basis that there was no provision for the agency's secured claim. The firm again consulted with the Doellings, and the IRS continued its investigation of the lien. The parties agreed to sustain the objection to confirmation; Leffler stated that "the idea was that we would get this worked out with the IRS." *Id*. at 83. Leffler explained that the firm stayed in contact with the IRS, and eventually the IRS confirmed that the tax lien had been filed in the wrong jurisdiction. According to Leffler, the IRS amended its proof of claim, removing the designation of secured status, classifying a small portion of the debt as priority debt and the remainder as a general unsecured claim. *Id*. at 83-84. Leffler testified on cross-examination that he had inquired at the initial interview with the Doellings as to whether they had filed all of their tax returns, and they answered in the affirmative. *Id*. at 84.

The Doellings' case has since been dismissed, after remaining in their Chapter 13 bankruptcy case for approximately three years. According to Leffler, the Doellings suffered additional employment and income problems and even though they eventually became current on their

payments to the Chapter 13 Trustee, their case was dismissed. *Id*. at 74.[11]

Referencing the Boleman Firm's Exhibit 11-R, Leffler explained that beginning on the effective date of BAPCPA, the firm instituted a policy of keeping time in all cases, regardless of whether they were filed prior to the enactment of BAPCPA. Exhibit 11-R reflects the time spent by members of the firm in addressing the two Motions to Dismiss filed by the Chapter 13 Trustee in the Doelling case, which time the Boleman Firm is not seeking compensation for in these proceedings. *Id*. at 78.

Leffler provided explanation with regard to Boleman Firm Exhibit 21-R relating to the Doelling case. Again, Leffler testified that the amounts contained in Exhibit 21-R are an accurate representation of the amounts contained in the Supplemental Fee Application filed in the Doelling case. *Id*. at 79-80 (referencing Boleman Law Firm Exhibit 21-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-32020-DOT, Gerald and Vicki Doelling).

A review of Exhibit 21-R reveals that the fees sought are comprised of the amount from Line 114 ($1,795.50) and Line 242 ($2,006.00) of the document attached to the Supplemental Fee Application. When the "no-look" amount of $1,500.00 is subtracted, the net fee, as represented on the exhibit, is $2,301.50.[12]  The exhibit further shows that the total amount of fees and costs

---

[11]  The Court notes for the record that on July 19, 2007, a combined Motion to Reopen Case, Motion to Substitute Attorney, and Motion to Vacate Order Dismissing Case was filed by proposed new counsel for the Doellings, H. Darden Hutson. Gerald & Vicki Doelling, Case Number 03-32020-DOT, Motion to Reopen Case, Motion to Substitute Attorney, and Motion to Vacate Order Dismissing Case, filed July 19, 2007, Docket Entry 91. A hearing was held on the motion on August 8, 2007, before Chief Judge Tice of this Court, and the matter was taken under advisement. On August 9, 2007, an Order granting the combined Motion was entered by the Court.

[12]  Costs incurred by the Boleman Firm, according to Exhibit 21-R, totaled $1,449.08 as of the date of the Supplemental Fee Application. Of this amount, the Chapter 13 Trustee paid

requested in the application was $1,600.00, reduced by $1,685.58 from total fees and costs of

$3,285.58.  *See* Boleman Law Firm Exhibit 21-R.  According to Leffler, of the $1,600.00 total

amount requested, 70% of that amount, or $1,120.00 was attributable to fees.  Tr. at 79-80

### C.  *Jimmy & Deborah Pyles*, 03-32251-DOT

Jimmy and Deborah Pyles had experienced instability in their income during the years prior

to filing their Chapter 13 case.  According to Leffler, there were no "specific big types of action"

pending against the Pyles at the time they first visited the Boleman Firm; instead, the Pyles were

facing a substantial debt load when their income significantly decreased.  Tr. at 89.

When asked to explain what services the initial $1,500.00 "no-look" fee encompassed,

Leffler began by describing the initial consultation that a prospective debtor has with a

paraprofessional (non-lawyer or administrative) staff member of the Boleman Firm, in which

information is gathered from the clients and documents are reviewed.  Once internal forms are

completed by the paraprofessional, an attorney reviews the forms, asks clarifying questions of the

client, and explains to the client how the bankruptcy process works as well as alternatives to filing

bankruptcy.  *Id*. at 90-91.

With regard to the Pyles case, Leffler referenced Exhibit 60 for the hearing held March 7-8,

2006, the Supplemental Fee Application filed in the Pyles case and recounted that a paraprofessional

member of the firm met with the Pyles on February 22, 2003, reviewed their documents, and

completed the firm's internal forms.  *Id*. at 92.  This employee spent 3.1 hours total performing the

initial consultation with the debtor.  *Id*. at 102.  Attorney Butch Cabreros met with the Pyles and

---

$280.00 to the firm from the bankruptcy estate.  The firm represents that it received $185.00
from the Doellings that it applied to costs.  Thus, a balance of $984.08 remained for costs.

16

reviewed their information. The Pyles finalized their decision to file bankruptcy and retained the

Boleman Firm as counsel. The paraprofessional who initially met with the Pyles prepared the

physical file for another employee, who prepared the petition and schedules. According to Leffler,

the application accurately reflects the services provided for the initial $1,500.00 "no-look" fee. *Id.*

at 92-93. Leffler later confirmed under cross-examination that the paraprofessional employees who

performed the initial consultations in the Vernon-Williams and Doelling cases also spent 3.1 hours

performing those duties, as reflected on the Supplemental Fee Applications in those respective cases.

*Id.* at 102-03.

Regarding the supplemental services provided to the Pyles, Leffler explained that

approximately eighteen months after filing the case, Mrs. Pyles informed the firm that her wages

were being garnished by a creditor that was not listed in the original bankruptcy schedules and was

not listed on the credit reports the firm accessed for the Pyles. The firm amended the bankruptcy

schedules and contacted the creditor to halt the garnishment, which was released approximately one

month after the firm contacted the creditor. *Id.* at 98. The firm also addressed a Motion to Dismiss

by the Chapter 13 Trustee for failure to make payments. Upon contacting their clients, the firm

learned that Mrs. Pyles had been out of work. Mr. Pyles was able to bring the payments current with

his earnings. The firm monitored the Pyles's payments prior to the hearing on the Motion to

Dismiss by asking the Pyles to provide them with copies of all payments sent to the Chapter 13

Trustee's lock box. Those copies were provided to the Chapter 13 Trustee, who withdrew his

motion based upon the curing of the payment arrears. *Id.* at 98-99. According to Leffler, the

Boleman Firm generally requests supplemental fees for these types of services. *Id.* at 99-100.

Leffler represented to the Court that the Pyles remain in their Chapter 13 case, with the last

17

payment being due to the Chapter 13 Trustee in November 2007. He further informed the Court that the Pyles were in the process of seeking the Court's approval to purchase a home, as they did not own real property prior to filing their Chapter 13 bankruptcy. *Id.* at 97.[13]

Regarding Exhibit 22-R of the Boleman Firm relating to the Pyles case, Leffler once again testified that the amounts contained in the exhibit are an accurate representation of the amounts contained in the Supplemental Fee Application filed in the Pyles case. *Id.* at 94 (referencing Boleman Law Firm Exhibit 22-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-32251-DOT, Jimmy and Deborah Pyles). Exhibit 22-R represents that the fee request is comprised of the amount from Line 114 ($1,795.50) and Line 185 ($514.00) of the document attached to the Supplemental Fee Application. The net fee, after subtracting the "no-look" fee, is $809.50. The total amount of fees and costs owed is represented as $649.74, but the firm is only requesting supplemental fees of $500.00. *See* Boleman Law Firm Exhibit 22-R. Leffler explained that the entire $500.00 being requested in the Supplemental Fee Application is attributable to fees because as of the date of the filing of the Supplemental Fee Application, the firm had received monies from the Chapter 13 Trustee for the reimbursement of costs that exceeded the costs actually incurred. Tr. at 95. According to Exhibit 22-R, the Boleman Firm incurred costs totaling $505.24. The Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate for costs. The firm represents that it received $385.00 from the Pyles that it applied to costs, thus resulting in a credit balance of $159.76. However, it appears that the total fees and costs of $649.74 was computed by subtracting the credit balance for costs of $159.76 from the total fees of $809.50. *See* Boleman Law Firm Exhibit 22-R.

---

[13] The Court notes that the Pyles' Chapter 13 discharge was entered on July 27, 2007.

18

D. *Geraldine Bessie Markins*, 03-34259-DOT

Geraldine Markins, a self-employed painting contractor, owed numerous medical bills and was being sued in state court by one of her medical creditors when she met with Leffler. She also owed federal and state tax obligations. Tr. at 105-06. Leffler confirmed that the typical initial consultation procedures were provided to Ms. Markins when she first visited the Boleman Firm on April 22, 2003. The firm prepared bankruptcy petition and schedules for Ms. Markins' signature, which she provided on April 29, 2003; the firm filed her petition that same day. *Id*. at 106.

With regard to the initial services provided to Ms. Markins, Leffler testified that he had no reason to doubt that the descriptions and time records in the Markins case were identical to those same entries in the Vernon-Williams, Doelling, and Pyles cases for both the attorney and the paraprofessional members of the firm. *Id*. at 113.

The Boleman Firm also provided supplemental services to Ms. Markins. Leffler explained that upon filing Ms. Markins' case, the firm contacted the creditor that had filed a warrant in debt, providing the creditor with the relevant documentation regarding the bankruptcy filing and advising the creditor of the automatic stay. The firm later followed up with the creditor to ensure that the warrant in debt had been dismissed, which it had. *Id*. at 107. Ms. Markins' initial Chapter 13 plan was confirmed, but the total amount of the claims filed by her creditors was higher than anticipated. When the Chapter 13 Trustee advised the firm by letter of the underfunding issue created by the higher-than-anticipated claims, the firm reviewed the situation with Ms. Markins and proceeded to file a modified Chapter 13 plan to address the funding concerns of the Chapter 13 Trustee. *Id*. at 107-08. The filing of this modified plan does not appear on the Supplemental Fee Application filed in the Markins case, and Leffler confirmed that the firm was not seeking compensation for that

19

particular service.  *Id*. at 109-10.

Later in the case, the Chapter 13 Trustee filed a Motion to Dismiss the case for unreasonable delay precipitated by the underfunding issue.  This underfunding concern resulted from the filing of a claim by the IRS for a significant post-petition tax claim under Section 1305 of the Bankruptcy Code for tax liability incurred by Ms. Markins in 2003.  Because this priority debt had to be paid in full, payment to the general unsecured creditors was insufficient, leading the Chapter 13 Trustee to file a Motion to Dismiss.  The firm met with Ms. Markins to discuss the matter, and the parties decided to file a modified plan which increased her plan payment to sufficiently fund the plan.  *Id*. at 108-09.  Leffler confirmed that 1.7 hours of attorney time and 3.5 hours of paraprofessional time was listed on the document attached to the Supplemental Fee Application with regard to the Chapter 13 Trustee's Motion to Dismiss.  *Id*. at 114 (referencing Supplemental Fee Application filed in the Markins case, submitted as Exhibit 126 at the hearing held March 7-8, 2006).

When asked on cross-examination to explain why this Motion to Dismiss required these amounts of attorney and paraprofessional (non-lawyer) time, and the Motion to Dismiss listed on Boleman Law Firm Exhibit 15-R, Statement of Additional Supplemental Fees–Markins, lists only 0.9 hours of attorney time and 0.4 hours of paraprofessional time, Leffler offered that the bases of the motions were distinct, in that the second Motion to Dismiss, contained on Exhibit 15-R, was a simpler matter to analyze, as that motion was filed because Markins failed to make her Chapter 13 plan payments.  *Id*. at 115.  When asked whether "some of the difference could be accounted for by the fact that this represents actual time," Leffler responded, "I think that you are comparing apples to oranges, really.  Because the issues on those two different types of motions to dismiss are quite different."  *Id*.

20

Leffler testified that Ms. Markins remained in bankruptcy for forty months before her case was dismissed for failure to make her Chapter 13 plan payments. She also benefitted from the firm's services by receiving protection under the automatic stay. *Id*. at 110.

Leffler confirmed that the amounts contained on the Boleman Firm's Exhibit 23-R relating to the Markins case were the same as those contained in the Supplemental Fee Application filed in that case. *Id*. at 112 (referencing Boleman Law Firm Exhibit 23-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-34259-DOT, Geraldine Bessie Markins). Leffler recited that the total amount of the fee request is $700.00, with 76% of that amount, or $532.00 attributable to fees. *Id*. at 112. A review of Exhibit 23-R reveals that the total fees in the Markins case consist of the amount from Line 114 ($1,866.50) and Line 181 ($564.00) of the document attached to the Supplemental Fee Application.[14] The amount requested in the fee application was reduced from $1,232.26. The net fee, as represented on the exhibit, is $930.50 when the "no-look" amount of $1,500.00 is subtracted. *See* Boleman Law Firm Exhibit 23-R.

### E. *Michael Lee Lipscomb, Jr.*, 03-35603-DOT

Michael Lipscomb, Jr., engaged the services of the Boleman Firm when he faced the threat of repossession of his automobile and experienced difficulty making payments on his secured and unsecured debts. Tr. at 118-19. The initial services provided to Mr. Lipscomb were "very similar, if not identical" to the ones described in the other cases before the Court. Due to the threat of repossession, Lipscomb's case was filed quickly. *Id*. at 119.

---

[14] Costs incurred by the Boleman Firm, according to Exhibit 23-R, totaled $966.76. Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate. The firm represents that it received $385.00 from Ms. Markins that it applied to costs. Thus, a balance of $301.76 remained for costs.

Leffler confirmed that the Boleman Firm provided Mr. Lipscomb with the same services for the $1,500.00 "no-look" portion of their fees as provided to their other clients previously described. *Id*. at 120. He further affirmed that the Supplemental Fee Application filed in the Lipscomb case reflects that for the initial client meetings, 3.1 hours of attorney time and 3.1 hours of paraprofessional time was listed, the same as in the other cases previously discussed. *Id*. at 128.

The firm provided two services to Mr. Lipscomb which Leffler classified as supplemental. First, after filing the petition, the firm immediately contacted the creditor that was threatening to repossess Mr. Lipscomb's automobile. Second, when Mr. Lipscomb became unemployed approximately six months after his Chapter 13 case was filed and subsequently defaulted on his Chapter 13 plan payments to the Trustee, the Trustee filed a Motion to Dismiss based on that default. The firm reviewed Mr. Lipscomb's case, met with him to review his budget, and filed a modified plan that, combined with a payment made in the interim to the Chapter 13 Trustee by the debtor, cured the payment default. The Chapter 13 Trustee then withdrew his Motion to Dismiss Mr. Lipscomb's case. *Id*. at 120-21. Mr. Lipscomb benefitted from this particular service because he is still in his Chapter 13 plan, and Leffler represented that the debtor is scheduled to make his last payment under the plan in 2007. Leffler also stated that in addition to receiving his discharge, Lipscomb will also benefit because the liens related to his secured debt will be released. *Id*. at 122-23.

According to Leffler, the actions taken to prevent repossession of Mr. Lipscomb's automobile is listed as supplemental and beyond the scope of the $1,500.00 "no-look" fee because such action is "of an urgent nature, that would significantly impact our client and create all sorts of additional work if we didn't respond to them." *Id*. at 122. As to the Motion to Dismiss specifically,

Leffler stated that motion was filed more than a year after the case was filed, and "[i]t's a traditionally supplemental type of service, especially given the change in circumstances that the client has experienced from the time of filing that was not anticipated . . . and the modified plan that was filed in connection with the motion to dismiss, the reason for putting it in the supplemental time frame." *Id.* When asked why the time amount listed in the document attached to the Supplemental Fee Application for the Motion to Dismiss in the Lipscomb case was larger than for the Motion to Dismiss in the Markins case, which also was filed on the basis of a default in plan payments, Leffler stated that the motion in the Markins case was not time-consuming because Ms. Markins communicated quickly to the firm that she desired for her case to be dismissed as opposed to curing the arrears. *Id.* at 127.

The Boleman Firm's Exhibit 24-R relating to the Lipscomb case reflects, per Leffler, the same amounts as contained in the Supplemental Fee Application filed in that case. *Id.* at 124 (referencing Boleman Law Firm Exhibit 24-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-35603-DOT, Michael Lee Lipscomb, Jr.). The total amount of the fee request in the Supplemental Fee Application is $700.00, with the entire amount attributable to fees. *Id.* at 124. According to Exhibit 24-R, the request was reduced from the total amount (fees plus costs) of $962.09. The total fees in the Lipscomb case are reflected in Line 114 ($1,795.50) and Line 190 ($720.50) of the document attached to the Supplemental Fee Application.[15] The net fee, as represented on the exhibit, is $1,016.00 when the "no-look" amount of $1,500.00 is

_____

[15] Costs incurred by the Boleman Firm, according to Exhibit 24-R, totaled $551.09. Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate. The firm represents that it received $325.00 from Mr. Lipscomb that it applied to costs. Thus, a credit of $53.91 existed for costs. It appears that this amount was subtracted from the net fees of $1,016.00, to arrive at the total amount of $962.09.

subtracted.  *See* Boleman Law Firm Exhibit 24-R.

F.  *Thomas D. Childrey, IV*, 03-37186-DOT

Leffler met with Thomas Childrey when he visited the firm.  Mr. Childrey had suffered a loss of income due to an employment-related injury and had fallen behind on various debt payments. He was facing an imminent foreclosure on his residence and threats of service disconnection by utility companies.  Tr. at 129-30.  The firm filed Mr. Childrey's Chapter 13 case within one week of the initial meeting with him due to the urgent situation created by the pending foreclosure and possibility of the disconnection of utilities.  *Id*. at 130.  Leffler confirmed to the Court that the document attached to the Supplemental Fee Application in the Childrey case lists 3.1 hours of attorney time and 3.1 hours of paraprofessional time for the initial client meetings.  *Id*. at 139.

The Boleman Firm is seeking supplemental compensation in the Childrey case for several tasks.  First, the firm notified the law firm that was to conduct the foreclosure sale of the filing of Mr. Childrey's Chapter 13 case.  The firm also notified two different utility companies of the filing of the bankruptcy case and the imposition of the automatic stay; however, these activities are not reflected in the Supplemental Fee Application, and the firm is not requesting compensation for performing those services.  *Id*. at 131.  The firm is seeking compensation for negotiating a consent order with the lienholder on Mr. Childrey's automobile whereby Mr. Childrey was permitted to retain his vehicle and cure the arrearage of post-petition payments to that creditor after that creditor had filed a motion seeking relief from the automatic stay.  *Id*. at 131-32.  The firm also addressed a Motion for Relief filed by Mr. Childrey's mortgage company relating to post-petition mortgage payment arrears.  The firm negotiated a consent order in that matter as well, which allowed Mr. Childrey to retain possession of the property, retain the benefit of the automatic stay as to that

24

property, and to cure his arrears over a short period of time.  When Mr. Childrey again fell behind

in his mortgage payments, the firm addressed the Notice of Default issued by the mortgagee.  After

communicating with the client several times, receiving proof of payments from him, and reviewing

the information, the firm communicated their client's position to the mortgagee, and the issue was

resolved.  *Id*. at 132-33.  Finally, Leffler related details of the Motion to Dismiss filed by the Chapter

13 Trustee which the firm also addressed for Mr. Childrey.  A problem arose with the funding of the

plan due to the filing of a large secured claim that the firm eventually determined was filed in error.

The firm communicated this conclusion to the creditor, who withdrew the claim, and the Trustee

withdrew his Motion to Dismiss.  *Id*. at 133.

Mr. Childrey completed the payments in his Chapter 13 plan with funds derived from the

refinance of his mortgage, which was approved by the Court after the Boleman Firm filed the

appropriate motion on behalf of the debtor.  Mr. Childrey's creditors were paid one-hundred percent

of their claims, and Mr. Childrey received his discharge.  *Id*. at 135-36.

Leffler opined that the supplemental services provided in the Childrey case for which the

Boleman Firm seeks compensation are of the type typically listed as supplemental in applications

for compensation that the firm files with the Court, and that the services are similar to those

appearing on supplemental applications for compensation filed by other firms.  *Id*. at 133-34.

Exhibit 25-R submitted by the Boleman Firm reflects, as confirmed by Leffler, that the

$2,000.00 amount sought is solely attributed to fees.  *Id*. at 137 (referencing Boleman Law Firm

Exhibit 25-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-

37186-DOT, Thomas D. Childrey, IV).  As represented on Exhibit 25-R, Line 114 of the document

attached to the Supplemental Fee Application filed in the Childrey case shows fees of $1,866.50,

and Line 224 reflects fees of $2,356.50. The net fee is $2,723.00 when the "no-look" amount of $1,500.00 is subtracted. The firm reduced the amount it is seeking in its application to $2,609.61. This amount appears to reflect the application of a credit balance for costs of $113.39.[16]  *See* Boleman Law Firm Exhibit 25-R.

### G. *A'braham Barakhyahu*, 03-37623-DOT

A'braham Barakhyahu, a self-employed event planner, and his wife had a large amount of unsecured debt, a portion of which was connected with three different automobile loans. One of the automobiles was set to be repossessed for payment default at the time the Barakhyahus visited the Boleman Firm. According to Leffler's review of their file, the Barakhyahus received the same initial services for the $1,500.00 fee that are provided to other clients that visit the firm seeking to file for bankruptcy protection. Tr. at 140-41.

Leffler testified that as soon as the joint bankruptcy case was filed on behalf of the Barakhyahus, the firm took steps to ensure that the automobile that was set to be repossessed remained in the possession of the debtors by contacting the creditor to advise that the automatic stay was in effect. *Id*. at 141, 148. The Chapter 13 Trustee filed an objection to confirmation of the Barakhyahu plan on the basis that the plan did not commit all available disposable income. Leffler explained that after the case was filed, Mr. Barakhyahu secured higher paying employment, which was disclosed to the Chapter 13 Trustee at the Section 341 Meeting of Creditors, but the original plan did not account for his new income. A member of the firm attended the hearing on the

---

[16]  Costs incurred by the Boleman Firm, according to Exhibit 25-R, totaled $491.61. Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate. The firm represents that it received $325.00 from Mr. Childrey that it applied to costs. Thus, a credit of $113.39 existed for costs. It appears that this amount was subtracted from the net fees of $2,723.00, to arrive at the total amount of $2,609.61.

objection, which was sustained by the Court.  The firm then filed a modified plan to provide for one-hundred percent repayment of the claims that were anticipated at that time.  *Id*. at 141-42.

After the modified plan was confirmed, the Chapter 13 Trustee determined that the claims that had been filed totaled an amount higher than anticipated and that the plan would not pay the proposed percentage.  The Trustee advised the firm of this fact by letter, and the firm reviewed the claims, ultimately determining that another modified plan needed to be filed to avoid a future Motion to Dismiss by the Trustee  *Id*. at 142-43.

Subsequently, the Barakhyahus encountered difficulty making their plan payments, due to the instability of Mrs. Barakhyahu's income and her post-petition debt.  They consulted with the firm about converting their case to one under Chapter 7, but the firm concluded at that time that remaining under Chapter 13 would provide a better result for the debtors.  The firm filed another modified plan for the Barakhyahus, in which the debtors surrendered one of their automobiles which was being paid for through the plan, resulting in a lower monthly plan payment.[17]  The lienholder of that automobile later filed a motion seeking relief from the automatic stay, to which the debtors consented, and the Boleman Firm facilitated the transfer of the vehicle to the creditor's possession.  *Id*. at 143-44.

Leffler informed the Court that not all of the services he discussed appeared on the Supplemental Fee Application.  The modified plan in which the automobile was surrendered and the motion seeking relief from the automatic stay as to that automobile are not reflected even though

---

[17]  The Court notes that on July 21, 2005, after the filing of the Supplemental Fee Application in her joint case with her husband, Mrs. Barakhyahu filed a Notice of Voluntary Conversion to Chapter 7 in relation to her case only.  According to the Court's review of Mr. Barakhyahu's case file, he remains in his Chapter 13 case as of September 12, 2007.

they took place prior to the filing of the Supplemental Fee Application. Leffler stated that it was his belief that the fee application was in the process of being prepared while those services were being provided, and thus they were not incorporated into the application. *Id*. at 144-45. Leffler again stated his belief that the supplemental services provided in the Barakhyahu case are of the type typically listed as supplemental in fee applications the firm files, and likewise that the services are similar to those appearing on fee applications filed by other firms in the Richmond Division. *Id*. at 145. In response to questioning on cross-examination, Leffler testified that the act of contacting the automobile creditor to notify them that the automatic stay was in effect was included as a supplemental service because "that was the practice in this court, developed over a number of years. It was our understanding that that was what the Court agreed with and approved." *Id*. at 149. Leffler conceded, however, that the firm contacted the automobile creditor during the same time frame as other tasks that were billed in the $1,500.00 "no-look" portion of the firm's fee. *Id*.

Leffler confirmed that the amounts contained on the Boleman Firm's Exhibit 26-R relating to the Barakhyahu case were the same as those contained in the Supplemental Fee Application filed in that case. *Id*. at 146 (referencing Boleman Law Firm Exhibit 26-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-37623-DOT, A'braham Barakhyahu). Leffler stated that of the total amount sought in the supplemental application for compensation, $561.00 is attributable to fees. *Id*. at 147. A review of Exhibit 26-R reflect that the total amount requested in the Supplemental Fee Application is $850.00, reduced from $1,382.69, and that fees comprise 66% of that total.[18] The total fee in the Barakhyahu case is $2,792.50, consisting of

---

[18] Costs incurred by the Boleman Firm, according to Exhibit 26-R, totaled $1,270.25. Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate. The firm represents that it received $325.00 from the debtor that it applied to costs. Thus, a balance

$1,795.50 from Line 114 and $997.00 from Line 181 of the document attached to the Supplemental

Fee Application.  The net fee is $1,292.50 when the "no-look" amount of $1,500.00 that the firm

has already received is subtracted.  *See* Boleman Law Firm Exhibit 26-R.

H.  *Carrol & Melinda Wood*, 03-37772-DOT

When the Woods first visited the Boleman Firm, a foreclosure was scheduled on their home;

two judgments had recently been entered against them; and they were unable to pay their debts as

they came due.  The firm provided initial services in the Wood case similar to those provided to

other debtors.  Because of their particular situation, the Woods' case was filed within eight days

after their first meeting at the firm, according to Leffler.  Tr. at 152-53.  With regard to those

services, Leffler testified that 3.7 hours was spent on the Woods matter on the day of the initial

meeting because the petition was also prepared that day.  *Id*. at 158-59.

Leffler explained to the Court the four supplemental services that appear on the fee

application.  The firm immediately addressed the foreclosure by contacting the firm that was to

conduct the foreclosure.  The firm also contacted counsel for a creditor who, between the time the

Woods initially consulted with the Boleman Firm and the time the petition was filed, had filed a

warrant in debt.  No additional action was taken by the firm, according to Leffler, because no willful

violation of the automatic stay was perceived and the warrant in debt was withdrawn.  *Id*. at 153.

The firm also negotiated with the Woods' mortgage company after that creditor filed a Motion for

Relief as to the Woods' residence because of post-petition payment arrears.  A consent order was

entered which settled the motion and allowed the debtors to pay the arrears over an extended time

period.  Finally, the firm responded to a Motion to Dismiss filed by the Chapter 13 Trustee in the

---

of $665.25 remained for costs.

Woods' case for failure to pay their Chapter 13 plan payments.  The Woods' paid a portion of the

arrearage prior to the hearing on the motion, and the Trustee withdrew his motion.  *Id*. at 153-54.[19]

Leffler confirmed that the services categorized as supplemental in the Woods case were of the type

that the Boleman Firm typically includes on applications for supplemental fees and for which other

practitioners of the Richmond bankruptcy bar also typically request supplemental compensation.

*Id*. at 155.  Leffler confirmed that the Supplemental Fee Application also reflected entries relating

to time spent making photocopies.  *Id*. at 159-60.  Finally, Leffler testified that the firm responded

on behalf of the Woods to several motions to dismiss filed by the Trustee after the fee application

was filed.  *Id*. at 155.

Leffler testified that Boleman Firm Exhibit 27-R presented an accurate representation of the

fees set forth in the Supplemental Fee Application filed in the Wood case.  *Id*. at 156 (referencing

Boleman Law Firm Exhibit 27-R, Recap of Total Fees and Supplemental Fee Request Breakdown,

Case Number 03-37772-DOT, Carrol and Melinda Wood).  The fees in the Wood case as of the

filing of the Supplemental Fee Application totaled $2,731.00, as represented by Line 114

($1,795.50) and Line 211 ($935.50) of the document attached to the application.  When the "no-

look" amount of $1,500.00 is subtracted, the net fee is $1,231.00.  The total amount of fees and costs

according to Exhibit 27-R is $1,382.69,[20] but the firm is seeking only $750.00 on its application.

*See* Boleman Law Firm Exhibit 27-R.  Leffler further represented that based upon a proration of the

---

[19]  According to the Court's review of the Woods case file, the Woods remain in their Chapter 13 case as of September 12, 2007.

[20]  Costs incurred by the Boleman Firm, according to Exhibit 27-R, totaled $816.69.  Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate.  The firm represents that it received $385.00 from the Woods that it applied to costs.  Thus, a balance of $151.69 remained for costs.

fees sought, of the amount requested, $667.50, or 89%, was attributable to fees.  Tr. at 157.

### I.  *Zoe Laquanda Jarrell*, 03-37773-DOT

Zoe Jarrell had fallen into arrears on her mortgage payment and was facing foreclosure when she sought the services of the Boleman Firm.  In addition, a warrant in debt had been filed against her; she was behind on her automobile loan payments; and she had debts related to numerous credit cards.  Referencing the Supplemental Fee Application filed in the Jarrell case, which was submitted to the Court at the March 7-8, 2006, hearing as Exhibit 71 of the Boleman Firm, Leffler affirmed that the initial services provided were similar to those performed in other cases.  *Id*. at 162-63.

With regard to the initial services, Leffler confirmed on cross-examination that 3.1 hours of paraprofessional (non-attorney) time was spent on Ms. Jarrell's case on July 30, 2003.  Leffler further confirmed that the same paraprofessional, Nadine Rosengraft, who performed the services in Ms. Jarrell's case on July 30, 2003, also performed similar services on the same day in the Barakhyahu case.  *Id*. at 171.  According to Leffler, "[t]his was what she did all day everyday." *Id*. at 172.  Leffler could not testify as to how many cases Rosengraft worked on in a typical day because he "was not her manager. . . . She probably did a couple different appointments during the day.  I'm not sure, though.  I really don't know." *Id*.  Leffler further testified that he was "sure she did" other things during the day but could not provide further detail.  *Id*. at 173.  Leffler confirmed once again that the firm bills for time spent making photocopies as paraprofessional time.  *Id*.

Leffler described the supplemental services that the firm provided to Ms. Jarrell.  The firm addressed the pending foreclosure and the warrant in debt, which were dealt with on the day that the petition was filed with the Court.  *Id*. at 164, 173.  The firm also addressed post-filing threats to discontinue certain utilities services due to Ms. Jarrell's non-payment by contacting the creditors

and advising of her bankruptcy filing.  Leffler informed the Court that utility creditors had not been

included on the petition initially because she did not realize that they could be included, and

consequently the firm amended Ms. Jarrell's schedules.  *Id*. at 164.

When Ms. Jarrell's mortgage holder filed a Motion for Relief for post-petition payment

default, the firm negotiated a consent order which allowed six months to bring her mortgage

payments current.  *Id*. at 164-65.  The firm also consulted with Ms. Jarrell when she continued to

experience difficulty paying her Chapter 13 plan payment and her regular mortgage payment plus

the mortgage arrears.  When Ms. Jarrell defaulted with regard to the consent order related to her

mortgage payments and the mortgagee moved to foreclose on her home, the firm filed a modified

plan which provided for the surrender of the residential real property and resulted in a lower monthly

plan payment.  *Id*. at 165.  The firm addressed a second Motion for Relief, this one by the holder of

Ms. Jarrell's automobile loan, which alleged the debtor was not maintaining full insurance coverage

on her automobile as she was contractually obligated to do.  The firm communicated to Ms. Jarrell

the importance of maintaining insurance coverage, and when the coverage was obtained, the creditor

dismissed its motion.  *Id*. at 165-66.  Leffler represented that all of these services are listed in the

Supplemental Fee Application filed in Ms. Jarrell's case and that such services are similar to those

for which other practitioners before the Bankruptcy Court in Richmond seek compensation.  *Id*. at

166.

The firm also provided two services to Ms. Jarrell that are not listed on the supplemental fee

application filed in her case.  First, the firm communicated the existence of the automatic stay in Ms.

Jarrell's case to the Virginia Employment Commission with regard to a suit the commission had

filed against her.  The firm also communicated with a medical office that had refused treatment to

32

Ms. Jarrell because of an outstanding debt to that office.  After speaking with the client, the firm amended Ms. Jarrell's schedules to provide for the payment of the medical debt.  *Id*. at 167.

When asked to speak of the benefits that Ms. Jarrell has received from the services performed by the Boleman Firm, Leffler stated that Ms. Jarrell remained in her residence for over a year despite a "spotty payment history to her mortgage company"; issues with her automobile loan creditor were resolved; and as of April 30, 2007, Ms. Jarrell remained in her bankruptcy case and under the protection of the Bankruptcy Code.[21]  *Id*. at 168.

Leffler confirmed for the Court that the amounts on the Boleman Firm Exhibit 28-R correlate to the amounts appearing on the Supplemental Fee Application filed in Ms. Jarrell's case.  *Id*. at 169-70 (referencing Boleman Law Firm Exhibit 28-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-37773-DOT, Zoe Laquanda Jarrell).   Of the $1,200.00 amount requested in the fee application, 99%, or $1,188.00, is apportioned to fees.  *Id*. at 170.  The total amount (fees and costs) as of the date of the application was $1,808.37.[22]  A review of Exhibit 28-R reflects that the total fee as of the date of the fee application was $3,283.50, the sum of the amounts contained on Line 114 ($1,795.50) and Line 228 ($1,488.00) of the document attached to the application.  *See* Boleman Law Firm Exhibit 28-R.

### J.  *Mary Lou Ann Ranicki*, 03-38152-DOT

When Mary Lou Ranicki first met with the Boleman Firm, she was not working and was

---

[21]  According to the Court's review of Ms. Jarrell's case file, she remains in her Chapter 13 case as of September 12, 2007.

[22]  Costs incurred by the Boleman Firm, according to Exhibit 28-R, totaled $639.87.  Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate.  The firm represents that it received $335.00 from Ms. Jarrell that it applied to costs.  Thus, a balance of $24.87 remained for costs.

living on retirement income.  Ms. Ranicki attempted to formulate a consolidation plan for her credit

card debt through a credit counseling agency, but her attempt was unsuccessful.  Ms. Ranicki also

had mortgage debt.  Tr. at 176-77.  Referencing the Supplemental Fee Application filed in the

Ranicki case, which was filed as  Boleman Law Firm Exhibit 137 in the March 7-8, 2006, hearing,

Leffler affirmed that Ms. Ranicki was provided with the same initial services that all debtors receive.

*Id*. at 177.  These services, as in previous cases, necessitated 3.1 hours of paraprofessional time and

3.1 hours of attorney time, according to the application.  *Id*. at 188.

According to Leffler, the services that the firm classifies as supplemental in the Ranicki case

were all provided post-confirmation.  *Id*. at 177, 188.  Ms. Ranicki's initial Chapter 13 plan was

confirmed after no objections were filed.  However, the Chapter 13 Trustee filed a Motion to

Dismiss post-confirmation on the basis of underfunding, which resulted from the filing of an

unanticipated mortgage arrears claim and a higher than anticipated balance to be paid on her

automobile.  Ms. Ranicki had also fallen into arrears on her plan payments.  Just prior to the hearing,

Ms. Ranicki made a large payment to the Trustee, and the firm also filed an amended Chapter 13

plan to correct the underfunding issue.  Based upon these actions, the Chapter 13 Trustee withdrew

his motion.  *Id*. at 177-78.

The firm also addressed a Motion for Relief from Stay filed by Ms. Ranicki's mortgage

company.  After consulting with the client, the firm negotiated a consent order that allowed Ms.

Ranicki a short period of time to cure the arrears owed to the mortgage company.  *Id*. at 178-79.

A second Motion to Dismiss for payment arrears was filed by the Chapter 13 Trustee at

approximately the same time that the Motion for Relief was filed.  According to Leffler, Ms. Ranicki

had relocated out of state, was out of work, and incurred moving expenses, which led to her payment

34

default.  The firm negotiated two continuances with the Trustee to allow Ms. Ranicki an opportunity to make payments to the Trustee and to file a modified Chapter 13 plan to help bring her plan payments current.  *Id*. at 183-84.  Services rendered in connection with the Motion for Relief as well as the Chapter 13 Trustee's first and second Motions to Dismiss are included in the application and reflect the type of services generally included in applications for supplemental compensation filed not only by the Boleman Firm but other practitioners as well.  *Id*. at 180, 185.

The Chapter 13 Trustee filed a third Motion to Dismiss later in the case due to the debtor's failure to make plan payments.  According to Leffler, Ms. Ranicki's financial circumstances had changed, and the firm formulated another modified Chapter 13 plan to allow the debtor to become current on her plan payments.  The Trustee again withdrew his motion.  *Id*. at 179.  This Motion to Dismiss was not included on the fee application, however, and the firm is not seeking compensation for its services in connection with this particular matter.  Additionally, the firm is also not seeking compensation for addressing two additional Motions to Dismiss by the Chapter 13 Trustee that were filed subsequent to the filing of the Supplemental Fee Application in the Ranicki case.  *Id*. at 181-82.  Despite five Motions to Dismiss in total, Ms. Ranicki did receive her Chapter 13 discharge and paid all creditors in full through her plan.  *Id*. at 190.

Leffler testified that the fees listed in the supplemental application are accurately reflected in Boleman Firm Exhibit 29-R.  According to Leffler, supplemental fees totaled $2,162.50, and cumulative fees as of the filing of the application totaled $3,958.00.  *Id*. at 186 (referencing Boleman Law Firm Exhibit 29-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-38152-DOT, Mary Lou Ann Ranicki).  After subtracting the $1,500.00 "no-look" fee that the firm had already received, the net fees equaled $2,458.00.  The total fees and costs according

to Exhibit 29-R is $2,646.01, but the firm is requesting only $1,900.00 in supplemental fees.[23]
Boleman Law Firm Exhibit 29-R.  Of that amount, 93%, or $1,767.00, is attributable to fees.  Tr.
at 187.

### K.  *Celestine Berryman*, 03-39422-DOT

Celestine Berryman was facing repossession of her automobile and the foreclosure of her
home, both of which she had been attempting to address in a prior Chapter 13 case, which was
dismissed shortly before she met with the Boleman Firm.  After reviewing her circumstances and
budgetary abilities, the firm decided that it was appropriate for the debtor to file another Chapter 13
case.  *Id*. at 192-93.

Referencing the Supplemental Fee Application filed in Ms. Berryman's case, which was
previously submitted to the Court as Exhibit 148 in relation to the March 7-8, 2006, hearing, Leffler
confirmed that Ms. Berryman's initial services were essentially the same as those provided in other
cases, with the added issues of good faith and feasibility being addressed in light of Ms. Berryman
having previously filed a Chapter 13 case.  *Id*. at 193-94.  The initial services in the Berryman case
also consumed 3.1 hours of paraprofessional time and 3.1 hours of attorney time.  *Id*. at 194, 201.
In response to questioning on cross-examination, Leffler testified that he is cognizant of the practice
by some attorneys of classifying clerical duties such as making photocopies as overhead and
refraining from charging their client for time spent performing such duties.  *Id.* at 202.

The Boleman Firm addressed two matters post-confirmation that are classified as
supplemental services on the Supplemental Fee Application.  First, Leffler recounted that the

---

[23] Costs incurred by the Boleman Firm, according to Exhibit 29-R, totaled $793.01.  Of
this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate.  The
firm represents that it received $325.00 from Ms. Ranicki that it applied to costs.  Thus, a
balance of $188.01 remained for costs.

Chapter 13 plan in the Berryman case had funding issues due to the filed claims totaling more than anticipated.  The firm discussed this issue with the client, as well as her ability to pay an increased Chapter 13 plan payment and the appropriateness of filing an amended plan.  The firm filed an amended Chapter 13 plan for Ms. Berryman which addressed the underfunding issue by increasing her plan payment.  *Id*. at 194.  Second, the Chapter 13 Trustee filed a Motion to Dismiss for failure to make plan payments.  Ms. Berryman brought her plan payments current, and the Trustee withdrew his motion at the hearing, which the Boleman Firm attended for the debtor.  *Id*. at 194-95.  Both of these services appear on the Supplemental Fee Application; are of the type typically reflected in such applications; and are of the type that other practitioners before the Bankruptcy Court in Richmond generally included on their supplemental fee applications as well.  *Id*. at 195.  Not included on the Boleman Firm's application are supplemental services provided to Ms. Berryman post-filing of the application, including addressing a Motion for Relief and subsequent Notice of Default filed by the mortgage company; and a second Motion to Dismiss by the Chapter 13 Trustee for failure to make Chapter 13 plan payments which led to the dismissal of Ms. Berryman's case.  *Id*. at 195-97.  Despite the fact that Ms. Berryman's case was ultimately dismissed, Leffler opined that the services provided by the firm helped keep Ms. Berryman in her case for approximately two years and allowed her to remedy problems with her mortgage for a period of time.  *Id*. at 197-98.

Regarding Exhibit 30-R of the Boleman Firm relating to the Berryman case, Leffler confirmed that the amounts contained in the exhibit accurately represent the amounts contained in the Supplemental Fee Application filed in the Berryman case.  *Id*. at 198-99 (referencing Boleman Law Firm Exhibit 30-R, Recap of Total Fees and Supplemental Fee Request Breakdown, Case Number 03-39422-DOT, Celestine Berryman).  According to the exhibit, the total fee as of the filing

of the application was $2,411.50, consisting of the $1,795.50 amount found on Line 114 and

$616.00 located on Line 184 of the document attached to the Supplemental Fee Application.[24]  *See*

Boleman Law Firm Exhibit 30-R.  Leffler further testified that of the total $625.00 amount sought

in the application, 90%, or $562.50, is related to fees, after a discount of $385.25 is applied to the

total fee and costs owed of $1,010.25.  Tr. at 199.

### III.  ARGUMENTS

On April 27, 2007, counsel for the Boleman Firm filed a Trial Memorandum containing a

chart which purports to represent a breakdown of the reimbursement sought in each of the eleven

cases.  Trial Memorandum on Remand filed by The Boleman Law Firm, P.C., filed April 27, 2007,

Docket Entry 254, at 2 (hereinafter "Boleman Trial Memorandum").[25]  The memorandum also

contains several arguments as to the proper law to be applied.  First, the firm contends that Congress,

through the language of Section 330 of the Bankruptcy Code, intended that reviews of fee requests

address the reasonableness of those fees as a whole.  According to the firm, the reasonableness of

fees and costs within this District is determined by application of the lodestar analysis, or by

assessing the reasonable number of hours multiplied by a reasonable hourly rate.  The twelve *Barber*

---

[24]  Costs incurred by the Boleman Firm, according to Exhibit 30-R, totaled $578.75.  Of this amount, the Chapter 13 Trustee paid $280.00 to the firm from the bankruptcy estate.  The firm represents that it received $200.00 from Ms. Berryman that it applied to costs.  Thus, a balance of $98.75 remained for costs.

[25]  The Court observes that the amounts contained in the reimbursement summarization with regard to the total fees and the amount requested in the Supplemental Fee Applications are identical to those contained in Exhibits 20-R through 30-R and thus will not repeat those amounts here.  The amounts for "Total Fees and Costs Incurred" and "Discount" contained in the chart are not identical to Exhibits 20-R through 30-R, apparently due to the inclusion by the firm of costs incurred in the cases after the filing of the supplemental applications in the calculations.  *See* Boleman Trial Memorandum, at 3 fn.1.

factors, announced by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978), *cert. denied*, 439 U.S. 934 (1978), provide a basis upon which the Court may adjust the fee amount obtained through the lodestar analysis.  Boleman Trial Memorandum, at 2-3.

A second chart contained in the memorandum purports to contain the lodestar analysis for each of the eleven cases.  The memorandum then addresses the *Barber* factors as applied to each case.  First, as to the time and labor expended, the firm provides a recitation, in chart format, as to the supplemental services provided in each case.  According to that chart, in nine of the eleven cases, the firm provided some services which were not included on the Supplemental Fee Applications in each of those cases.  *Id*. at 5-6.

The final section of the memorandum addresses the absence of traditional time records in the cases at issue.  The Boleman Firm offers that even though traditional time records do not exist, contemporaneous records of the services provided were made, which additionally documents the employees providing each service and the date on which the service was performed.  *Id*. at 11.  The firm reminds that there was no dispute that the work was actually performed.  *Id*. (citing *The Boleman Law Firm, P.C. v. United States Trustee*, 355 B.R. 548, 553 (E.D. Va. 2006)).

Further, the firm asserts that even if traditional time records had been kept, the Court was not required to find that the actual number of hours spent performing the tasks in each case was reasonable.  Instead, the Court must make the ultimate decision as to reasonableness after reviewing the fee applications, taking the *Barber* factors into account, and adjusting the fee award as necessary. *Id*. (quoting *Guidry v. Clare*, 442 F.Supp.2d 282, 294 (E.D. Va. 2006); citing *Boleman Law Firm, P.C.*, 355 B.R. at 553).

The firm asserts that it has already substantially adjusted the lodestar figures downward,

39

resulting in discounts ranging from 8.5% to 32.2% of the total fees and costs. In doing so, the firm ensures that creditors are not prejudiced and "demonstrates [the firm's] commitment to promoting the success of the debtor in that the reduction of fees and costs allows the plan to continue without the potential for disruption or extension by the Chapter 13 trustee." *Id*. at 12. By charging $165.00 to $175.00 per hour, the firm "is implicitly discounting its compensation." *Id*. at 13. The firm also states that it "attempted to record the least amount of time necessary to complete the task" and while testimony at the March 7-8, 2006, hearing was divergent as to the amount of time necessary to perform the initial consultation, the amount of time it takes attorneys at the firm to complete other tasks was not rebutted. The firm compares its intentional omission from fee applications of certain services, such as when clients make inquiries regarding plan payments or collection letters, with that of a conventional law practice, asserting that in the latter, all tasks are billed in tenths of an hour, or six-minute increments, even if a task takes less time. *Id*. These factors, combined with the fact that supplemental compensation is sought in only a finite number of cases, and that the services were provided over four years ago, with no interest applying, should provide a sufficient downward adjustment in the fees to account for the lack of time records. *Id*. at 13-14.

In its closing argument brief, the firm argues that the United States Trustee does not believe that services provided at the commencement of representation should be classified as "supplemental" and that such services should be subsumed into the "initial" services. Closing Arguments filed by The Boleman Law Firm, P.C., filed May 30, 2007, Docket Entry 276, at 2 (hereinafter "Boleman Closing Arguments"). The firm contends that the point in time when the services are performed should not matter and points out that neither Local Bankruptcy Rule 2016-1, which addresses compensation to professionals, nor Section 330 of the Bankruptcy Code contains

40

any distinction between "initial" and "supplemental" services. *Id.* at 6. Instead, this nomenclature

has "developed locally over time," similar to the use of the phrase "flat fee," which the court often

refers to in its opinions. *Id.* (citing *In re Harris*, Case No. 96-36765-DOT, 1998 WL 408896 (Bankr.

E.D. Va. Apr. 14, 1998)). The firm cites to the *In re Harris* decision by Chief Judge Tice of this

Court, and his explanation of what the "flat fee" should cover:

> Ordinarily this charge should cover interviews with the client, contacting creditors
> when necessary and verifying other information for the statements and schedules,
> preparation of petition, schedules and a confirmable plan, attendance at the § 341
> meeting of creditors, and, finally, attendance to other routine matters encountered in
> the case.
> . . . .
> . . . When additional fees are sought, the judges expect attorneys to demonstrate that
> the *total fee* in a case is reasonable in light of all circumstances.

*In re Harris*, 1998 WL 408896, at *1-2. Thus, the firm argues that the "total fee" Chief Judge Tice

refers to is the "flat fee" plus the amount requested in the supplemental fee application. Boleman

Closing Arguments, at 7. According to the firm, the question before the Court is not whether the

firm has "'used up'" the "flat fee," but whether the value of all services that the firm provided to a

particular debtor amounts to at least the "total fee." *Id.* This approach is appropriate according to

the firm because in some cases, the value of "initial" services could exceed the "flat fee" amount.

*Id.* at 8.

The Boleman Firm also expands upon its legal argument relied upon during the April 30,

2007, hearing. The firm contends that, unlike in the case of *J. P. v. County School Board of

Hanover*, Case No. 3:06cv028, 2007 WL 840090 (E.D. Va. Mar. 15, 2007), "there is no indication

here that the inadequacies in the documentation . . . implicate a large number of hours." Boleman

Closing Arguments, at 11. The firm concedes that this Court has sufficient cause to discount the

fees charged for the services provided for the debtors at the beginning stages of the case because the

41

firm cannot substantiate that exactly 3.1 hours was spent due to the lack of contemporaneous time records. *Id.* The firm further concedes that the time spent photocopying documents appears on the applications as part of a "lumped" task entry, making it difficult to discern the true amount of time that specific task took and that a discount should also be applied to those hours. *Id.* at 11-12. As to the appropriate amount of the discount, the firm reiterates to the Court that the firm has already "significantly discounted" its fees, as demonstrated on Exhibits 20-R through 30-R, and that the United States Trustee offered no rebuttal evidence on this subject. *Id.* at 12.

The Boleman Firm further relies on the *Board of Hanover* case for the proposition that in the event that the firm did not put forth sufficient evidence regarding the twelve *Johnson* (or *Barber*) factors, such should not result in an automatic downward adjustment in the lodestar figure. The firm likens the urgent time constraints it faced in the instant cases to the circumstances faced in the *Board of Hanover* case by the plaintiffs' counsel, which took over the case mid-way through the administrative hearing proceedings. *Id.* (quoting *Board of Hanover*, 2007 WL 840090, at *8).

In his argument at the hearing held on April 30, 2007, counsel for the United States Trustee represented and reiterated his position from the earlier hearings that he did not contest that the work represented by the Boleman Firm had not been performed; rather, the crux of the case lay in the amount of time spent performing that work. Tr. at 24.

The United States Trustee urges that certain tasks should not be considered supplemental, because they were performed at the inception of the case. Other services, however, could be considered supplemental in nature, but that if the Court decides to give further consideration to awarding compensation for these supplemental services, any award should be dependent upon whether the firm has proven that it earned the initial $1,500.00 fee. Closing Argument filed by the

42

United States Trustee, filed May 30, 2007, Docket Entry 277, at 2-3 (hereinafter "United States Trustee Closing Argument").  To this extent, he offers argument on two additional issues against awarding compensation in each of the eleven cases.  First, he argues that the Court should consider that many tasks listed in the exhibit attached to the fee application are clerical in nature that should be absorbed into overhead, as they require no special expertise.  *Id*. at 3 (citing *In re Peoples Sav. & Inv., Inc.*, 103 B.R. 264, 275 (Bankr. E.D. Okla. 1989); *In re Pothoven*, 84 B.R. 579, 586 (Bankr. S.D. Iowa 1988)).  The United States Trustee acknowledges that all courts do not agree that all time spent performing clerical duties is not compensable.  *Id*. (citing *In re Stanley*, 120 B.R. 409, 415 (Bankr. E.D. Tex. 1990)).  He asserts that the following tasks are generally found to not be compensable: making copies; general filing; maintaining a file; communicating with a client regarding their appointment time; and any routine task that is not specifically legal in nature.  Thus, the United States Trustee concludes that "many of the tasks performed by the non-attorney staff" of the firm are not compensable.  *Id*.

Second, the United States Trustee urges that many of the time amounts listed on the application appear to be overstated, specifically the number of hours of attorney time and paraprofessional time billed on the first day clients visit the firm.  He argues that these time amounts should be contrasted with the testimony given by Chapter 13 Trustee Carl Bates at the March 7-8, 2006, hearing, where he stated that an initial client interview could be performed in approximately one hour.  *Id*.  Additionally, the United States Trustee cites to Leffler's testimony in which he stated that multiplying six minutes by the amount of time spent in hours may result in an amount of time that exceeds that time actually spent.  *Id*. at 3-4 (citing Tr. at 61).  He further alleges that the lack of accuracy with regard to this particular task possibly reduces the credibility of the other time

43

amounts listed.  *Id.*

## IV.  CONCLUSIONS OF LAW

The provisions of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the

Local Bankruptcy Rules that apply to the analysis of supplemental fee applications were discussed

in depth in this Court's previous opinion.  The Court relies on and incorporates that recitation herein,

to the extent not reversed by the District Court on appeal.

The Fourth Circuit requires courts to evaluated attorney fees utilizing a "hybrid" of the

*Barber* factors and the lodestar method.  *In re Vernon-Williams*, 343 B.R. 766, 786 (Bankr. E.D. Va.

2006) (citing *Equal Employment Opportunity Comm'n v. Serv. News Co.*, 898 F.2d 958, 965 (4th

Cir. 1990); *In re Great Sweats, Inc.*, 113 B.R. 240, 241 (Bankr. E.D. Va. 1990)).  In *Barber v.

Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978), *cert. denied*, 439 U.S. 934 (1978), the Fourth Circuit

held that courts must consider the twelve factors set forth in *Johnson v. Georgia Highway Express,

Inc.*, 488 F.2d 714 (5th Cir. 1974), when determining the reasonableness of the attorney fees

requested.  These twelve factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered; (4)
> the attorney's opportunity costs in pressing the instant litigation; (5) the
> customary fee for like work; (6) the attorney's expectations at the outset of the
> litigation; (7) the time limitations imposed by the client or circumstances; (8) the
> amount in controversy and the results obtained; (9) the experience, reputation and
> ability of the attorney; (10) the undesirability of the case within the legal
> community in which the suit arose; (11) the nature and length of the professional
> relationship between attorney and client; and (12) attorneys' fees awards in
> similar cases.

*Barber*, 577 F.2d at 226 n.28.

As this Court earlier stated, "[a]pplying these factors, attorneys' fees are to be evaluated by

the lodestar method.  '[T]he product of reasonable hours and a reasonable rate constitutes the

44

lodestar [method].'"   *In re Vernon-Williams*, 343 B.R. at 786 (quoting *In re Harris*, Case No. 96-36765, 1998 WL 408896, at *3 (Bankr. E.D. Va. Apr. 14, 1998); citing *Equal Employment Opportunity Comm'n v. Serv. News Co.*, 898 F.2d 958, 965 (4th Cir. 1990) (in turn citing *Daly v. Hill*, 790 F.2d 1071 (4th Cir.1986), and *Blum v. Stenson*, 465 U.S. 886, 888 (1984)) (stating that "these [Barber] factors should be considered in determining the reasonable rate and the reasonable hours, which are then multiplied to determine the lodestar figure which will normally reflect a reasonable fee")).   "The burden of proof as to the reasonableness of the requested compensation rests with the applicant." *Boleman Law Firm, P.C. v. United States Trustee* (*In re Vernon-Williams*), 355 B.R. 548, 553 (E.D. Va. 2006).

The United States District Court ruled that while contemporaneous time records are "the preferred starting point in the lodestar analysis . . . [t]heir unavailability . . . does not preclude further analysis—especially  when, as in this case, it is undisputed that the work for which compensation is sought was performed."   *Id.*   The Court further directed that "[s]uch inadequate documentation is clearly 'a proper basis for reducing a fee award.'" *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006)).   The District Court instructed that when a court is presented with inadequate time records, the court must independently determine the reasonableness of the hours spent in the case by utilizing the twelve *Johnson* factors and "'other considerations,'" and then reduce the fee award by either reducing the hours that are not adequately documented or by reducing the award by a fixed percentage.   *Id.* (citing *Guidry*, 442 F. Supp. 2d at 294).[26]

_____

[26]  In the recent case of *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006), the Court explained:

Because it remains undisputed that the records presented to the Court do not contain contemporaneously recorded time, the traditional starting point in the lodestar analysis, that is, multiplying the number of hours spent by the hourly rate, cannot be performed. Thus, in accordance with Chief Judge Spencer's instruction, the Court will begin its analysis of the supplemental fee requests by examining them in the context of the *Barber* factors. Next, the Court will analyze other considerations raised by the parties. Finally, the Court will determine whether a reduction in fees is appropriate, and if so, whether that reduction should be in the nature of disallowing compensation for the inadequately documented hours or whether the Court should reduce the fees sought by a fixed percentage.

### A. The Time and Labor Expended

The first *Barber* factor is the most contested of the twelve. As stated during the course of this litigation, it is undisputed that services for which the Boleman Firm seeks compensation were performed for the clients. These services are reflected in the documents submitted as attachments to the Supplemental Fee Applications. *In re Vernon-Williams*, 343 B.R. at 788, 790. However, as this Court previously observed, "[i]t is uncontested that the Boleman Firm used non-traditional billing methods and relied on 'minimums' to determine the time spent on the tasks depicted in the

---

Lumping and other types of inadequate documentation are thus a proper basis for reducing a fee award because they prevent an accurate determination of the reasonableness of the time expended in a case. Such a reduction can be accomplished in one of two ways: (i) by identifying and disallowing specific hours that are not adequately documented, or (ii) by reducing the overall fee award by a fixed percentage or amount based on the trial court's familiarity with the case, its complexity, and the counsel involved.

*Id*. at 294 (citing *Equal Employment Opportunity Comm'n v. Nutri/System, Inc.*, 685 F. Supp. 568, 576 (E.D. Va. 1988)).

46

supplemental fee applications." *Id* .at 775 (citing Pl. Pre-Trial Mem., at 19; Transcript from March 7-8, 2006, hearings at 88, 140-43, and 196-202).  None of the evidence offered at either the March 7-8, 2006, hearing or at the April 30, 2007, hearings contradicts that conclusion.  It also remains undisputed that "the Boleman Firm did not record its actual time spent in regard to the contested supplemental fee applications."  *Id*. at 776.  Instead, minimum time amounts for each task were included on the template used in creating the Supplemental Fee Applications and were determined to be the minimum amount of time that a given task can take, based upon analysis of past actual time records by the Boleman Firm.  In particular, a former member of the firm who worked as a stockbroker prior to becoming an attorney was instrumental in calculating the "minimums."  Previous testimony also indicated that members of the firm review the template on at least a semiannual basis and adjust the "minimums" based on their experience in handling bankruptcy matters.  *Id*. at 777-78.  No evidence, however, of any type of empirical study by the firm has been provided to the Court to demonstrate that the use of the minimum amounts of time is always appropriate for every attorney and paraprofessional working in every case.  *Id*. at 790-91.  Further, evidence offered by the United States Trustee during the March 7-8, 2006, hearing, in the form of testimony of two former employees of the Boleman Firm "alleged that some of the services and tasks could be done for less than said minimums in the contested supplemental fee applications." *Id*. at 779.

The Court previously explained at length the numerous difficulties arising from the lack of contemporaneous time records in this case.  *See id*. at 788-98.  The evidence presented on April 30, 2007, did not provide any clarification regarding the use of "minimums" by the Boleman Firm, but rather, focused on the uncontested fact that the services listed on the individual fee applications had

47

been performed.  While the firm asserts in its trial memorandum that the length of time that it takes attorneys in its firm to complete tasks has not been rebutted (*see* Boleman Trial Memorandum, at 13), such assertion is immaterial, given that the firm has the burden of proving that it earned the fees sought.  *In re Vernon-Williams*, 355 B.R. at 553.

Regarding the time expended by the Boleman Firm, the United States Trustee argues that time amounts listed for the first day that each of the clients visited the firm appear to be overstated, in light of testimony given at the March 7-8, 2006, hearing that the tasks listed could be performed in less time.  The United States Trustee also contends that Leffler's testimony at the April 30, 2007, hearings that multiplying the total time by the six-minute increment may result in an amount greater than the amount of time actually spent exemplifies the problems that result when tasks are itemized individually without accounting for any overlap between them.  The United States Trustee also asserts that the time amounts listed for the first day the clients visited appear to be identical on a majority of the applications.

The firm counters that the United States Trustee is attempting to relitigate the issue of the lack of contemporaneous time records, which it asserts was resolved by Judge Spencer.  According to the firm, sufficient evidence has been submitted to allow the Court to determine the reasonableness of the hours spent.  The firm concedes that the lack of contemporaneous time records for services performed at the beginning of the cases (which tasks totaled 3.1 hours in a majority of the cases at issue) provides sufficient cause for the Court to discount the fees sought for those tasks. Further, to the extent that entries for time spent making photocopies of documents were lumped with other tasks, a discount should be applied to those hours as well, in accord with Judge Payne's recent decision in *J.P. v. County School Board of Hanover*.

48

The Court recognizes the issue raised by the United States Trustee regarding the possible overstatement of time that could result from listing discrete tasks individually and without accounting for any overlap. However, because contemporaneous time was not kept, and the time amounts submitted were merely pre-determined "minimums," it is difficult to conclusively make such determination. The Court finds the issue raised regarding the seemingly identical entries for tasks performed on the first day that the clients in these cases visited the Boleman Firm to be similarly problematic. The problem is exacerbated by the testimony heard on March 7-8, 2006, that the tasks could be completed in less time. Given the instruction of the District Court in its appellate opinion and the uncontradicted fact that contemporaneous time records were not kept in these cases, the Court finds that these issues should be considered as part of the larger issue of the lack of adequate time records as factors in reducing any supplemental fees that are awarded.

### B. The Novelty and Difficulty of the Questions Raised

This Court previously stated that:

> Most of the tasks which the Boleman Firm cite to as supporting their entitlement to fees over and above the amounts heretofore received are not atypical of those occurring frequently in Chapter 13 cases, such as motions for relief from the automatic stay, objections to confirmation, objections to claims, or filing modified Chapter 13 plans. These tasks are hardly novel to a Chapter 13 debtor's attorney; their difficulty, however, is especially impossible to quantify without the accurate knowledge of how much time each task consumed.

*In re Vernon-Williams*, 343 B.R. at 797 n.33.

The firm asserts that the skills of an experienced bankruptcy practitioner were required for the proper performance of the services. While the firm's assertion is true, it is likewise accurate that the experience gained by the attorneys of the Boleman Firm over the years logically make the issues faced by their clients less novel and less difficult in nature to those attorneys when compared with

49

attorneys who have less experience or knowledge about bankruptcy-related issues.  As the lack of

time records impacts the analysis of this *Barber* factor, as previously expressed, the Court will also

take this conclusion into determining the appropriate fee reduction.

### C.  The Skill Required to Properly Perform the Legal Services Rendered

According to the firm, the clients it serves need attorneys with expert qualifications to

perform the services for which they are requesting compensation.  The Court agrees that qualified

attorneys inevitably aid their clients by performing necessary services during the course of

representation.  As this Court has stated previously, the firm "enjoys an excellent reputation for the

performance of its duties in representing debtors" and has a "well-deserved reputation for

competence." *Id*. at 810.

### D.  The Attorney's Opportunity Costs in Pressing the Instant Litigation

As this Court stated in its previous opinion, "[t]he evidence is unconvincing regarding any

sacrifice of opportunity costs in undertaking each of these eleven cases or that the cases are

undesirable within the legal community, in that the Boleman Firm has elected to limit its practice

to primarily the representation of debtors in Chapter 13 bankruptcy cases." *Id*. at 797 n.33; *see also*

*id*. at 772 (recounting testimony by G. Russell Boleman that the firm limits its practice to debtor

representation).  Because the firm concentrates its practice representing mainly one category of

clientele, it stands to reason that if the firm was not providing services in one client's case, they

would in all likelihood be serving another, similarly situated client.  The firm's assertion that it

incurred opportunity costs in preparing and submitting supplemental applications for compensation,

in that the firm cannot be compensated for such time, and that such provides a limited incentive to

provide additional services to clients, simply does not speak to the issue.  If the firm wishes to

50

receive supplemental compensation, the issue must be placed before the Court.  Thus, such effort

on the part of the Boleman Firm cannot be considered an opportunity cost, particularly given the

potential pecuniary benefit to the firm.

### E.  The Customary Fee for Like Work

This Court stated in its previous opinion that the hourly rate of $165.00 charged by the

Boleman Firm for attorney work in these cases was "quite reasonable."  *Id.* at 808 n.52.  The firm

utilized that hourly rate in nine of the eleven cases before the Court, but applied an hourly rate of

$175.00 for attorney work in the Markins and Childrey cases, according to its Closing Argument

brief, though the firm provides no explanation as to why a different rate was used in these cases

either in that brief or those respective fee applications.[27]  Further, the firm utilizes an hourly rate of

$65.00 for its paraprofessional workers.  The United States Trustee has voiced no objection to the

use of either the $65.00 per hour rate for paraprofessionals or the use of a blended per hour rate for

attorneys.

In reviewing the Supplemental Fee Applications, the Court observes, using the application

in the Vernon-Williams case by example, that of the sixteen attorneys listed, the hourly rate for six

of those attorneys is $155.00, or $10.00 less than the "blended" hourly rate.  The Court notes,

however, that only the "current hourly rates" for the attorneys are provided.  Information is provided

as to when each attorney's individual hourly rate last increased prior to the filing of the application,

and by comparing those dates with the date on which Ms. Vernon-Williams first visited the firm in

July 2004, the Court finds that five attorneys' hourly rates have increased since that time.  The firm

---

[27]  The petitions in ten of the eleven cases at issue were filed between February 2003 and
October 2003.  The Vernon-Williams petition was filed July 29, 2004.

does not endeavor to provide the Court with additional information as to what the applicable hourly rates were for those five attorneys at the time of Ms. Vernon-Williams's initial consultation with the firm or prior to their rate increases. As of the date the application was filed, the rate for four of the attorneys listed was $155.00 per hour, which logically means the rates for those attorneys (absent unusual circumstances) was less than $155.00 prior to the rate increase. Of the eleven attorneys whose rates did not increase, only two of those attorneys' rates are listed at $155.00 per hour. Thus, nine of the attorneys whose hourly rates have not increased were charging in excess of $165.00 per hour when Ms. Vernon-Williams retained the firm. Specifically, those rates ranged from $175.00 to $195.00 per hour. The firm notes in the Supplemental Fee Application that "a blended hourly rate of $165.00 per hour validly represents a reasonable rate that is actually lower than a rate based upon the individual rates of each attorney who provided services." In reviewing each of the Supplemental Fee Applications, the Court finds that practically identical representations were made in those applications as well.[28]

The Court previously declined to address the appropriateness of utilizing such a rate since it concluded that fees should be denied for lack of contemporaneous time records. *Id.* A "blended" rate is "'meant to account for the different billing rates of partners and associates by taking an average of the two.'" *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 98 (2d Cir. 2006) (quoting *Figueroa ex rel. Havre v. Savanar Rest., Inc.*, 182 F. Supp. 2d 339, 341 (S.D.N.Y. 2002)). A "blended" hourly rate has been used in determining fee awards in other courts within the Fourth Circuit. *See, e.g.*, *Burns v. Anderson*, Case No.

---

[28] Slight variations were noted between the applications, but none that impact the Court's analysis of this issue.

52

1:02CV1326 JCC, 2006 WL 2456372, at *6 n.15 (E.D. Va. Aug. 22, 2006) (slip copy) (examining counsel's methodology in arriving at a blended hourly rate, in which the total amount of fees sought was divided by the total number of hours expended, and finding that a blended hourly rate was appropriate for all attorney work performed).   It has also been used in determining fee awards in many courts outside this Circuit, so long as adequate documentation and evidence was submitted to the court to substantiate the fee sought and the hourly rate computation.  *See, e.g.*, *Carter v. Copy Train, Inc.*, Case No. 02 Civ. 7254(MHD), 2004 WL 690746, at *1 (S.D.N.Y. Mar. 30, 2004); *First Nat'l Bank of Chicago v. Comm. of Creditors Holding Unsecured Claims* (*In re Powerine Oil Co.*), 71 B.R. 767, 772 (B.A.P. 9th Cir. 1986); *In re Corporate Press, Inc.*, Case No. 03-32669-SAF-11, 2004 WL 2983816, at *2 (Bankr. N.D. Tex. Nov. 1, 2004); *In re Se. Banking Corp.*, 314 B.R. 250, 268-69 (Bankr. S.D. Fla. 2004); *In re Crowley*, 293 B.R. 628, 633 (Bankr. D. Vt. 2003); *In re Mayes*, 101 B.R. 494, 498 n.5 (Bankr. W.D. Mich. 1988).   Additionally, if a court is without sufficient evidence regarding the prevailing market rate regarding attorney fees, "the court may rely on its own knowledge of the market."  *Sec. Ins. Co. of Hartford v. Campbell Schneider & Assocs.*, 481 F. Supp. 2d 496, 503 (D.S.C. 2007) (quoting *Costar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000)).

In the instant matter, the Court heard testimony from Messrs. Hyman, Matson, and White in which they confirmed that an hourly rate of $165.00 for attorney work was quite reasonable for the Richmond, Virginia market.  *In re Vernon-Williams*, 343 B.R. at 772.  The Court extrapolates from that testimony that Messrs. Matson and White would reach the same conclusion regarding the use of an hourly rate of $175.00 for attorney work.  While the Boleman Firm did not disclose its methodology in arriving at its blended hourly rates of $165.00 and $175.00, the Court finds, based

53

upon its review of the hourly rates charged by the individual attorneys at the firm, the testimony

regarding the reasonableness of the rates, and the Court's own knowledge of the Richmond, Virginia

market, that the application of these rates in these cases is appropriate.

Finally, in the Supplemental Fee Application filed in the Vernon-Williams case, the firm

represents that the paraprofessional hourly rate of $65.00 "represents a rate that is lower than a rate

based upon the individual rates of each para-professional who provided services." In reviewing

these rates (which are represented to be current hourly rates and without any additional information

as to any rate changes), the Court notes that the hourly charges for the paraprofessionals listed range

from $65.00 to $95.00 per hour. The Court finds that the $65.00 per hour charge for

paraprofessional work is appropriate.

### F.  The Attorney's Expectations at the Outset of the Litigation

This Court previously opined that "[t]he expectation at the outset of these cases is to receive

the 'no-look' fee and perhaps some additional amounts if a supplemental fee application is approved

by the Court." *Id.* at 797 n.33. The firm confirmed this expectation in its trial memorandum and

in its closing argument brief, where, citing on Leffler's testimony, the firm stated that it relied on

the historical practice of Chief Judge Tice of reviewing supplemental fee applications for

compliance with the *Barber* factors. With regard to the Boleman Firm's expectations as to the

outcomes of the cases, the firm notes that it expects the cases it files on behalf of debtors to proceed

without difficulty and to achieve confirmation of the Chapter 13 plans. Such expectations as to the

progression of the cases are reasonable, especially in light of the experience and knowledge of the

members of the firm.

54

G.  The Time Limitations Imposed by the Client or Circumstances

The nature of the proceedings before this Court require prompt action and "[t]he time limitations imposed are typical of those in all Chapter 13 filings . . . ."  *Id.*  The firm cites that it is bound also by the time constraints and limitations contained in the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules.  The firm urges this Court to find that the time constraints it faces are similar in nature to those faced by counsel in the *J.P. v. County School Board of Hanover* case.  In that case, the plaintiffs' counsel undertook representation of the client mid-way through the administrative hearings (*see J.P. v. Country School Board of Hanover*, Case No. 3:06cv028, 2007 WL 840090, at *8 (E.D. Va. Mar. 15, 2007)), which is wholly dissimilar to the matters currently before the Court, and none of the evidence presented by the firm lends itself to such a finding.  The Boleman Firm did not undertake representation after the cases commenced, but rather, represented the debtors in these eleven cases from the very beginning of the cases.  To be sure, some clients faced circumstances that were more exigent in comparison to those of other clients, such as an imminent foreclosure or repossession, but all of the clients that came to the Boleman Firm were facing some type of financial hardship that was accompanied by at least a minimal level of time constraint as evidenced by the inquiring of the firm for its assistance in filing for bankruptcy protection.

H. The Amount in Controversy and the Results Obtained

"The results obtained in these cases appear to be satisfactory, as Chapter 13 plans were confirmed and continue to pay-out. . . ."  *In re Vernon-Williams*, 343 B.R. at 797 n.33.  Testimony by Leffler at the April 30, 2007, hearings convinces the Court that the Boleman Firm's goal is to help their clients reorganize their debts and achieve a discharge.  According to the firm, seventy

percent of its debtor-clients have received their discharge.  Of the eleven cases currently before the

Court, a Chapter 13 discharge has been entered in two cases, and debtors in six cases continue to

make payments to the Chapter 13 Trustee under their Chapter 13 plans.  Three cases have been

dismissed.  Thus, the Court find the results achieved thus far in these cases to be acceptable.

### I.  The Experience, Reputation and Ability of the Attorney

"[T]he Boleman Firm is experienced and enjoys a good reputation in its representation of

Chapter 13 debtors."  *Id.*  Testimony by Messrs Hyman, Matson, and White at the March 7-8, 2006,

hearing confirm this statement.  The Court finds that the Boleman Firm possesses experience and

ability that is at least equal to that of counsel representing other debtors in the Richmond area.

### J.  The Undesirability of the Case Within the Legal Community in Which the Suit Arose

As the Court reminded above when discussing the opportunity costs to the firm in

representing the clients in these eleven cases, the Court previously expressed that it was

unconvinced regarding the undesirability of the cases at issue within the legal community.  *Id.*  The

Boleman Firm urges that the difficulty in obtaining payments for services rendered and the

imposition of the substantial fee cuts makes these cases undesirable.  The Court certainly appreciates

the firm's concern about obtaining compensation for the work performed for the debtors it

represents.  However, given the firm's calculation that seventy percent of the debtors it represents

receive their discharge, it stands to reason that in at least that percentage of cases, the firm receives

full payment of at least the $1,500.00 "no-look" fee,[29] notwithstanding any supplemental

compensation which may be approved.  Further, even in the thirty percent of cases where the debtors

---

[29]  The "no-look" fee of $1,500.00 was in effect at all times relevant to the eleven cases at
issue here.

do not receive a discharge, it seems likely that the debtors in those cases have made at least a portion, though perhaps only a few, payments towards their Chapter 13 plans in those cases, which funds would have been first used to satisfy administrative expenses of the estate, including attorney fees, in these pre-BAPCPA cases. *See* 11 U.S.C. § 507(a)(1) (2004).[30] Therefore, the Court remains of the opinion that the cases before it are not undesirable in the legal community.

K.  The Nature and Length of the Professional Relationship Between Attorney and Client

"[T]he relationship of the Boleman Firm with its debtor-client is simply transactional in length, lasting for the duration of the bankruptcy itself." *In re Vernon-Williams*, 343 B.R. at 797 n.33.  The firm echoes this sentiment in its trial memorandum.  The Court finds that this factor is neutral in application to the cases at issue.

L.  Attorneys' Fees Awards in Similar Cases

According to the Boleman Firm, the fees sought in these cases are consistent with or below those sought by other bankruptcy practitioners.  The firm contends that the Richmond Division of the Bankruptcy Court has historically approved supplemental fee applications filed by the Boleman Firm.

It is difficult for the Court to analyze this factor in light of the issues surrounding the failure of the firm to contemporaneously record the time spent performing each task, as expressed above, even though the rates utilized by the firm in calculating the fees its seeks are reasonable.  Thus, the Court finds that this circumstance should be considered as part of the larger issue of the lack of adequate time records as a factor in reducing any supplemental fees that are awarded.

---

[30]  Because the cases at issue were filed prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the version of the Bankruptcy Code in effect in 2004 would apply to the priority of payments from the bankruptcy estate.

M.  The Exercise of Billing Judgment

With the analysis of the *Barber* factors complete, the Court now turns to the issue of "billing judgment."  This Court previously discussed the consistent requirement of attorneys to exercise "billing judgment" when an award of fees is sought.  "'[B]illing judgment is the voluntary reduction of a fee by counsel to a private client for services [that] either conferred a negligible benefit or were excessive.'"  *Id.* at 807 (quoting *In re Maxine's Inc.*, 304 B.R. 245, 249 (Bankr. D. Md. 2003) (citing in turn *In re Leonard Jed Co.*, ("*Jed I*"),103 B.R. 706, 713 (Bankr. D. Md. 1989)); also citing *In re Great Sweats, Inc.*, 113 B.R. 210, 242-44 (Bankr. E.D. Va. 1990)).  A fee application must indicate the exercise of "billing judgment" by disclosing the number of hours "written off" of the requested fee.  *In re Maxine's Inc.*, 304 B.R. at 249.

The Court previously opined as to the difficulty in examining or quantifying the amount of fees discounted or waived by the Boleman Firm, as well as the contention of the firm regarding its practice of not billing for certain services, and Leffler's testimony from March 2006 that the firm engages in billing judgment by "'waiving fees'" for certain tasks.  *In re Vernon-Williams*, 343 B.R. at 807 (citing Transcript from March 7-8, 2006, hearings at 94).  In particular, the Court commented as to the testimony of Leffler and Laura Alridge that the firm used a Control Sheet to show whether a voluntary discount would be taken or billing judgment exercised in a given case.  The Court noted that Alridge's testimony in particular suggested that the determination as to whether supplemental compensation would be sought in a certain case depended upon the availability of excess funding in that case.  *Id.* at 808 n.51.  The Court further remarked that, despite this testimony, such Control Sheets for the eleven cases at issue were neither provided to the Court nor provided to the United States Trustee during the course of discovery.  *Id.* at 808 n.53.  Even without such exhibits, the Court

58

noted the likelihood that the firm engages in practices that are beneficial to the clients but are not recorded for billing purposes. *Id*. at 808. However, the Court was unable, from the testimony given and charts submitted with the Boleman Firm's pre-trial memorandum prior to the March 7-8, 2006, hearings, to discern how the "waived" or "discounted" amounts were calculated. *Id*. The Court was also not provided with any explanation was to why certain dollar amounts did not total correctly, *i.e.*, why the "total fees and costs above the initial sum allowed by the Court," less the alleged "fees and costs waived" did not total the "fee requested." *See id.* at 808-09.

The exhibits submitted at this stage of the proceedings provide no additional assistance to the Court in determining how the "discount" amount was computed or how the firm determined how the discount would be apportioned between fees and costs as set forth on Exhibits 20-R through 30-R. Similar to the previous hearing, no testimony during the instant hearings explained the "discount" amounts. In the trial memorandum submitted prior to the hearings on April 30, 2007, the firm states that its voluntary reductions, which range from 8.5% to 32.2%, "demonstrates its commitment to promoting the success of the debtor in that the reduction of fees and costs allows the plan to continue without the potential for disruption or extension by the Chapter 13 trustee" and that by charging $165.00 to $175.00 per hour, the firm "is implicitly discounting its compensation." From these statements, the only definite conclusion that the Court can draw is that the firm did not apply the same voluntary discount to all of the cases at issue but was not provided with any information as to how these percentages were determined or calculated.

The firm also asserts that its intentional omission from the fee applications of certain tasks serves as additional evidence of a voluntary downward adjustment of the firm's fees and favors awarding the supplemental fees sought. A chart provided in the trial memorandum serves as the first

59

mention of the specific services that were provided but not listed in the Supplemental Fee Applications in nine of the eleven cases at issue. The Court is perplexed as to how, prior to the submission of the trial memorandum (which was filed electronically with the Court after the close of business on the last business day prior to the April 30, 2007, hearings), it was to factor the omission of any services into its analysis without copiously examining each of the case files; even then, some of the services that were omitted may not have been apparent. Further, the chart contained in the memorandum does not delineate whether the services were omitted as an exercise of billing judgment, or rather, because the services were provided after the filing of the fee applications.

In any event, Leffler did provide some additional testimony regarding the services that were not included on the Supplemental Fee Applications. His testimony corresponded with the chart in the trial memorandum with the exception that two services omitted from the fee application filed in Doelling case and one service omitted from the Childrey fee application were not mentioned by Leffler. According to Leffler, all of the omitted services performed in the Pyles, Wood, Jarrell, and Berryman cases were performed after filing the supplemental fee applications in those cases. The omitted services listed for the Markins case were performed prior to the filing of the fee application. Services omitted from the Barakhyahu and Ranicki fee applications were performed both prior to and after the filing of the fee applications in those cases.

The Court finds that little weight should be placed on any of the purported voluntary reductions with regard to the Pyles, Wood, Jarrell, and Berryman cases since the omitted services were all performed after the filing of the Supplemental Fee Applications. While some weight could be given to the omission of certain services in the Markins, Barakhyahu, and Ranicki cases, since

60

those services were provided prior to the submission of the applications, the Court overall finds it is difficult to place much weight on the supposed voluntary discount that may result from the omission of certain tasks from the fee applications, given the difficulty in sorting out whether these omitted services were performed before or after the filing of the supplemental fee applications. The Court is also disturbed that the Boleman Firm possibly attempted to skew the evidence as to the voluntary reductions in fees by labeling services performed after the filing of the supplemental applications as "omitted." Thus, even though the Boleman Firm argues that it has adjusted fees downward, it remains difficult for this Court to determine whether an appropriate amount of discount was taken without being privy to the discount determination process and whether the motivation for reducing the fees was genuine.

### N.  Point in Time that Services were Performed

This Court stated in its previous opinion that "[i]t is axiomatic that in order to approve an award of supplemental compensation in a Chapter 13 case, the Court must not only be persuaded of the entitlement to the additional compensation sought, but that the original fees awarded without the benefit of a formal fee application were fully earned." *In re Vernon-Williams*, 343 B.R. at 810. On this point, both parties appear to agree.

The parties disagree as to whether the point in time services are performed should dictate whether a service may be classified as "supplemental" and as to whether the firm has proven that it earned the $1,500.00 "no-look" fee in each of the cases before the Court. While the United States Trustee does not object to an award of compensation for certain services the firm has deemed to be "supplemental," so long as the firm proves that it earned the "no-look" fee, he does object to the classification of services performed in the early stages of the case as "supplemental," contending

61

that those services should be included in the "no-look" fee. He argues that "supplemental" services should not occur simultaneously with the filing of a case. This argument is made specifically with regard to the firm contacting creditors who had collection actions (such as warrants in debt or imminent repossessions or foreclosures) in progress at the time of the filing of the case to inform them of the bankruptcy filing, which occurred in the Vernon-Williams, Lipscomb, Childrey, Barakhyahu, Wood, and Jarrell cases. This argument is also employed by the United States Trustee regarding a motion for relief from the automatic stay that was settled shortly after the Section 341 Meeting of Creditors in the Doelling case; efforts by the firm to secure the release of a post-petition garnishment in the Pyles case; and amending the Chapter 13 plan in the Barakhyahu case when the debtor secured new employment soon after the Section 341 Meeting of Creditors. The United States Trustee also points to the firm's own separation of the tasks listed on the fee applications into categories of "initial" and "supplemental." Further, the United States Trustee relies on the Requirements for Supplemental Fee Applications in Chapter 13 Cases, issued by the Richmond Division of this Court, which states that unless unusual circumstances are presented, the "no-look" fee should encompass routine services in asserting that the firm has not proven it has earned the "no-look" fees in these cases.

The Boleman Firm argues that no provision in either the Bankruptcy Code or the Bankruptcy Rules distinguishes "initial" from "supplemental" services and that this nomenclature has developed in the Eastern District of Virginia along with the term "flat fee." Instead, the firm, relying on Chief Judge Tice's decision in the *In re Harris* case and the decision by the Bankruptcy Court for the District of Colorado in *In re McNally*, asserts that the question that the Court must answer is not whether the flat fee has been earned, but whether the value of all of the services performed for the

client equals at least the total fee accrued.  The firm argues that it has proven that it earned the "no-look" fee of $1,500.00 in each case by virtue of the fact that the firm provided "core" services to those debtors and that those services, while requiring substantial time on the part of the firm, "have a value in and of themselves," citing such services as attending the Section 341 Meeting of Creditors and filing the requisite documents for the debtors.  The firm also relies on the United States Trustee's acknowledgment that certain services are eligible for compensation.  The firm additionally contends that, given the results achieved for the debtors, limiting the firm to compensation of only $1,500.00 is not reasonable.

Chief Judge Tice previously concluded that the "no-look" fee should "cover interviews with the client, contacting creditors when necessary and verifying other information for the statements and schedules, preparation of petition, schedules and a confirmable plan, attendance at the § 341 meeting of creditors, and, finally, attendance to other routine matters encountered in the case."  *In re Harris*, Case No. 96-36765-T, 1998 WL 408896, at *1 (Bankr. E.D. Va. 1998); *see also In re Roman*, Case No. 05-31472-DOT, 2005 WL 3736305, at *1 (Bankr. E.D. Va. June 27, 2005) (unreported) (similar finding).  In addition, Chief Judge Tice has found "routine" services to include "those related to state court civil actions . . . ."  *See In re Roman*, 2005 WL 3736305, at *2.

Based upon these findings, the Court concludes that steps taken at the beginning of a case to notify creditors of the filing of a case should be included as part of the "no-look" fee, absent compelling circumstances.  As explained above, it is not beyond reason that the clients served by the Boleman Firm were all facing financial hardship that included imminent action by one or more creditors.  As a result, the act of contacting creditors to inform them of the filing of a bankruptcy petition should not be viewed as a task that is anything other than routine and part of the duty owed

63

to the client.  Further, without taking such action, the firm unnecessarily invites the possibility of

having to pursue an action against these creditors for possible violations of the automatic stay under

Section 362 of the Bankruptcy Code.  Instead, this Court finds that such tasks clearly fall within the

category of "contacting creditors when necessary" that Chief Judge Tice previously discussed.

Further, the Boleman Firm has not provided the Court with sufficient evidence to demonstrate that

such activities in any of the eleven cases at issue were anything other than "routine."  *See In re

Roman*, 2005 WL 3736305, at *1 ("[I]t is important that counsel's supplemental fee request why any

charge is not routine.").

    The Court declines to make a ruling regarding the other services that the United States

Trustee complains were performed in the beginning stages of the cases and thus should be included

in the "no-look" fee.  In the instant cases, difficulties again arise with regard to the lack of

contemporaneous time records, and without such records, the Court cannot determine whether those

tasks should be subsumed into the "no-look" fee.  This is not to say, however, that the timing of the

performance of activities is the only consideration.  While the temporal nature of the task is certainly

to be considered, it is but one factor, and the Court must consider tasks within the context of the case

as a whole.  There are undoubtedly scenarios where tasks performed at the inception of a case may

be warrant supplemental compensation.  Those tasks are more properly addressed by the Court on

a case by case basis.

O.  Should Certain Services be Classified as "Clerical" or "Overhead"?

    The United States Trustee argues that certain services provided by the firm are more properly

classified as clerical tasks and that the firm should not be reimbursed for such tasks.  These services

include making copies; general filing; maintaining files; communicating with clients regarding

appointment times; and routine tasks that are not legal in nature.  The Boleman Firm argues that

requirements within the Bankruptcy Code and applicable rules necessitate the completion of certain

tasks, such as making and serving copies of documents on the pertinent parties.  The firm points to

language from the *McNally* decision where the Court found such charges to be *de minimus* in light

of the fee application as a whole and when taking the twelve applicable factors into consideration.

Like the other considerations discussed above, an inherent difficulty arises in trying to

resolve this question because of the lack of contemporaneous time records.  Even if the Court were

to determine that services cited by the United States Trustee should not be considered to be clerical

in nature and should not be subsumed into the general overhead costs associated with operating a

law firm, the Court still is left without a reliable record of the length of time it took to perform those

tasks.  The Court in *In re McNally*, Case No. 06-10073-HRT, 2006 WL 2348687 (Bankr. D. Colo.

Aug. 10, 2006), had detailed time records to utilize in its analysis.  *Id*. at *4.  The Court here has no

such records and thus cannot reach the conclusion that the *McNally* court made, that is, that the so-

called clerical tasks consumed only *de minimus* time in comparison with the rest of the time spent

in the case.  *See id*. at *12, 14-15.

Difficulty also arises were the Court to conclude in accord with the United States Trustee's

position.  Many of the tasks he cites as "clerical" are grouped together with other tasks which may

be compensable.  For example, Line 192 of the document attached to the Supplemental Fee

Application in the Vernon-Williams case contains several tasks: "Prepare photocopies of plan,

review for accurate collation, organize and log on USBC filing manifest."  Similar entries are found

not only in the document attached to the Vernon-Williams Supplemental Fee Application, but in the

fee applications in the other cases as well.  Supposing that the Court found that the preparation of

photocopies of the plan was a clerical task for which the Boleman Firm could not seek compensation, this Court would then be challenged with the task of separating out the time for making photocopies from the remaining tasks, an inherently difficult task to perform when the time that is listed is admittedly not accurate. That is not to say, however, that if the Court were provided with accurate time records, it would find such a task compensable. In this instance, however, no determination can be made on this issue given the evidence before the Court.

### P. Fee Award

Upon consideration of the Supplemental Applications for Compensation pursuant to the *Barber* factors and the additional issues discussed above, the Court concludes that the supplemental fees sought should be awarded but that the fees should be reduced by a fixed percentage. The lack of contemporaneous time records and use of time "minimums" gives rise to various problems, including the possible overstatement of time set forth for discrete tasks; identical entries for tasks performed at the beginning of representation of the debtors in virtually all of the cases; difficulty in discerning both the novelty and difficulty of the questions addressed by the Boleman Firm on behalf of the clients; and how the fees sought compare with fee awards in similar cases. "[I]t is well-settled that uncertainties arising because of inadequate records must be resolved against the applicant." *In re Gen. Oil Distrib., Inc.*, 51 B.R. 794, 801 (Bankr. E.D.N.Y. 1985) (citing *New York Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1142 (2d Cir. 1983)). The Court concludes that to remove certain task entries from the totals would not only be an arduous task to perform but would still necessitate a reduction of fees by a percentage to account for the lack of contemporaneous time records. *See id.* at 801 (citing *Carey*, 711 F.2d at 1142) (recognizing that "'it is unrealistic to expect a trial judge to evaluate and rule on every entry in a[] [fee] application'").

66

While the Court is mindful of the firm's assertion that it has apparently voluntarily reduced the fees sought in each case, the firm's failure to explain such reduction leaves this Court without a basis to factor that reduction into its own calculation of what percentage reduction constitutes an appropriate sanction for the myriad problems associated with the records submitted by the firm. As stated *ad nauseam* througout this Opinion, the lack of contemporaneous time records places the Court in the difficult position of determining the appropriate discounting factor to be applied to the fees sought by the Boleman Firm. Further, the hybrid of the *Barber* factor/lodestar fee award analysis employed in the Fourth Circuit does not easily lend itself to a quantifiable end figure to be used in fee awards. Thus, the Court is left in a position which requires it to fairly compensate the Boleman Firm for the supplemental services rendered, while appropriately discounting the fees sought to account for both the inherently flawed methodology in the Boleman Firm's record keeping and those *Barber* factors which suggest to the court that the firm's fees ought to be reduced. Therefore, the Court finds that an award of two-thirds of the supplemental fees sought, along with the $1,500.00 in fees already received in each of these cases, is appropriate and fairly compensates the Boleman Firm for the work performed in each case. The firm, within Exhibits 20R through 30R submitted in connection with the April 30, 2007, hearings, sets forth the portion of the total amount sought in the Supplemental Fee Applications that was attributable to fees (as opposed to costs). The Court will utilize the apportioned amount in determining the supplemental fee award for each case.

The Court notes that an award of two-thirds of the fees sought still results in the Boleman Law Firm receiving the vast majority of the total fees claimed in these cases.[31] As set forth in the

---

[31] As indicated in the chart below, the total fees claimed by the Boleman Firm is the sum of the "no-look" fee of $1,500.00 paid in each of these cases and the supplemental fees sought by the Boleman Firm, as set forth in Exhibits 20R through 30R.

67

chart below, the firm is still receiving not less than 80% of the total fees sought in each of these cases.

The following table summarizes the amounts relevant to the Court's calculations and its determination of fees.

| Debtor(s) | Fees Paid Through Plan | Supplemental Fees Sought | Total Fees Sought | Supplemental Fees Awarded | Total Fees Awarded | Percentage of Total Fees Awarded |
|---|---|---|---|---|---|---|
| **Vernon-Williams** | $1,500.00 | $704.00 | $2,204.00 | $469.36 | $1,969.36 | 89.35% |
| **Doelling** | $1,500.00 | $1,120.00 | $2,620.00 | $746.70 | $2,246.70 | 85.75% |
| **Pyles** | $1,500.00 | $500.00 | $2,000.00 | $333.35 | $1,833.35 | 91.67% |
| **Markins** | $1,500.00 | $532.00 | $2,032.00 | $354.68 | $1,854.68 | 91.27% |
| **Lipscomb** | $1,500.00 | $700.00 | $2,200.00 | $466.69 | $1,966.69 | 89.40% |
| **Childrey** | $1,500.00 | $2,000.00 | $3,500.00 | $1,333.40 | $2,833.40 | 80.95% |
| **Barakhyahu** | $1,500.00 | $561.00 | $2,061.00 | $374.02 | $1,874.02 | 90.93% |
| **Wood** | $1,500.00 | $667.50 | $2,167.50 | $445.02 | $1,945.02 | 89.74% |
| **Jarrell** | $1,500.00 | $1,188.00 | $2,688.00 | $792.04 | $2,292.04 | 85.27% |
| **Ranicki** | $1,500.00 | $1,767.00 | $3,267.00 | $1,178.06 | $2,678.06 | 81.97% |
| **Berryman** | $1,500.00 | $562.50 | $2,062.50 | $375.02 | $1,875.02 | 90.91% |

[REMAINDER OF PAGE INTENTIONALLY BLANK]

A separate order will issue.

The Clerk shall deliver copies of this Memorandum Opinion to C. Thomas Ebel, L. Lee Byrd, Jeffrey H. Geiger, and William A. Gray, Counsel for the Boleman Law Firm, P.C.; Robert B. Van Arsdale, Assistant United States Trustee; the above-captioned eleven Debtors; all Debtors who have requested notice and are listed in attached Exhibit B; and Robert Hyman, Chapter 13 Trustee.

**Entered this 21st day of September, 2007.**

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

## Exhibit B
### Debtors' Requests for Notice Filed in Case 04-37223, Vernon-Williams

| | |
|---|---|
| 1)Martha Lee Allen | 04-34543 |
| 2)Abraham Barakhyahu | 03-37623 |
| 3)Linda D. Bell | 04-37683 |
| 4)Angelia Braxton | 02-67376 |
| 5)Crezone T. Burton | 01-32300 |
| 6)Rebecca S. Cox | 04-38066 |
| 7)George A. Ford | 03-36598 |
| 8) Mark Fuller | 04-31276 |
| 9)Kimberly Garnes | 04-39777 |
| 10)Alma Campbell Gates | 04-35414 |
| 11) Hilary L. Graf | 04-33142 |
| 12)Susan S. Gray-Hurst | 04-36261 |
| 13)Jennifer Griffith | 02-64916 |
| 14)Shirley D. Harrison | 04-38072 |
| 15)Tracy & Wayne Harrison | 04-35223 |
| 16)David & Sarah Hill | 03-33220 |
| 17)Wayne L. Johnson | 04-38676 |
| 18)Gerald D. LaPierre | 04-34551 |
| 19)Cheryl A. McGuire | 04-32975 |
| 20)Bruce & Holly Paige | 04-30146 |
| 21)Marlene Pelham | 03-31603 |
| 22)Bascom & Helen Perkins | 04-33467 |
| 23)Dawn S. Randall | 03-40947 |
| 24)Lance Singleton | 04-38350 |
| 25)Stanley Taylor | 04-37360 |
| 26)Kenneth Wilkerson | 04-37133 |
| 27)Vernon & Debra Womack | 04-30481 |